EXHIBIT F

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

JENS ERIK SORENSEN, as TRUSTEE
OF SORENSEN RESEARCH AND
DEVELOPMENT TRUST,

        Plaintiff,

- vs -                                No. 08-CV-00095 JW

LEXAR MEDIA, INC., a Delaware
corporation; and DOES 1 - 100,

        Defendants.

_____

AND ALL RELATED COUNTERCLAIMS.

_____

VIDEO DEPOSITION OF STEPHEN PAUL PETRIE, Ph.D.

June 4, 2008

Reported by: LYNN PENFIELD, CSR No. 8589, RPR

```
 1                          I N D E X

 2

 3    THE WITNESS:                    EXAMINATION

 4    STEPHEN PAUL PETRIE, PH.D.

 5    BY MR. KUDLAC:                           9

 6                     E X H I B I T S

 7

 8    DEPOSITION EXHIBIT:                     PAGE

 9    1   An 18-page copy of the Summary        10

10        of the Activities and

11        Qualifications of Dr. Stephen

12        Paul Petrie, Professor

13    2   A 56-page copy of the                 28

14        Declaration of Dr. Stephen P.

15        Petrie in Support of Turn-Key's

16        Opposition to Plaintiffs'

17        Motion for Summary Judgment of

18        Non-Infringement or Invalidity

19        in the Koito Manufacturing Co.

20        versus Turn-Key-Tech case

21

22

23

24

25
```

| | | | |
|---|---|---|---|
| 1 | 3 | A 10-page copy of the | 30 |
| 2 | | Declaration of Dr. Stephen P. | |
| 3 | | Petrie in Support of Turn-Key's | |
| 4 | | Motion for Summary Judgment of | |
| 5 | | Infringement in the Federal | |
| 6 | | Mogul Corp. versus | |
| 7 | | Turn-Key-Tech case | |
| 8 | 4 | A 14-page copy of the | 31 |
| 9 | | Declaration of Dr. Stephen P. | |
| 10 | | Petrie in Support of Turn-Key's | |
| 11 | | Motion for Summary Judgment on | |
| 12 | | Liability for Infringement in | |
| 13 | | the Turn-Key-Tech versus | |
| 14 | | Daimler Chrysler Corporation | |
| 15 | | case | |
| 16 | 5 | A 31-page copy of the | 63 |
| 17 | | Declaration of Stephen Petrie, | |
| 18 | | Ph.D. in Support of Plaintiff's | |
| 19 | | Amended Motion for Application | |
| 20 | | of 35 U.S.C. section 295 | |
| 21 | | Presumption of Infringement | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

| 1 | 6 | A 12-page copy of United States | 66 |
| 2 | | Patent 4,935,184, Sorensen, | |
| 3 | | Stabilized Injection Molding | |
| 4 | | When Using a Common Mold Part | |
| 5 | | with Separate Complimentary | |
| 6 | | Mold Parts, FW002 through 13 | |
| 7 | 7 | A 1-page copy of a D-5493 | 102 |
| 8 | | drawing of a Lexar Media | |
| 9 | | JumpDrive, 128MB | |
| 10 | 8 | A 1-page copy of a D-sized | 103 |
| 11 | | drawing of D-5493, a Lexar | |
| 12 | | Media JumpDrive 128MB | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

```
 1                            APPEARANCES

 2

 3    FOR THE PLAINTIFF:

 4                   LAW OFFICES OF J. MICHAEL KALER

 5                   BY:   J. MICHAEL KALER, ESQ.

 6                   9930 Mesa Rim Road, Suite 200

 7                   San Diego, California   92121

 8                   (858) 362-3151

 9                   michael@kalerlaw.com

10    FOR THE DEFENDANTS:

11                   WEIL, GOTSHAL & MANGES LLP

12                   BY:   KEVIN KUDLAC, P.C., ESQ.

13                   8911 Capital of Texas Highway

14                   Building One, Suite 1350

15                   Austin, Texas   78759

16                   (512) 349-1885; FAX (512) 527-0798

17                   kevin.kudlac@weil.com

18    VIDEO RECORDING SERVICES PROVIDED BY:

19                   JORDAN MEDIA GROUP, INC.

20                   BY:   ALAN PEAK

21                   1228 Madison Avenue

22                   San Diego, California   92116

23                   (619) 299-5040

24    ALSO PRESENT:

25                   JENS ERIK SORENSEN
```

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

```
 1          VIDEO DEPOSITION OF STEPHEN PAUL PETRIE, Ph.D.

 2    taken by Defendants at 9930 Mesa Rim Road, Suite 200,

 3    San Diego, California  92121, commencing on Wednesday,

 4    June 4, 2008, at 9:33 a.m. before Lynn Penfield,

 5    Certified Shorthand Reporter, Registered Professional

 6    Reporter.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 09:35:43 | 1 | San Diego, California    June 4th, 2008  9:35 a.m. |
| 09:35:55 | 2 | THE VIDEO OPERATOR:  This is the deposition of |
| 09:35:57 | 3 | Stephen Petrie being taken on behalf of defendants in |
| 09:36:01 | 4 | the matter Jens Erik Sorensen, et al., versus Lexar |
| 09:36:07 | 5 | Media, Inc., et al., in the U.S. District Court of the |
| 09:36:11 | 6 | Northern District of California, case No. 08-CV-00095. |
| 09:36:17 | 7 | This deposition is being held in the offices of |
| 09:36:21 | 8 | J. Michael Kaler at 9930 Mesa Rim Road in San Diego, |
| 09:36:27 | 9 | California on June 4, 2008, at 9:36 a.m. |
| 09:36:33 | 10 | My name is Alan Peak with the firm Jordan |
| 09:36:35 | 11 | Media, Inc., 1228 Madison Avenue in San Diego, |
| 09:36:39 | 12 | California, and I'm the legal video specialist.  The |
| 09:36:42 | 13 | certified shorthand reporter is Lynn Penfield with |
| 09:36:46 | 14 | Kramm & Associates, Inc., 2224 Third Avenue in San |
| 09:36:47 | 15 | Diego. |
| 09:36:48 | 16 | Will counsel please state their appearances for |
| 09:36:50 | 17 | the record. |
| 09:36:51 | 18 | MR. KALER:  I'm Michael Kaler.  I represent the |
| 09:36:55 | 19 | Sorensen Research and Development Trust and Jens Erik |
| 09:37:00 | 20 | Sorensen, the plaintiffs in the present instance. |
| 09:37:02 | 21 | MR. KUDLAC:  Kevin Kudlac from Weil, Gotshal & |
| 09:37:03 | 22 | Manges here on behalf of Lexar Media, Inc. |
| 09:37:08 | 23 | THE VIDEO OPERATOR:  And the witness may now be |
| 09:37:08 | 24 | sworn. |
| 09:37:09 | 25 | (The witness was duly sworn.) |

| | | |
|---|---|---|
| 09:37:21 | 1 | THE WITNESS:  I do, so help me God. |
| 09:37:23 | 2 | MR. KALER:  Okay.  Before we actually start |
| 09:37:24 | 3 | with questioning, there is the issue of videography. |
| 09:37:27 | 4 | The Federal Rules of Civil Procedure require that |
| 09:37:30 | 5 | recording by videography or any other particular |
| 09:37:33 | 6 | recording mechanism be included in prior notice.  There |
| 09:37:36 | 7 | was nothing in our communications to indicate that the |
| 09:37:41 | 8 | deposing party intended to videotape this deposition. |
| 09:37:46 | 9 | Not wanting to repeat the deposition, I've |
| 09:37:49 | 10 | discussed with opposing counsel and it's my |
| 09:37:53 | 11 | understanding that we can stipulate to allow the |
| 09:37:56 | 12 | videotaping to go forward, but that the video recording |
| 09:38:02 | 13 | of the deposition will be treated as sealed and not |
| 09:38:07 | 14 | distributed or made available to anyone other than the |
| 09:38:09 | 15 | parties in this case until at some time in the future |
| 09:38:13 | 16 | when a Court rules on whether the videotape shall be |
| 09:38:18 | 17 | allowed as evidence in this matter. |
| 09:38:23 | 18 | Is that so stipulated? |
| 09:38:25 | 19 | MR. KUDLAC:  That's fine. |
| 09:38:26 | 20 | MR. KALER:  Okay. |
| 09:38:26 | 21 | |
| 09:38:26 | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

| | | |
|---|---|---|
| 09:38:26 | 1 | STEPHEN PAUL PETRIE, Ph.D., |
| 09:38:26 | 2 | having been first duly sworn, testified as follows: |
| 09:38:26 | 3 | |
| 09:38:26 | 4 | EXAMINATION |
| 09:38:28 | 5 | BY MR. KUDLAC: |
| 09:38:28 | 6 | Q.    Good morning, sir. |
| 09:38:29 | 7 | A.    Good morning. |
| 09:38:30 | 8 | Q.    My name is Kevin Kudlac, and I represent Lexar |
| 09:38:33 | 9 | Media in this case. |
| 09:38:35 | 10 | Would you tell us your full name. |
| 09:38:37 | 11 | A.    Stephen Paul Petrie. |
| 09:38:39 | 12 | Q.    Where are you from? |
| 09:38:41 | 13 | A.    Ipswich, Massachusetts. |
| 09:38:43 | 14 | Q.    Would you tell us a little bit about your |
| 09:38:45 | 15 | education. |
| 09:38:48 | 16 | A.    I graduated from high school in 1962, from |
| 09:38:56 | 17 | Lowell High School in Lowell, Massachusetts.  I got a |
| 09:39:01 | 18 | Bachelor of Science degree in textile chemistry in 1967 |
| 09:39:06 | 19 | from Lowell Technological Institute.  I received a |
| 09:39:10 | 20 | Master of Science in textile chemistry from Lowell |
| 09:39:13 | 21 | Technological Institute in 1968; and I obtained a Ph.D. |
| 09:39:20 | 22 | in polymer science: -- excuse me -- Materials Science: |
| 09:39:28 | 23 | Polymer science in 1977 from the University of |
| 09:39:31 | 24 | Connecticut in Storrs, Connecticut. |
| 09:39:35 | 25 | Q.    Did the Lowell Institute of Technology go on to |

| | | |
|---|---|---|
| 09:39:39 | 1 | become the University of Massachusetts at Lowell? |
| 09:39:41 | 2 | A. I believe the title is "University of |
| 09:39:44 | 3 | Massachusetts Lowell." |
| 09:39:47 | 4 | Q. Sorry. I added the "at," didn't I? |
| 09:39:51 | 5 | Did -- is it -- so that Institute of Technology |
| 09:39:53 | 6 | where you got your degrees later became UMass Lowell, if |
| 09:39:58 | 7 | you will? |
| 09:39:59 | 8 | A. Yes. |
| 09:39:59 | 9 | Q. That was sort of the progression then? |
| 09:40:02 | 10 | A. Not exactly. |
| 09:40:04 | 11 | Q. Was there something in between? |
| 09:40:06 | 12 | A. Yes. |
| 09:40:06 | 13 | Q. What was that? |
| 09:40:08 | 14 | A. University of Lowell. |
| 09:40:09 | 15 | Q. I see. |
| 09:40:14 | 16 | MR. KUDLAC: I'm going to ask the court |
| 09:40:15 | 17 | reporter to mark as Defendant's Exhibit 1, or however |
| 09:40:26 | 18 | she's got them marked. |
| 09:40:28 | 19 | (Exhibit 1 was marked for identification.) |
| 09:40:31 | 20 | BY MR. KUDLAC: |
| 09:40:32 | 21 | Q. Marked as Exhibit 1, a document entitled |
| 09:40:35 | 22 | "Summary of the Activities and Qualifications of |
| 09:40:38 | 23 | Dr. Stephen Paul Petrie, Professor." |
| 09:40:42 | 24 | Do you recognize Exhibit 1? |
| 09:40:44 | 25 | A. Yes. |

| | | | |
|---|---|---|---|
| 09:40:45 | 1 | Q. | And is that your CV or curriculum vitae? |
| 09:40:50 | 2 | A. | Yes, sir. |
| 09:40:50 | 3 | Q. | Is that your most current curriculum vitae? |
| 09:40:54 | 4 | A. | No, sir. |
| 09:40:56 | 5 | Q. | When did you -- when did you prepare a more |

09:41:00    6    recent version?

09:41:01    7        A.    I think this week.

09:41:02    8        Q.    I see.  Would you happen to have a copy with

09:41:06    9    you?

09:41:06    10       A.    No, sir.

09:41:10    11             MR. KALER:    I would be prepared to stipulate

09:41:11    12   that as soon as Mr. Petrie provides it to me, I can

09:41:16    13   forward a copy of the updated CV to you.

09:41:23    14             MR. KUDLAC:    I'd appreciate it, but not a

09:41:24    15   problem.

09:41:24    16       Q.    When you were preparing your most recent

09:41:26    17   version of your CV, did you notice any errors in the

09:41:29    18   prior version?

09:41:32    19       A.    No, sir.

09:41:43    20       Q.    Beginning with any employment you had while you

09:41:44    21   were going to undergraduate or graduate school,

09:41:48    22   whichever employment came first, would you tell me a

09:41:50    23   little bit about your employment history.

09:42:03    24       A.    When I was going to college -- this is

09:42:09    25   undergraduate school -- I worked at the Robinson Yarn

Case 5:08-cv-00095-JW    Document 35-7    Filed 06/09/2008    Page 13 of 50

Deposition of Stephen Paul Petrie, Ph.D.                SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| 09:42:12 | 1 | Dye Works in Lowell, Massachusetts, and I worked both in |
| 09:42:19 | 2 | the plant and in the laboratory, and I continued with |
| 09:42:27 | 3 | that until I got my Master's degree; and then after |
| 09:42:34 | 4 | that, I went to work for the Heminway and Bartlett |
| 09:42:39 | 5 | Manufacturing Company in Watertown, Connecticut, and I |
| 09:42:44 | 6 | worked there until 1974, at which time I went back to |
| 09:42:53 | 7 | graduate school to get my Ph.D. |
| 09:42:57 | 8 | After I got out of graduate school with a . |
| 09:42:59 | 9 | Ph.D., I started teaching at Southeastern Massachusetts |
| 09:43:06 | 10 | University, okay, and that later became the University |
| 09:43:11 | 11 | of Massachusetts Dartmouth, so it's one of our sister |
| 09:43:17 | 12 | institutions.  I worked there for two years, and then I |
| 09:43:21 | 13 | transferred to the University of Lowell, which is now |
| 09:43:24 | 14 | the University of Massachusetts Lowell, and I've been |
| 09:43:28 | 15 | there ever since. |
| 09:43:30 | 16 | During my tenure at the University of |
| 09:43:33 | 17 | Massachusetts Lowell, I worked for the Army Materials |
| 09:43:37 | 18 | and Mechanics Research Center in Watertown, |
| 09:43:40 | 19 | Massachusetts, I think for 14 or 16 years until they |
| 09:43:47 | 20 | closed the place as part of the BRAC, okay, Base |
| 09:43:53 | 21 | Reorganization and Closing, government acronym. |
| 09:43:58 | 22 | Q.    Got to have an acronym, right? |
| 09:44:00 | 23 | A.    And I started my own company, Materials |
| 09:44:02 | 24 | Research Laboratories, Incorporated x-number of years |
| 09:44:06 | 25 | ago, and I have done my consulting under that company |

Deposition of Stephen Paul Petrie, Ph.D.                SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 09:44:12 | 1 | right up to the present. |
| 09:44:14 | 2 | Q.   Is the -- I will wait while -- there is a plane |
| 09:44:19 | 3 | flying overhead. |
| 09:44:20 | 4 | MR. KALER:  We are in the flight path for the |
| 09:44:22 | 5 | local Marine air base, so we get a lot of those. |
| 09:44:28 | 6 | MR. KUDLAC:  Excellent. |
| 09:44:30 | 7 | Q.   Is the -- your work at -- Materials Research |
| 09:44:34 | 8 | Lab, that's your company? |
| 09:44:36 | 9 | A.   Yes. |
| 09:44:36 | 10 | Q.   Okay.  Is that work that you've been doing |
| 09:44:38 | 11 | since you founded it, is that listed in Exhibit 1? |
| 09:44:52 | 12 | A.   No, it doesn't appear to be. |
| 09:44:54 | 13 | Q.   Okay.  And the reference to the U.S. Army |
| 09:45:02 | 14 | research lab that you made reference to, is that listed |
| 09:45:05 | 15 | on page 3 of Exhibit 1? |
| 09:45:08 | 16 | A.   Yes, it is, sir. |
| 09:45:09 | 17 | Q.   Okay. |
| 09:45:11 | 18 | A.   They changed the name of that place a couple of |
| 09:45:13 | 19 | times while I worked there too. |
| 09:45:15 | 20 | Q.   I suppose that's not surprising. |
| 09:45:18 | 21 | Can you -- is the -- well, if you would, would |
| 09:45:23 | 22 | you briefly describe what work you did for the U.S. Army |
| 09:45:28 | 23 | base that you worked for. |
| 09:45:30 | 24 | A.   It was basically materials engineering.  In |
| 09:45:36 | 25 | layman's terms, we used to make them and break them. |

| | | |
|---|---|---|
| 09:45:39 | 1 | And because I worked for the Army, the threats were |
| 09:45:46 | 2 | ballistic and tectonic in nature, so we used to shoot |
| 09:45:50 | 3 | holes in the plastic and blow them up. |
| 09:45:53 | 4 | Q. So the things that you were making and |
| 09:45:55 | 5 | breaking, what were they? |
| 09:45:58 | 6 | A. Mostly armor, and a lot of it was transparent |
| 09:46:02 | 7 | armor; for example, a face shield for somebody that |
| 09:46:07 | 8 | would be driving a Humvee or it could be transparent |
| 09:46:15 | 9 | blocks for tanks. |
| 09:46:27 | 10 | Q. If you would turn to pages numbered 1 and 2 of |
| 09:46:30 | 11 | Exhibit 1, your CV, do you see on page 1 towards the |
| 09:46:35 | 12 | bottom it lists "professor" at the Plastics Engineering |
| 09:46:41 | 13 | Department, University of Massachusetts Lowell; and then |
| 09:46:44 | 14 | on the next page it lists "instructor," Continuing |
| 09:46:47 | 15 | Education, University of Massachusetts Lowell? |
| 09:46:50 | 16 | A. Yes. |
| 09:46:51 | 17 | Q. Do you see those two? |
| 09:46:53 | 18 | A. Yes. |
| 09:46:53 | 19 | Q. Can you tell me what the difference is between |
| 09:46:55 | 20 | the professor role and the instructor role? |
| 09:47:05 | 21 | A. Excuse me. This thing came unstuck -- |
| 09:47:08 | 22 | Q. I'm sorry about that. |
| 09:47:09 | 23 | A. -- so I will put it back on. |
| 09:47:11 | 24 | Q. Thank you. |
| 09:47:12 | 25 | A. The difference is that these are two separate |

| 09:47:16 | 1 | entities.  The University of Massachusetts Lowell is run |
| 09:47:23 | 2 | by the Commonwealth of Massachusetts, and it's a |
| 09:47:30 | 3 | State-funded educational institution for higher |
| 09:47:37 | 4 | learning.  Continuing Education is a quasi-State |
| 09:47:46 | 5 | institution that isn't funded by the Commonwealth of |
| 09:47:51 | 6 | Massachusetts. |
| 09:47:55 | 7 | So, in layman's terms, if you were a student at |
| 09:47:59 | 8 | the University of Massachusetts Lowell, you would be |
| 09:48:03 | 9 | paying a lesser tuition to study there because it was |
| 09:48:11 | 10 | partially State supported than you were if you were |
| 09:48:14 | 11 | going to -- this is typically called night school -- |
| 09:48:16 | 12 | where you would be paying a higher tuition because it |
| 09:48:19 | 13 | isn't funded. |
| 09:48:20 | 14 | Q.   The "this is typically called night school," |
| 09:48:22 | 15 | you're referring to the Continuing Education aspect of |
| 09:48:25 | 16 | the University of Massachusetts Lowell? |
| 09:48:28 | 17 | A.   Yes.  And at one time it was free.  So this was |
| 09:48:36 | 18 | set up to try and help people that worked in the local |
| 09:48:44 | 19 | industry get training in areas such as drafting and |
| 09:48:45 | 20 | other technical studies, so it was basically to try to |
| 09:48:51 | 21 | get a better trained work force. |
| 09:48:55 | 22 | Q.   Does that mean you were employed at two |
| 09:48:57 | 23 | different places that pay you from the University of |
| 09:49:00 | 24 | Massachusetts Lowell, or is it just you do work in sort |
| 09:49:03 | 25 | of two different aspects of things? |

| | | |
|---|---|---|
| 09:49:04 | 1 | A.    Well, again, I'm just a professor.  So I'm |
| 09:49:11 | 2 | really not sure of how they work this, but under the |
| 09:49:13 | 3 | laws of the Commonwealth, we can only get one check from |
| 09:49:17 | 4 | the Commonwealth.  So what they do is they pay us |
| 09:49:21 | 5 | through the University of Massachusetts Lowell so the |
| 09:49:25 | 6 | money gets paid to me as a salary.  The taxes are taken |
| 09:49:31 | 7 | out of it, my retirement's taken out of it, and whatever |
| 09:49:36 | 8 | other things like health insurance, whatever. |
| 09:49:38 | 9 | Q.    Got it. |
| 09:49:44 | 10 | Since the time you received your Ph.D., have |
| 09:49:49 | 11 | you taken any further coursework, done any further |
| 09:49:52 | 12 | studying? |
| 09:49:55 | 13 | A.    Yes.  As a matter of fact, every time I get a |
| 09:50:00 | 14 | chance that I can take a course, I try and do so.  And |
| 09:50:04 | 15 | if you take a look on page 16, it says, "Other Studies |
| 09:50:09 | 16 | and Interests."  You know, this is a list of some of the |
| 09:50:14 | 17 | other courses that I've taken, and most of these have |
| 09:50:17 | 18 | been back between the -- when I started in 1979 up until |
| 09:50:25 | 19 | 1993.  I almost took another course last year, but I |
| 09:50:31 | 20 | couldn't schedule it. |
| 09:50:34 | 21 | Q.    Between, say, 2002 and today, have you taken |
| 09:50:38 | 22 | any further coursework or studies? |
| 09:50:48 | 23 | A.    Not to my knowledge. |
| 09:50:50 | 24 | Q.    Since you referred me to page 16 of your CV, |
| 09:50:55 | 25 | which is Exhibit 1, let me ask you to turn back to |

| | | |
|---|---|---|
| 09:50:57 | 1 | page 15, since we're close by there. |
| 09:51:01 | 2 | A.    Yes. |
| 09:51:02 | 3 | Q.    And on that page, it lists "Membership in |
| 09:51:06 | 4 | Professional Societies," and the list actually continues |
| 09:51:08 | 5 | on to page 16 if you need to look at it. |
| 09:51:11 | 6 | Are you currently a member of any professional |
| 09:51:15 | 7 | societies? |
| 09:51:16 | 8 | A.    No. |
| 09:51:23 | 9 | Q.    And for the professional societies that you |
| 09:51:25 | 10 | list on pages 15 and 16 of your CV, which is Exhibit 1, |
| 09:51:30 | 11 | I see that they all say "Former member." |
| 09:51:34 | 12 | Do you have any recollection of the time frames |
| 09:51:37 | 13 | that you belonged to any of these professional societies |
| 09:51:40 | 14 | that are listed on pages 15 and 16? |
| 09:51:48 | 15 | A.    This would be very hard to reconstruct. |
| 09:51:51 | 16 | Q.    Fair enough.  Can you tell me why you are a |
| 09:51:55 | 17 | former member of these?  Was there something that |
| 09:51:58 | 18 | happened that you decided you didn't want to be a member |
| 09:52:01 | 19 | anymore? |
| 09:52:02 | 20 | A.    Well, to give you an example, if you take a |
| 09:52:10 | 21 | look at the bottom of page 15, I'm a former member of |
| 09:52:17 | 22 | the American Association of Textile Chemists and |
| 09:52:18 | 23 | Colorists. |
| 09:52:22 | 24 | I started as just a member when I was a student |
| 09:52:25 | 25 | in school, and then I was chairman of the Western |

| | | |
|---|---|---|
| 09:52:29 | 1 | New England Section; and after that, I left the industry |
| 09:52:34 | 2 | to go back to graduate school, so that would have been |
| 09:52:37 | 3 | in 1974-75 circa, and I've only had a couple of cases |
| 09:52:47 | 4 | since then that I have done any work with textiles. |
| 09:52:50 | 5 | After that basically I've done mostly plastics, so there |
| 09:52:55 | 6 | was no need to belong to that. |
| 09:52:58 | 7 | Q. So the first one that's listed under |
| 09:53:00 | 8 | "Professional Societies," The Society of Plastics |
| 09:53:04 | 9 | Engineers -- |
| 09:53:06 | 10 | A. Right. |
| 09:53:06 | 11 | Q. -- SPE -- |
| 09:53:06 | 12 | A. Yes. |
| 09:53:07 | 13 | Q. -- can you tell me when you were a member of |
| 09:53:09 | 14 | that society. |
| 09:53:10 | 15 | A. Not exactly, but when I started working at |
| 09:53:20 | 16 | Lowell, they wanted me to be the advisor for the student |
| 09:53:25 | 17 | chapter, and I guess the scheme of things was to get a |
| 09:53:32 | 18 | lot of activities on your resume so you could get |
| 09:53:36 | 19 | tenure. |
| 09:53:37 | 20 | And one year I was told by another faculty |
| 09:53:43 | 21 | member that he had just been appointed advisor for the |
| 09:53:49 | 22 | student chapter, unbeknownst to me; and if I wasn't |
| 09:53:55 | 23 | going to be the advisor for the student chapter anymore, |
| 09:53:58 | 24 | there was no reason to belong to the association. I |
| 09:54:01 | 25 | still wrote papers and still presented them at meetings, |

| | | |
|---|---|---|
| 09:54:04 | 1 | but I didn't have to be a member.  So to me there was no |
| 09:54:08 | 2 | benefit to being a member. |
| 09:54:21 | 3 | Q.   If I could ask you to turn to page 2 of |
| 09:54:26 | 4 | Exhibit 1, your CV, and on that page, towards the |
| 09:54:30 | 5 | bottom, there's a title, "Visiting Professor." |
| 09:54:37 | 6 | A.   Oh, yes. |
| 09:54:41 | 7 | Q.   And there's -- there's two entries under there, |
| 09:54:44 | 8 | one for Ching Hwa University in Beijing, and also the |
| 09:54:49 | 9 | second one for the Peking Institute of Chemical |
| 09:54:52 | 10 | Technology, Beijing. |
| 09:54:54 | 11 | Could you explain what those appointments were |
| 09:54:57 | 12 | for, or those positions? |
| 09:55:02 | 13 | A.   I was asked if I would like to go to China to |
| 09:55:11 | 14 | teach courses, and I said yes.  And one of the |
| 09:55:17 | 15 | professors in the department, S.J. Chan -- God bless |
| 09:55:23 | 16 | him; he is now deceased -- set it up with somebody in |
| 09:55:31 | 17 | China for me to go over and teach for a couple of weeks. |
| 09:55:33 | 18 | And my first stint was at Ching Hwa University, |
| 09:55:37 | 19 | which is a pretty famous place.  It's the equivalent to |
| 09:55:43 | 20 | our MIT; and the second place was the Peking Institute |
| 09:55:49 | 21 | of Chemical Technology that I saw recently in the news. |
| 09:55:53 | 22 | That isn't as much on the sciency side; it's more in the |
| 09:55:59 | 23 | chemical engineering, so I taught courses at both of |
| 09:56:03 | 24 | these schools. |
| 09:56:04 | 25 | Q.   Other than those two courses that are listed in |

| | | |
|---|---|---|
| 09:56:06 | 1 | your CV, have you taught any other courses in Asia? |
| 09:56:10 | 2 | A.   In Asia? |
| 09:56:12 | 3 | Q.   Yes. |
| 09:56:12 | 4 | A.   No. |
| 09:56:16 | 5 | Q.   Have you presented any papers or spoken at |
| 09:56:19 | 6 | conferences in Asia? |
| 09:56:21 | 7 | A.   No. |
| 09:56:23 | 8 | Q.   Have you toured any manufacturing facilities in |
| 09:56:26 | 9 | Asia? |
| 09:56:27 | 10 | A.   Yes. |
| 09:56:27 | 11 | Q.   When was that? |
| 09:56:34 | 12 | A.   Back when I was at one of these universities. |
| 09:56:37 | 13 | I forget exactly which. |
| 09:56:41 | 14 | Q.   So back in the 1985 time frame? |
| 09:56:43 | 15 | A.   Yes. |
| 09:56:44 | 16 | Q.   Was that the only time you've ever toured a |
| 09:56:46 | 17 | manufacturing facility in Asia? |
| 09:56:53 | 18 | A.   Yes. |
| 09:57:08 | 19 | Q.   Other than the time in 1985 for the two |
| 09:57:11 | 20 | references in your CV, have you ever as part of your |
| 09:57:16 | 21 | professional career any other times gone to Asia? |
| 09:57:21 | 22 | A.   As part of my professional career? |
| 09:57:23 | 23 | Q.   Yes, sir. |
| 09:57:25 | 24 | A.   No. |
| 09:57:26 | 25 | Q.   All right.  Just to be clear, I wasn't asking |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 09:57:28 | 1 | about whether you've gone there just to go there for |
| 09:57:31 | 2 | vacation, tourism, or anything like that.  I wasn't |
| 09:57:35 | 3 | interested in that.  I'm not trying to get into that |
| 09:57:37 | 4 | personal stuff. |
| 09:57:38 | 5 | A.    Right. |
| 09:57:38 | 6 | Q.    Okay.  Do you have any reason to believe that |
| 09:57:42 | 7 | you would be denied a visa to visit China? |
| 09:57:55 | 8 | A.    No. |
| 09:57:55 | 9 | Q.    Do you have any reason to believe that you |
| 09:57:57 | 10 | would be denied a visa to visit Taiwan if you needed |
| 09:58:03 | 11 | one? |
| 09:58:03 | 12 | A.    No. |
| 09:58:04 | 13 | Q.    Do you have a valid passport? |
| 09:58:06 | 14 | A.    Yes. |
| 09:58:10 | 15 | Q.    Is it valid for more than three months from |
| 09:58:13 | 16 | now, if you remember? |
| 09:58:16 | 17 | A.    I have no idea, sir. |
| 09:58:20 | 18 | Q.    That's fine.  I don't know how long mine is |
| 09:58:23 | 19 | valid for either, but sometimes people know. |
| 09:58:44 | 20 | Right above the "Visiting Professor" entry in |
| 09:58:47 | 21 | your CV, there is a line that says "On-site industrial |
| 09:58:52 | 22 | training programs." |
| 09:58:54 | 23 | Do you see that? |
| 09:58:55 | 24 | A.    Yes. |
| 09:58:55 | 25 | Q.    And there you list Ford, Gillette, Lucent |

| | | |
|---|---|---|
| 09:58:58 | 1 | Technology, MaCom, and Velcro. |
| 09:59:02 | 2 | For any of these on-site industrial training |
| 09:59:05 | 3 | programs, did you prepare papers or presentation |
| 09:59:08 | 4 | materials or a slide show, anything like that? |
| 09:59:12 | 5 | A.   Yes. |
| 09:59:12 | 6 | Q.   Do you still have any of those materials? |
| 09:59:27 | 7 | A.   Yes. |
| 09:59:27 | 8 | Q.   Did any of those on-site industrial training |
| 09:59:30 | 9 | programs that you list deal with injection molding? |
| 09:59:34 | 10 | A.   Yes. |
| 09:59:35 | 11 | Q.   Which ones? |
| 09:59:49 | 12 | A.   The ones at Ford, Gillette, MaCom; and I'm not |
| 10:00:08 | 13 | sure about Lucent Technologies and Velcro. |
| 10:00:12 | 14 | Q.   Do you remember what aspects of injection |
| 10:00:15 | 15 | molding the Ford presentation or Ford industrial |
| 10:00:20 | 16 | training program dealt with? |
| 10:00:24 | 17 | A.   Yes. |
| 10:00:25 | 18 | Q.   What was that? |
| 10:00:26 | 19 | A.   Well, at Ford I talked about injection molding, |
| 10:00:32 | 20 | fiber-reinforced materials and how it affected the |
| 10:00:39 | 21 | fracture thereof; and I also talked about injection |
| 10:00:46 | 22 | molding in general for making different types of parts. |
| 10:00:56 | 23 | Q.   When you say "injection molding in general," |
| 10:01:01 | 24 | that's a pretty big statement. |
| 10:01:04 | 25 | Was there a particular aspect of injection |

| | | |
|---|---|---|
| 10:01:05 | 1 | molding that you were talking about, or just the whole |
| 10:01:09 | 2 | thing? |
| 10:01:11 | 3 | A.    Well, if I had to classify it, I had a very |
| 10:01:16 | 4 | general audience, so the skill sets of the people at- -- |
| 10:01:24 | 5 | attending the seminar were quite varied, so it went from |
| 10:01:28 | 6 | basically people at the mechanic level up to I think |
| 10:01:32 | 7 | there were engineers in the class.  So it was broad and |
| 10:01:38 | 8 | general. |
| 10:01:42 | 9 | Q.    Do you recall if anything in the presentation |
| 10:01:44 | 10 | to Ford on injection molding dealt with using a common |
| 10:01:49 | 11 | mold? |
| 10:02:06 | 12 | A.    I don't remember. |
| 10:02:11 | 13 | Q.    Can you describe for me generally what the |
| 10:02:13 | 14 | presentation, the on-site industrial training program |
| 10:02:18 | 15 | for Gillette with respect to injection molding dealt |
| 10:02:22 | 16 | with? |
| 10:02:22 | 17 | A.    I've taught a number of courses at Gillette |
| 10:02:25 | 18 | which actually I think spans back over 10 years, and one |
| 10:02:30 | 19 | of these courses specifically was on injection molding, |
| 10:02:39 | 20 | and it was a three-credit course that was given through |
| 10:02:47 | 21 | Continuing Education at the University of Massachusetts |
| 10:02:51 | 22 | Lowell. |
| 10:03:04 | 23 | Q.    Did anything in that Continuing Education class |
| 10:03:07 | 24 | deal with using a common mold in an injection molding? |
| 10:03:19 | 25 | A.    I have a confidentiality agreement with |

| | | |
|---|---|---|
| 10:03:20 | 1 | Gillette, and you've put me in a very bad position. |
| 10:03:24 | 2 | Q. I didn't mean to, as you might understand, but |
| 10:03:27 | 3 | I wanted to ask. |
| 10:03:28 | 4 | Let me just say if you think there's a |
| 10:03:31 | 5 | confidentiality issue and you'd like to talk to your |
| 10:03:33 | 6 | attorney, to Mr. Kaler about that, I would be happy to |
| 10:03:36 | 7 | let you go do that. I won't make you answer a question |
| 10:03:39 | 8 | right now. It wouldn't seem fair to me. |
| 10:03:46 | 9 | A. Thank you. |
| 10:03:50 | 10 | Q. So if you'd like to -- would you like to do |
| 10:03:52 | 11 | that? |
| 10:03:53 | 12 | A. Yes, I would, sir. |
| 10:04:00 | 13 | MR. KUDLAC: Let's go off the record. |
| 10:04:00 | 14 | THE VIDEO OPERATOR: Off the record at 10:03. |
| 10:06:15 | 15 | (Recess from 10:03 a.m. to 10:12 a.m.) |
| 10:12:55 | 16 | THE VIDEO OPERATOR: Back on the record at |
| 10:12:56 | 17 | 10:12 a.m. |
| 10:12:59 | 18 | MR. KALER: Okay. While we were off the |
| 10:13:01 | 19 | record, I had a conference with the witness. He is |
| 10:13:04 | 20 | subject to a confidentiality agreement with Gillette, |
| 10:13:08 | 21 | and pursuant to that agreement I don't think it would be |
| 10:13:14 | 22 | appropriate for him to discuss the contents of anything |
| 10:13:17 | 23 | he discussed with Gillette without a Court order or |
| 10:13:20 | 24 | protective order of some type. |
| 10:13:22 | 25 | I doubt that it really goes to the core of what |

| | | |
|---|---|---|
| 10:13:25 | 1 | you wanted to do today anyway, but I think that before |
| 10:13:30 | 2 | you can talk about what he said to Gillette, he would |
| 10:13:33 | 3 | need a Court order. |
| 10:13:34 | 4 | MR. KUDLAC:  Fair enough.  That was why I |
| 10:13:36 | 5 | wanted you to have that conversation, and I knew we -- |
| 10:13:40 | 6 | MR. KALER:  I appreciate the courtesy. |
| 10:13:42 | 7 | MR. KUDLAC:  I know we don't have a protective |
| 10:13:44 | 8 | order yet, so we may come back to that at some point |
| 10:13:48 | 9 | later on. |
| 10:13:49 | 10 | THE WITNESS:  Thanks. |
| 10:13:50 | 11 | BY MR. KUDLAC: |
| 10:13:50 | 12 | Q.  But I don't want to get you in trouble with |
| 10:13:52 | 13 | somebody else. |
| 10:14:02 | 14 | Does the copy of your CV that we've marked as |
| 10:14:06 | 15 | Exhibit 1 list the lawsuits or cases that you've been |
| 10:14:11 | 16 | involved in as an expert? |
| 10:14:13 | 17 | A.  No. |
| 10:14:30 | 18 | Q.  Have you testified before? |
| 10:14:31 | 19 | A.  Yes. |
| 10:14:32 | 20 | Q.  In how many different cases, if you can recall? |
| 10:14:35 | 21 | A.  I really don't know. |
| 10:14:38 | 22 | MR. KALER:  Just for clarification, by |
| 10:14:39 | 23 | "testimony" do you mean an actual court, or do you |
| 10:14:41 | 24 | include depositions and declarations? |
| 10:14:43 | 25 | MR. KUDLAC:  I'm -- let me clarify that. |

| | | | |
|---|---|---|---|
| 10:14:45 | 1 | Q. | Have you given a deposition before? |
| 10:14:47 | 2 | A. | Yes. |
| 10:14:47 | 3 | Q. | How many times? |
| 10:14:49 | 4 | A. | I don't know. |
| 10:14:50 | 5 | Q. | Do you think it's more than 10? |
| 10:14:59 | 6 | A. | It may be.  I don't know. |
| 10:15:02 | 7 | Q. | Fair enough. |
| 10:15:03 | 8 | | Can you tell me any of the cases that you can |
| 10:15:05 | 9 | recall in which you've been deposed? | |
| 10:15:17 | 10 | A. | Yes. |
| 10:15:17 | 11 | Q. | Which ones -- which ones can you recall?  I'm |
| 10:15:19 | 12 | sorry. | |
| 10:15:22 | 13 | A. | The Turn-Key-Tech versus Koito; State of New |
| 10:15:35 | 14 | Hampshire versus Ross; Ferguson versus General Motors. | |
| 10:15:46 | 15 | One of them was -- I can't remember the name of the | |
| 10:16:20 | 16 | company, but it was versus Sylvania Shoe. | |
| 10:16:29 | 17 | | And I would have to go back and refer to my |
| 10:16:35 | 18 | notes to find the other ones. | |
| 10:16:37 | 19 | Q. | That's fine. |
| 10:16:38 | 20 | | Was the Turn-Key-Tech versus Koito a patent |
| 10:16:42 | 21 | infringement case? | |
| 10:16:43 | 22 | A. | Yes. |
| 10:16:44 | 23 | Q. | Was the State of New Hampshire versus Ross a |
| 10:16:48 | 24 | patent infringement case? | |
| 10:16:50 | 25 | A. | No. |

| 10:16:50 | 1 | Q. Can you briefly describe what the general |
| 10:16:53 | 2 | subject matter of the State of New Hampshire versus Ross |
| 10:16:57 | 3 | was. |
| 10:16:58 | 4 | A. Criminal. |
| 10:16:59 | 5 | Q. Was the Ferguson versus General Motors case a |
| 10:17:02 | 6 | patent infringement case? |
| 10:17:04 | 7 | A. No. |
| 10:17:05 | 8 | Q. What was the general subject matter of that |
| 10:17:07 | 9 | case? |
| 10:17:08 | 10 | A. Personal injury. |
| 10:17:11 | 11 | Q. And was the case against Sylvania Shoe a patent |
| 10:17:16 | 12 | infringement case? |
| 10:17:18 | 13 | A. No. |
| 10:17:19 | 14 | Q. What was the general subject matter of that |
| 10:17:21 | 15 | case? |
| 10:17:22 | 16 | A. Breach of contract. |
| 10:17:26 | 17 | Q. Okay. Have you ever testified in a court |
| 10:17:28 | 18 | hearing or trial? |
| 10:17:30 | 19 | A. Yes. |
| 10:17:30 | 20 | Q. Can you recall any of the hearings -- or the |
| 10:17:33 | 21 | cases that involved a hearing or trial that you've |
| 10:17:35 | 22 | testified in? |
| 10:17:38 | 23 | A. Yes. |
| 10:17:38 | 24 | Q. Which ones can you recall? |
| 10:17:43 | 25 | A. Well, there was the Turn-Key-Tech versus Koito; |

| | | |
|---|---|---|
| 10:17:52 | 1 | State of New Hampshire versus Ross; the Sylvania Shoe |
| 10:17:58 | 2 | one; and Ferguson versus General Motors; and the other |
| 10:18:08 | 3 | ones I can't remember their names. |
| 10:18:10 | 4 | Q.   Were any of the other ones patent infringement |
| 10:18:13 | 5 | cases? |
| 10:18:16 | 6 | A.   I really don't remember. |
| 10:18:22 | 7 | Q.   Can you put a number -- an estimate on the |
| 10:18:24 | 8 | number of times you've testified at a hearing or trial? |
| 10:18:28 | 9 | A.   Not really. |
| 10:18:58 | 10 | MR. KUDLAC:   Can I have the court reporter mark |
| 10:18:59 | 11 | this as Exhibit 2. |
| 10:19:01 | 12 | Counsel? |
| 10:19:22 | 13 | (Exhibit 2 was marked for identification.) |
| 10:19:23 | 14 | (Discussion off the record.) |
| 10:19:24 | 15 | BY MR. KUDLAC: |
| 10:19:24 | 16 | Q.   Sir, I've handed you what I've had the court |
| 10:19:27 | 17 | reporter mark as Exhibit 2, a document that has a title |
| 10:19:31 | 18 | of "Declaration of Dr. Steven P. Petrie in Support of |
| 10:19:38 | 19 | Turn-Tey" -- I think that should be Turn-Key's -- |
| 10:19:42 | 20 | "Opposition to Plaintiffs' Motion for Summary Judgment |
| 10:19:44 | 21 | of Noninfringement or Invalidity." |
| 10:19:48 | 22 | A.   Yes. |
| 10:19:49 | 23 | Q.   Sir, do you recognize this document, Exhibit 2? |
| 10:20:35 | 24 | A.   Yes. |
| 10:20:36 | 25 | Q.   Is that a declaration that you submitted in the |

| | | |
|---|---|---|
| 10:20:39 | 1 | Koito Manufacturing versus Turn-Key-Tech case that was |
| 10:20:42 | 2 | in the Southern District of California? |
| 10:20:47 | 3 | A.    Yes. |
| 10:20:53 | 4 | Q.    If I could, would you turn to what is probably |
| 10:20:57 | 5 | the sixth or seventh page in Exhibit 2, which is |
| 10:21:03 | 6 | Exhibit A to the declaration, the cover page for the |
| 10:21:07 | 7 | "Injection Molding Handbook" by Dominick V. Rosato and |
| 10:21:13 | 8 | Donald D. Rosato. |
| 10:21:17 | 9 | Do you see that? |
| 10:21:18 | 10 | A.    Yes. |
| 10:21:19 | 11 | Q.    Is that a fairly famous handbook in the |
| 10:21:22 | 12 | injection molding world? |
| 10:21:25 | 13 | A.    Yes. |
| 10:21:25 | 14 | Q.    Is that something that you would ordinarily |
| 10:21:28 | 15 | rely on in the injection molding profession? |
| 10:21:39 | 16 | A.    Could you repeat the question, please. |
| 10:21:42 | 17 | Q.    Sure.  Is the "Injection Molding Handbook" |
| 10:21:44 | 18 | that's referenced in Exhibit A something that a person |
| 10:21:49 | 19 | in the injection molding profession would rely on? |
| 10:21:56 | 20 | A.    Well, I would have to opine on this matter |
| 10:22:00 | 21 | because I don't know for a fact, but I'd say yes. |
| 10:22:05 | 22 | Q.    Okay.  And do you know if there are more |
| 10:22:11 | 23 | current versions of the "Injection Molding Handbook" |
| 10:22:12 | 24 | than the one that's referenced in Exhibit A to |
| 10:22:13 | 25 | Exhibit 2? |

| | | |
|---|---|---|
| 10:22:19 | 1 | A.   Yes, I think there is one. |
| 10:22:21 | 2 | Q.   Would that be a 2000 version? |
| 10:22:24 | 3 | A.   That would -- I think that would be the circa. |
| 10:22:31 | 4 | Q.   And would the same be true for the 2000 version |
| 10:22:34 | 5 | about that time, for the Injection Molding Handbook, |
| 10:22:37 | 6 | that that's a document that the people in the injection |
| 10:22:39 | 7 | molding profession would rely on? |
| 10:22:44 | 8 | A.   Some people would rely on it. |
| 10:22:46 | 9 | Q.   Would it be unreasonable to rely on it? |
| 10:22:55 | 10 | A.   No. |
| 10:23:09 | 11 | Q.   If you would look back at the very first page |
| 10:23:12 | 12 | of Exhibit 2, you see there on the left-hand side of the |
| 10:23:15 | 13 | page in the middle where it says, "Koito Manufacturing |
| 10:23:21 | 14 | Limited and North American Lighting versus |
| 10:23:23 | 15 | Turn-Key-Tech, LLC, and Jens Ole Sorensen," is this the |
| 10:23:30 | 16 | case that you referred to as Turn-Key versus Koito? |
| 10:23:34 | 17 | A.   Yes. |
| 10:23:34 | 18 | Q.   Okay.  I wanted to make sure, because it had |
| 10:23:36 | 19 | the parties backwards from the way you referred to it. |
| 10:23:50 | 20 | MR. KUDLAC:  Can we mark this as Exhibit 3. |
| 10:24:04 | 21 | (Exhibit 3 was marked for identification.) |
| 10:24:05 | 22 | BY MR. KUDLAC: |
| 10:24:05 | 23 | Q.   Dr. Petrie, I'm handing you what I've marked as |
| 10:24:09 | 24 | Exhibit 3 -- I'm sorry. |
| 10:24:11 | 25 | Dr. Petrie, I'm handing you what the court |

Deposition of Stephen Paul Petrie, Ph.D.                SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 10:24:13 | 1 | reporter has marked as Exhibit 3, a document entitled, |
| 10:24:16 | 2 | "Declaration of Dr. Stephen P. Petrie in Support of |
| 10:24:22 | 3 | Turn-Key's Motion for Summary Judgment of |
| 10:24:24 | 4 | Infringement" -- |
| 10:24:25 | 5 | A.    Yes. |
| 10:24:25 | 6 | Q.    -- and this is from a case entitled, "Federal |
| 10:24:28 | 7 | Mogul Corporation versus Turn-Key-Tech and Jens O. |
| 10:24:33 | 8 | Sorensen." |
| 10:24:35 | 9 | Do you recognize this document, Exhibit 3, sir? |
| 10:24:59 | 10 | A.    Yes. |
| 10:25:00 | 11 | Q.    And this is a declaration that you submitted in |
| 10:25:03 | 12 | the Federal Mogul Corp. versus Turn-Key-Tech case? |
| 10:25:07 | 13 | A.    Yes. |
| 10:25:08 | 14 | Q.    Did you -- were you deposed in the Federal |
| 10:25:12 | 15 | Mogul case? |
| 10:25:13 | 16 | A.    Yes. |
| 10:25:14 | 17 | Q.    And was that a different deposition than any of |
| 10:25:17 | 18 | the other ones that we referred to earlier? |
| 10:25:21 | 19 | A.    Yes, sir, it was. |
| 10:25:22 | 20 | Q.    Did you testify at any hearings or trials in |
| 10:25:24 | 21 | the Federal Mogul case? |
| 10:25:31 | 22 | A.    I'm really not sure. |
| 10:26:04 | 23 | MR. KUDLAC:  Can I have you mark that as |
| 10:26:06 | 24 | Exhibit 4, please. |
| 10:26:15 | 25 | (Exhibit 4 was marked for identification.) |

| | | |
|---|---|---|
| 10:26:16 | 1 | BY MR. KUDLAC: |
| 10:26:16 | 2 | Q. Dr. Petrie, I'm handing you what I've had the |
| 10:26:19 | 3 | court reporter mark as Exhibit 4, a document entitled, |
| 10:26:23 | 4 | "Declaration of Dr. Stephen Petrie in Support of |
| 10:26:28 | 5 | Turn-Key's Motion for Summary Judgment on Liability for |
| 10:26:30 | 6 | Infringement" in the case styled "Turn-Key-Tech LLC |
| 10:26:34 | 7 | versus Daimler Chrysler Corporation." |
| 10:26:37 | 8 | Sir, do you recognize Exhibit 4? |
| 10:27:23 | 9 | A.    Yes. |
| 10:27:24 | 10 | Q.    And is Exhibit 4 a declaration that you |
| 10:27:26 | 11 | submitted in the Turn-Key-Tech versus Daimler Chrysler |
| 10:27:29 | 12 | Corporation case? |
| 10:27:31 | 13 | A.    Yes. |
| 10:27:31 | 14 | Q.    And that was a patent infringement case; is |
| 10:27:33 | 15 | that right? |
| 10:27:34 | 16 | A.    That's correct. |
| 10:27:34 | 17 | Q.    In the course of that patent infringement case, |
| 10:27:38 | 18 | the Turn-Key-Tech versus Daimler Chrysler Corporation, |
| 10:27:41 | 19 | did you inspect any molds that were used to fabricate or |
| 10:27:44 | 20 | manufacture the accused product? |
| 10:27:54 | 21 | A.    To the best of my knowledge, no. |
| 10:27:55 | 22 | Q.    Did you inspect any manufacturing facilities in |
| 10:27:57 | 23 | that case, the Turn-Key-Tech versus Daimler Chrysler |
| 10:28:01 | 24 | Corporation? |
| 10:28:02 | 25 | A.    To the best of my knowledge, no. |

Deposition of Stephen Paul Petrie, Ph.D.                SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 10:28:25 | 1 | Q.   Since the U.S. Army base that we referred to |
| 10:28:28 | 2 | earlier closed I think it was in 1996, have you done any |
| 10:28:33 | 3 | work in industry other than your consulting company that |
| 10:28:40 | 4 | you formed? |
| 10:28:57 | 5 | A.   Yes. |
| 10:28:57 | 6 | Q.   Can you describe that for me. |
| 10:29:28 | 7 | A.   I did some work for a company in Connecticut |
| 10:29:33 | 8 | that was a contractor for the United States Government, |
| 10:29:39 | 9 | and basically it was on laminates used by the Navy. |
| 10:30:01 | 10 | Q.   Did that work involve injection molding in any |
| 10:30:04 | 11 | way? |
| 10:30:06 | 12 | A.   No. |
| 10:30:13 | 13 | Q.   Any other industry work since the time of the |
| 10:30:15 | 14 | base closure? |
| 10:30:20 | 15 | A.   That wasn't part of my corporation? |
| 10:30:24 | 16 | Q.   That's right. |
| 10:30:41 | 17 | A.   I'm not sure. |
| 10:30:42 | 18 | Q.   Fair enough. |
| 10:30:44 | 19 |      Has -- since the time of the base closure in |
| 10:30:47 | 20 | 1996, the work that you've done as part of your |
| 10:30:53 | 21 | operation, has any of that involved injection molding? |
| 10:30:56 | 22 | A.   Yes. |
| 10:30:57 | 23 | Q.   In what way? |
| 10:30:58 | 24 | A.   I've worked on injection molding problems for |
| 10:31:01 | 25 | companies. |

| 10:31:02 | 1 | Q. Have any of those injection molding problems |
|---|---|---|
| 10:31:06 | 2 | involved the use of a common mold? |
| 10:31:31 | 3 | A. Yes. |
| 10:31:33 | 4 | Q. And can you tell me for which companies or |
| 10:31:35 | 5 | which work that your corporation has done that involved |
| 10:31:40 | 6 | the use of common molds in injection molding. |
| 10:31:43 | 7 | A. Well, as evidenced by these depositions, |
| 10:31:47 | 8 | Turn-Key-Tech. |
| 10:31:57 | 9 | Q. Was that actually doing work where you were |
| 10:32:00 | 10 | making products used by -- that used a common mold? |
| 10:32:08 | 11 | A. Well, it was in the analysis of molded |
| 10:32:13 | 12 | products; actually, molded samples. |
| 10:32:23 | 13 | Q. Is the work that you did for Turn-Key-Tech, was |
| 10:32:26 | 14 | that all consulting work for lawsuits, or potential |
| 10:32:29 | 15 | lawsuits? |
| 10:32:36 | 16 | A. Probably. |
| 10:32:37 | 17 | Q. And can you recall any work that you've done |
| 10:32:41 | 18 | for your corporation involving injection molding and |
| 10:32:45 | 19 | common molds that did not -- that was not connected to a |
| 10:32:49 | 20 | lawsuit? |
| 10:32:58 | 21 | A. No, but I did another one -- well, the answer |
| 10:33:02 | 22 | to your question -- can you reword the question, please. |
| 10:33:05 | 23 | Q. I'll reask what I think was the question, or |
| 10:33:07 | 24 | something close to it. |
| 10:33:09 | 25 | A. Well, we can have the court reporter read it |

| | | |
|---|---|---|
| 10:33:11 | 1 | back. |
| 10:33:11 | 2 | Q.   It wasn't clear the first time to you so I'll |
| 10:33:15 | 3 | try again -- |
| 10:33:14 | 4 | A.   All right. |
| 10:33:22 | 5 | Q.   -- and maybe I will get it better this time. |
| 10:33:24 | 6 | In connection with your work for your |
| 10:33:24 | 7 | corporation, can you -- let's just put a name to it.  I |
| 10:33:26 | 8 | don't remember what the name of it was. |
| 10:33:28 | 9 | A.   Materials Research Lab, Incorporated. |
| 10:33:34 | 10 | Q.   Materials -- |
| 10:33:34 | 11 | A.   You can call it MRL, Inc. |
| 10:33:39 | 12 | Q.   MRL, Inc.?  That's what I'll call it. |
| 10:33:42 | 13 | In connection with your work for MRL, Inc., has |
| 10:33:42 | 14 | any of the injection molding work that involved a common |
| 10:33:42 | 15 | mold that you did for MRL, Inc., did any of that not |
| 10:33:44 | 16 | involve a lawsuit? |
| 10:33:53 | 17 | A.   To the best of my knowledge, no. |
| 10:33:56 | 18 | Q.   In connection with your work for MRL, Inc., has |
| 10:34:00 | 19 | any of the injection molding work, regardless of whether |
| 10:34:04 | 20 | it involved a common mold, did any of your injection |
| 10:34:08 | 21 | molding work for MRL, Inc., not involve a lawsuit? |
| 10:34:13 | 22 | A.   Yes. |
| 10:34:13 | 23 | Q.   Can you describe that work for me. |
| 10:34:16 | 24 | A.   I worked on a problem with snap fittings, and |
| 10:34:26 | 25 | the snap fittings were breaking when they were strained. |

| 10:34:31 | 1 | And we did some short shots and analyzed the short shots |
| 10:34:39 | 2 | with a polariscope and found that they contained large |
| 10:34:45 | 3 | stresses, and I recommended that they do some mold |
| 10:34:50 | 4 | modification; and the mold was modified and the problem |
| 10:34:55 | 5 | went away. |
| 10:34:58 | 6 | Q.    Did the mold modification that you recommended |
| 10:35:01 | 7 | involve changing to using a common mold? |
| 10:35:06 | 8 | A.    No. |
| 10:35:07 | 9 | Q.    What kind of products were involved that had |
| 10:35:10 | 10 | these snap fittings that you referred to? |
| 10:35:15 | 11 | A.    There would be clothes hangers, but very |
| 10:35:22 | 12 | inexpensive ones; for instance, like you would find in |
| 10:35:26 | 13 | the dollar store. |
| 10:35:33 | 14 | Q.    With two children, I'm very familiar with the |
| 10:35:36 | 15 | dollar store. |
| 10:35:37 | 16 | What's a polariscope? |
| 10:35:40 | 17 | A.    Polariscope is -- that's my -- two crossed |
| 10:35:47 | 18 | poles. |
| 10:35:50 | 19 | Q.    And in what way did you use that to examine |
| 10:35:54 | 20 | these products? |
| 10:35:56 | 21 | A.    Well, if you orient your injection-molded piece |
| 10:36:01 | 22 | part in a certain direction, you can take a look at |
| 10:36:05 | 23 | extensions in the clear material, and the rise in the |
| 10:36:14 | 24 | double refraction is due to one of three things:  It can |
| 10:36:20 | 25 | be due to crystallinity, which we don't have, because |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 10:36:25 | 1 | this was an amorphous material; or it can be due to |
| 10:36:29 | 2 | orientation; and it could be due to stress or what I |
| 10:36:32 | 3 | consider strain, and they call it a strain |
| 10:36:36 | 4 | birefringence, so if there were residual stresses in the |
| 10:36:41 | 5 | part, you can take a look at the patent and, as you |
| 10:36:44 | 6 | modify the mold, you'll see a reduction in these |
| 10:36:48 | 7 | stresses, which means you are getting a more stress-free |
| 10:36:51 | 8 | part.  So it's an experimental method of stress |
| 10:36:56 | 9 | analysis. |
| 10:36:57 | 10 | Q.    You referred to short shots. |
| 10:36:59 | 11 | What's a short shot? |
| 10:37:02 | 12 | A.    For instance, if we were going to mold a part |
| 10:37:08 | 13 | that had a total shot of 1 ounce, what we would do would |
| 10:37:17 | 14 | be, for instance, to take shots in successive increments |
| 10:37:22 | 15 | of perhaps maybe an eighth of an ounce each, so we would |
| 10:37:27 | 16 | have an eighth, two-eighths, three-eighths, |
| 10:37:32 | 17 | four-eighths, up to the full shot, and we can see how |
| 10:37:36 | 18 | the mold fills and how the stress distribution changes |
| 10:37:41 | 19 | in the part. |
| 10:37:50 | 20 | Q.    Can you think of any other work at MRL, Inc. |
| 10:37:53 | 21 | that you did that involved injection molding separate |
| 10:37:56 | 22 | and apart from lawsuits? |
| 10:37:58 | 23 | A.    Yes. |
| 10:37:59 | 24 | Q.    Tell me about that. |
| 10:38:01 | 25 | A.    I did some work for a company that involved the |

KRAMM & ASSOCIATES, INC.

| | | |
|---|---|---|
| 10:38:04 | 1 | fracture of toothbrushes. |
| 10:38:13 | 2 | Q.   Did any of that work involve a common mold? |
| 10:38:16 | 3 | A.   Yes. |
| 10:38:19 | 4 | Q.   And can you describe what the work was that you |
| 10:38:22 | 5 | did regarding the fracture of toothbrushes. |
| 10:38:25 | 6 | A.   We took a look at the fractured surface of the |
| 10:38:30 | 7 | head of the toothbrush using scanning electron |
| 10:38:37 | 8 | microscopy and energy dispersive analysis. |
| 10:38:49 | 9 | Q.   Did you make any recommendations in that case? |
| 10:38:51 | 10 | A.   Yes. |
| 10:38:51 | 11 | Q.   And what were the recommendations? |
| 10:38:53 | 12 | A.   To change the material. |
| 10:39:00 | 13 | Q.   Was a common mold being used to manufacture the |
| 10:39:02 | 14 | toothbrushes at the time that the fracture was taking |
| 10:39:05 | 15 | place? |
| 10:39:05 | 16 | A.   Yes. |
| 10:39:06 | 17 | Q.   And was a common mold used afterwards? |
| 10:39:13 | 18 | A.   To the best of my knowledge, yes. |
| 10:39:27 | 19 | Q.   Did you ever consider whether the common mold |
| 10:39:30 | 20 | process being used in that situation infringed the '184 |
| 10:39:33 | 21 | patent? |
| 10:39:37 | 22 | A.   No. |
| 10:39:39 | 23 | Q.   Do you have any opinion as to whether that |
| 10:39:41 | 24 | common mold process that was used for manufacturing |
| 10:39:44 | 25 | those toothbrushes infringed the '184 patent? |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 10:39:49 | 1 | A.    Have I formed an opinion? |
| 10:39:51 | 2 | Q.    Yes, sir. |
| 10:39:51 | 3 | A.    No, sir. |
| 10:39:53 | 4 | Q.    Do you have any -- do you have any information |
| 10:39:57 | 5 | as to whether the manufacture of those toothbrushes that |
| 10:40:00 | 6 | was done using a common mold has a license to the '184 |
| 10:40:03 | 7 | patent? |
| 10:40:04 | 8 | MR. KALER:    I'm going to object to you asking |
| 10:40:06 | 9 | him about a product that's not in front of him and he |
| 10:40:09 | 10 | says he hasn't studied with regard to the '184 patent. |
| 10:40:14 | 11 | THE WITNESS:    Could you repeat the question, |
| 10:40:15 | 12 | please. |
| 10:40:16 | 13 | BY MR. KUDLAC: |
| 10:40:17 | 14 | Q.    Sure.    Do you have any information as to |
| 10:40:19 | 15 | whether the company that was manufacturing those |
| 10:40:20 | 16 | toothbrushes has a license to the '184 patent? |
| 10:40:23 | 17 | A.    No, sir. |
| 10:40:27 | 18 | Q.    In addition to the clothes hangers and |
| 10:40:40 | 19 | toothbrushes that you just referred to, can you recall |
| 10:40:41 | 20 | any other work for MRL, Inc., involving injection |
| 10:40:43 | 21 | molding -- |
| 10:40:43 | 22 | A.    Yes. |
| 10:40:43 | 23 | Q.    -- separate and apart from lawsuits? |
| 10:40:45 | 24 | A.    Yes.    This is a sort of tricky area, and -- |
| 10:41:06 | 25 | like, the questions come up, Does this involve a |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| 10:41:11 | 1 | lawsuit, and the answer we gave was no, because the suit |
| 10:41:14 | 2 | hasn't been filed. |
| 10:41:17 | 3 | Do you mean was there a potential for a |
| 10:41:18 | 4 | lawsuit, or had a lawsuit actually been filed? |
| 10:41:22 | 5 | Q.   Let me clarify for you. |
| 10:41:24 | 6 | A.   All right. |
| 10:41:24 | 7 | Q.   I recognize there can be some concern there. |
| 10:41:26 | 8 | What I'm looking for when I use "separate and |
| 10:41:29 | 9 | apart from lawsuits," I'm looking for work that you did |
| 10:41:32 | 10 | that did not involve trying to determine whether |
| 10:41:35 | 11 | something infringed, or work involved in a lawsuit. |
| 10:41:40 | 12 | What I'm looking for is work that you were |
| 10:41:42 | 13 | doing that didn't or wouldn't -- wasn't destined to be |
| 10:41:45 | 14 | part of a lawsuit; where you were doing consulting, |
| 10:41:48 | 15 | trying to fix a problem, trying to diagnose a problem, |
| 10:41:53 | 16 | something along those lines. |
| 10:41:54 | 17 | A.   Yes. |
| 10:41:55 | 18 | Q.   So other than the clothes hanger and the |
| 10:41:58 | 19 | toothbrushes, what other injection molding work for MRL, |
| 10:42:01 | 20 | Inc., can you think of? |
| 10:42:03 | 21 | A.   We took a look at fittings that were made for |
| 10:42:11 | 22 | plastic plumbing. |
| 10:42:12 | 23 | Q.   Anything else? |
| 10:42:14 | 24 | A.   I'd have to go back and look at my records. |
| 10:42:18 | 25 | Q.   Okay.   In your CV there are several papers that |

| 10:42:34 | 1 | refer to something called the Annual Technical |
| 10:42:38 | 2 | Conference, ANTEC, A-N-T-E-C, of the Society of Plastics |
| 10:42:47 | 3 | Engineers. |
| 10:42:48 | 4 | A.    Is there a question? |
| 10:42:49 | 5 | Q.    I was -- I'm getting to the question. |
| 10:42:51 | 6 | A.    Okay. |
| 10:42:51 | 7 | Q.    So let me start again. |
| 10:42:53 | 8 | In your CV, there's a reference in a couple of |
| 10:42:55 | 9 | the papers that you list there to the Annual Technical |
| 10:42:58 | 10 | Conference, ANTEC, of the Society of Plastics Engineers. |
| 10:43:02 | 11 | Can you describe for me what this Annual |
| 10:43:04 | 12 | Technical Conference is. |
| 10:43:10 | 13 | A.    Yes.    The name is pretty self-explanatory: |
| 10:43:14 | 14 | It's the national meeting for the Society of Plastics |
| 10:43:20 | 15 | Engineers which is held once a year. |
| 10:43:23 | 16 | Q.    Is that something that you went to? |
| 10:43:24 | 17 | A.    I've been to a number of them. |
| 10:43:26 | 18 | Q.    And have you presented speeches or papers at |
| 10:43:29 | 19 | those? |
| 10:43:30 | 20 | A.    Yes. |
| 10:43:31 | 21 | Q.    Is that a -- is that annual technical |
| 10:43:34 | 22 | conference a big event for the Society of Plastics |
| 10:43:38 | 23 | Engineers? |
| 10:43:41 | 24 | A.    For the Society of Plastics Engineers, it would |
| 10:43:44 | 25 | be the biggest event. |

| 10:44:17 | 1 | MR. KUDLAC: Would you mind if we took about a |
|---|---|---|
| 10:44:18 | 2 | 10-minute break? |
| 10:44:20 | 3 | THE WITNESS: That's fine. |
| 10:44:22 | 4 | THE VIDEO OPERATOR: Off the record at 10:44. |
| 10:44:24 | 5 | (Recess from 10:44 a.m. to 10:59 a.m.) |
| 10:59:52 | 6 | THE VIDEO OPERATOR: Back on the record at |
| 10:59:53 | 7 | 10:59. |
| 10:59:56 | 8 | BY MR. KUDLAC: |
| 10:59:59 | 9 | Q. Dr. Petrie, can you tell me how many different |
| 11:00:02 | 10 | cases -- that is, lawsuits that have actually been |
| 11:00:07 | 11 | filed -- you've worked on that relate to or involve |
| 11:00:10 | 12 | either the inventor in this case, Ole Sorensen, or |
| 11:00:17 | 13 | patents that are owned or assigned to the Sorensen |
| 11:00:21 | 14 | Trust? |
| 11:00:26 | 15 | A. No, I can't give you an exact number on that. |
| 11:00:30 | 16 | Q. Can you remember any of the cases that have |
| 11:00:31 | 17 | involved either the same inventor, Ole Sorensen, or the |
| 11:00:35 | 18 | Sorensen Trust, or patents that he was an inventor on? |
| 11:00:39 | 19 | A. Well, there's the automobile taillight cases, |
| 11:00:46 | 20 | you know, which -- you know, you refreshed my memory |
| 11:00:49 | 21 | with Federal Mogul and Daimler, and there was a Fuji |
| 11:01:03 | 22 | case that I just remembered -- excuse me -- and there's |
| 11:01:21 | 23 | this case, and -- you know, I would have to go back and |
| 11:01:27 | 24 | look at my records. |
| 11:01:29 | 25 | Q. Do you think that there are more than 10 cases |

Deposition of Stephen Paul Petrie, Ph.D.      SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 11:01:34 | 1 | in that list? |
| 11:01:37 | 2 | A.  Because the auto taillight case was very |
| 11:01:40 | 3 | complex, there were a lot of defendants, there may have |
| 11:01:44 | 4 | been, but I'm not sure of the exact number. |
| 11:01:51 | 5 | Q.  Can you give me an estimate about how much time |
| 11:01:54 | 6 | you've spent in the last year working on cases of this |
| 11:01:59 | 7 | kind. |
| 11:02:02 | 8 | MR. KALER:  Objection.  Ambiguous as to "of |
| 11:02:04 | 9 | this kind." |
| 11:02:06 | 10 | MR. KUDLAC:  Let me rephrase that. |
| 11:02:08 | 11 | Q.  Can you give me an estimate as to how much time |
| 11:02:10 | 12 | you spent over the last year working on cases involving |
| 11:02:14 | 13 | either the Sorensen Trust or the inventor -- patents |
| 11:02:18 | 14 | assigned to or invented by Ole Sorensen? |
| 11:02:22 | 15 | A.  In the past year? |
| 11:02:24 | 16 | Q.  Yes. |
| 11:02:25 | 17 | A.  It's -- I can't give you a number, but it would |
| 11:02:28 | 18 | be very small. |
| 11:02:40 | 19 | Q.  In the two years before that, can you give me |
| 11:02:42 | 20 | an estimate of how much time you spent on those kinds of |
| 11:02:45 | 21 | cases that I referred to? |
| 11:02:47 | 22 | A.  Not really. |
| 11:02:52 | 23 | Q.  Is it something more than very small? |
| 11:02:58 | 24 | A.  I don't keep track of, like, billable hours, so |
| 11:03:02 | 25 | I really don't know. |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| 11:03:05 | 1 | Q. Can you give me an estimate of how much you've |
| 11:03:08 | 2 | been compensated for your work on the cases relating to |
| 11:03:12 | 3 | Ole Sorensen as an inventor and patents invented by him, |
| 11:03:16 | 4 | or cases brought by Sorensen, or the Sorensen Trust, or |
| 11:03:24 | 5 | Turn-Key? |
| 11:03:25 | 6 | A. The question's a little bit ambiguous. |
| 11:03:26 | 7 | Are you talking about the total amount of |
| 11:03:26 | 8 | compensation, or the rate of compensation? |
| 11:03:29 | 9 | Q. First, the total amount of compensation. |
| 11:03:31 | 10 | A. I have no idea. |
| 11:03:33 | 11 | Q. Do you know if it's more than $100,000? |
| 11:03:37 | 12 | A. In the past two years? |
| 11:03:39 | 13 | Q. Yes, sir. |
| 11:03:46 | 14 | A. Is the question do I know it's more than |
| 11:03:48 | 15 | $100,000? |
| 11:03:50 | 16 | Q. Is it more than 100,000? |
| 11:03:53 | 17 | A. No. |
| 11:03:54 | 18 | Q. What is the rate of compensation? |
| 11:03:56 | 19 | A. $200 per hour. |
| 11:04:15 | 20 | Q. When were you first contacted about this case? |
| 11:04:23 | 21 | MR. KALER: And by "this case," you mean |
| 11:04:27 | 22 | Sorensen versus Lexar, I take it. |
| 11:04:29 | 23 | MR. KUDLAC: I'll rephrase the question to make |
| 11:04:31 | 24 | it clear. |
| 11:04:32 | 25 | Q. When were you first contacted about performing |

Deposition of Stephen Paul Petrie, Ph.D.                SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 11:04:35 | 1 | any work on the Sorensen versus Lexar Media case? |
| 11:04:40 | 2 | A.   Maybe -- again, estimating -- possibly a month |
| 11:04:44 | 3 | ago. |
| 11:04:52 | 4 | Q.   And, as you understand it, what is the scope of |
| 11:04:55 | 5 | your engagement on this case? |
| 11:04:59 | 6 | A.   I'm working as a consultant. |
| 11:05:05 | 7 | Q.   To do what? |
| 11:05:07 | 8 | A.   To examine the Lexar product and to examine the |
| 11:05:17 | 9 | patent and to proffer an opinion. |
| 11:05:29 | 10 | Q.   And to proffer an opinion on what? |
| 11:05:32 | 11 | A.   On whether or not I believe the product |
| 11:05:39 | 12 | infringes on the patent. |
| 11:05:51 | 13 | Q.   I believe that there were some materials |
| 11:05:54 | 14 | brought that are what you looked at or what you relied |
| 11:05:57 | 15 | on in forming your opinion, that were brought to the |
| 11:06:00 | 16 | deposition. |
| 11:06:02 | 17 | Is that right? |
| 11:06:02 | 18 | A.   Yes. |
| 11:06:03 | 19 | Q.   Could we go through and identify those -- |
| 11:06:05 | 20 | A.   Yes. |
| 11:06:06 | 21 | Q.   -- for the record now? |
| 11:06:09 | 22 | And since some of them are physical things, I |
| 11:06:12 | 23 | may ask you to -- or figure out a way we can get them to |
| 11:06:17 | 24 | be shown on the video camera. |
| 11:06:20 | 25 | We won't mark them with an exhibit because they |

Deposition of Stephen Paul Petrie, Ph.D.                SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 11:06:22 | 1 | are things that will stay in the custody of the |
| 11:06:24 | 2 | plaintiff in this case, but just so that we have a -- |
| 11:06:29 | 3 | some record of them, so we may need some help from the |
| 11:06:37 | 4 | videographer to get these -- |
| 11:06:40 | 5 | A.    Are these in focus? |
| 11:06:42 | 6 | MR. KALER:  You need to put those like on a |
| 11:06:44 | 7 | white sheet to give it some background. |
| 11:06:46 | 8 | MR. KUDLAC:  Yes, thank you.  I was just going |
| 11:06:48 | 9 | to suggest that. |
| 11:07:51 | 10 | THE WITNESS:  Uh-oh.  Do you see what happened |
| 11:07:55 | 11 | to the ring? |
| 11:07:57 | 12 | MR. KALER:  What ring? |
| 11:08:00 | 13 | THE WITNESS:  The ring that goes on there so |
| 11:08:03 | 14 | you can hook it up to something so you don't lose it. |
| 11:08:07 | 15 | MR. KALER:  The key fob ring? |
| 11:08:09 | 16 | THE WITNESS:  Yes.  Actually, it's a cotter |
| 11:08:12 | 17 | ring, but -- is it in there? |
| 11:08:14 | 18 | MR. KALER:  I don't see that, no. |
| 11:08:19 | 19 | BY MR. KUDLAC: |
| 11:08:19 | 20 | Q.    Could it have slipped into the -- that? |
| 11:08:23 | 21 | A.    It may have. |
| 11:08:28 | 22 | No.  Empty. |
| 11:08:34 | 23 | Q.    I see it.  It's in the end of the cap. |
| 11:08:37 | 24 | A.    Oh, it's in the end of the cap. |
| 11:08:40 | 25 | No -- |

| | | |
|---|---|---|
| 11:08:42 | 1 | Q.    Flip it over.  See? |
| 11:08:45 | 2 | A.    Oh, it is stuffed in there.  Very good. |
| 11:08:48 | 3 | Q.    Well, every now and then. |
| 11:08:50 | 4 | A.    That is good.  Very observant.  There we go. |
| 11:08:53 | 5 | Now we have it in its entirety. |
| 11:09:20 | 6 | Q.    All right.  And then also you had two other |
| 11:09:23 | 7 | things that you had with those, the two drawings that |
| 11:09:26 | 8 | you have in your -- |
| 11:09:28 | 9 | A.    Those weren't the product that I examined. |
| 11:09:30 | 10 | Q.    But did you examine the drawings that you |
| 11:09:33 | 11 | had -- |
| 11:09:34 | 12 | A.    Yes. |
| 11:09:34 | 13 | Q.    And that was something that you relied on in |
| 11:09:37 | 14 | forming your opinion that was in your declaration? |
| 11:09:41 | 15 | A.    Yes. |
| 11:09:41 | 16 | Q.    Okay.  So, if you wouldn't mind, would you hold |
| 11:09:46 | 17 | those up just so we can get them -- just so we can |
| 11:09:50 | 18 | identify them. |
| 11:09:51 | 19 | MR. KALER:  Those are large and small copies of |
| 11:09:53 | 20 | the same drawing. |
| 11:09:56 | 21 | THE WITNESS:  Right.  So this is the small one. |
| 11:09:59 | 22 | BY MR. KUDLAC: |
| 11:09:59 | 23 | Q.    We don't need to see the large one if they are |
| 11:10:03 | 24 | the same thing.  I will take counsel's representation |
| 11:10:06 | 25 | they are the same thing. |

| | | |
|---|---|---|
| 11:10:07 | 1 | Counsel, when you get a chance, can we have a |
| 11:10:10 | 2 | copy of -- |
| 11:10:11 | 3 | MR. KALER: Absolutely. |
| 11:10:11 | 4 | MR. KUDLAC: Thank you very much. |
| 11:10:11 | 5 | MR. KALER: Would you like a large or small |
| 11:10:13 | 6 | copy? |
| 11:10:14 | 7 | MR. KUDLAC: Maybe one of each. Maybe at the |
| 11:10:16 | 8 | next break we could get a copy of the small one and we |
| 11:10:19 | 9 | can mark that and just put it in the record, if that |
| 11:10:20 | 10 | would be okay with you. |
| 11:10:22 | 11 | MR. KALER: That would be fine. |
| 11:10:25 | 12 | BY MR. KUDLAC: |
| 11:10:25 | 13 | Q. So what -- if you wouldn't mind, could we go |
| 11:10:28 | 14 | through these, just to identify what they are for the |
| 11:10:30 | 15 | record, and we can start with just the paper items to |
| 11:10:34 | 16 | get those out of the way. |
| 11:10:36 | 17 | The first being on your right-hand side closest |
| 11:10:40 | 18 | to you, the thing called -- |
| 11:10:44 | 19 | A. Well, I mean, to start with, the product -- I |
| 11:10:48 | 20 | think the first thing would be this case that it was |
| 11:10:51 | 21 | bought in -- |
| 11:10:51 | 22 | Q. Okay. |
| 11:10:52 | 23 | A. -- plastic case. And I've worked on these |
| 11:10:57 | 24 | products for companies and, you know, people say, Why do |
| 11:11:04 | 25 | they make the case so big? |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 11:11:05 | 1 | It's so you can't put it in your pants pocket |
| 11:11:09 | 2 | and steal the thing, so this would be a non-pilferable |
| 11:11:13 | 3 | item. |
| 11:11:14 | 4 | So then they have this piece of plastic-coated |
| 11:11:18 | 5 | material, and this is a 128-megabyte jump drive, and |
| 11:11:24 | 6 | basically it's a USB storage device with data |
| 11:11:30 | 7 | protection. |
| 11:11:31 | 8 | Q.    Okay. |
| 11:11:32 | 9 | A.    So this is the sort of boilerplate that |
| 11:11:39 | 10 | explains the thing. |
| 11:11:40 | 11 | Then they have a User's Guide, which really has |
| 11:11:50 | 12 | nothing to do with the matter at hand; and then there's |
| 11:11:51 | 13 | this description of it, you know, which -- |
| 11:11:54 | 14 | Q.    This one says, "JumpDrive Secure Quick Start |
| 11:11:59 | 15 | Guide"? |
| 11:12:00 | 16 | A.    Yes.  And I didn't start this so it's not |
| 11:12:02 | 17 | really germane. |
| 11:12:05 | 18 | Q.    Fair enough. |
| 11:12:06 | 19 | A.    Then we have the electronics, the guts of it, |
| 11:12:11 | 20 | and this is right directly in front of my index finger, |
| 11:12:14 | 21 | and this contains the storage device and the -- I'd call |
| 11:12:20 | 22 | it microcircuitry that goes with it. |
| 11:12:23 | 23 | The front part up here, nearest my index |
| 11:12:27 | 24 | finger, is a USB-2 plug that goes into the -- in my |
| 11:12:36 | 25 | case, the CRT with my computer. |