EXHIBIT F
Part 2

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 11:12:41 | 1 | What they have surrounding this is two plastic |
| 11:12:51 | 2 | halves and one of these, okay, has obviously been |
| 11:13:01 | 3 | altered to remove the grips, okay, which are shown here |
| 11:13:09 | 4 | and here; and then to cover or protect the USB device, |
| 11:13:18 | 5 | they have this plastic cap.  And then this cotter ring |
| 11:13:26 | 6 | should really be over here, because it goes on the back |
| 11:13:30 | 7 | here and here, and some people will use a lanyard, okay, |
| 11:13:35 | 8 | to put it around their neck so they don't lose it.  And |
| 11:13:38 | 9 | I lost one of these out of my pocket one time, just came |
| 11:13:41 | 10 | out, and here's some kid at school got a nice jump |
| 11:13:45 | 11 | drive, but that's okay. |
| 11:13:47 | 12 | Q.    Merry Christmas, right? |
| 11:13:49 | 13 | A.    Right. |
| 11:13:50 | 14 | So basically that's the Lexar JumpDrive. |
| 11:13:54 | 15 | Q.    Okay.  So when you -- when you first saw the |
| 11:13:58 | 16 | Lexar JumpDrive that we have here in front of us, was it |
| 11:14:02 | 17 | in the condition that we see it now? |
| 11:14:05 | 18 | A.    Yes. |
| 11:14:06 | 19 | Q.    So you did not take it apart; is that correct? |
| 11:14:11 | 20 | A.    That is correct, sir. |
| 11:14:12 | 21 | Q.    And did you remove the grips from the one part |
| 11:14:16 | 22 | of the plastic shell that has the grips removed? |
| 11:14:24 | 23 | A.    Is the question did I remove these two parts |
| 11:14:28 | 24 | from this part? |
| 11:14:29 | 25 | Q.    Yes.  So let me rephrase that. |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 11:14:31 | 1 | Did you remove -- what do you want to refer to |
| 11:14:36 | 2 | those two black pieces as? |
| 11:14:39 | 3 | A.  Grips. |
| 11:14:39 | 4 | Q.  Okay.  Did you remove the two black grips from |
| 11:14:42 | 5 | the plastic shell? |
| 11:14:44 | 6 | A.  No, sir. |
| 11:14:46 | 7 | Q.  Do you know who did? |
| 11:14:48 | 8 | A.  Yes, sir. |
| 11:14:48 | 9 | Q.  And how do you know that? |
| 11:14:56 | 10 | A.  Two ways. |
| 11:15:00 | 11 | Q.  Would you tell me what they are. |
| 11:15:01 | 12 | A.  I was told that by Attorney Kaler, and I was |
| 11:15:07 | 13 | also told that by Mr. Paul Brown. |
| 11:15:10 | 14 | Q.  Okay.  Did you witness Mr. Brown -- okay. |
| 11:15:14 | 15 | Let me ask you:  Who took them apart? |
| 11:15:18 | 16 | A.  Well, to the best of my knowledge, Mr. Paul |
| 11:15:22 | 17 | Brown. |
| 11:15:23 | 18 | Q.  Okay.  And is that what Mr. Kaler told you? |
| 11:15:26 | 19 | A.  Yes, sir. |
| 11:15:27 | 20 | Q.  And that's what Mr. Brown told you? |
| 11:15:30 | 21 | A.  That's correct. |
| 11:15:30 | 22 | Q.  Okay.  Did you witness Mr. Brown take the grips |
| 11:15:32 | 23 | off the plastic shell? |
| 11:15:34 | 24 | A.  No. |
| 11:15:34 | 25 | Q.  Who disassembled the Lexar JumpDrive that we |

| 11:15:38 | 1 | see here? |
| 11:15:39 | 2 | A.   To the best of my knowledge, Mr. Paul Brown. |
| 11:15:42 | 3 | Q.   And did you witness Mr. Brown disassemble the |
| 11:15:45 | 4 | Lexar JumpDrive? |
| 11:15:46 | 5 | A.   No, sir. |
| 11:15:47 | 6 | Q.   Do you know who purchased the Lexar JumpDrive? |
| 11:15:51 | 7 | A.   No, sir. |
| 11:15:51 | 8 | Q.   Do you know where it was purchased? |
| 11:15:53 | 9 | A.   No, sir. |
| 11:16:02 | 10 | Q.   Do you know who prepared the drawings that were |
| 11:16:04 | 11 | referred to earlier that you showed -- that you held up? |
| 11:16:16 | 12 | A.   No, sir. |
| 11:16:30 | 13 | Q.   When did you first see the Lexar JumpDrive that |
| 11:16:32 | 14 | we have here on this page in front of us? |
| 11:16:40 | 15 | A.   Again, to the best of my knowledge, maybe two |
| 11:16:43 | 16 | or three weeks ago. |
| 11:16:44 | 17 | Q.   And have you seen any other Lexar JumpDrives? |
| 11:16:48 | 18 | A.   No, sir. |
| 11:17:12 | 19 | Q.   And where did you first see the Lexar |
| 11:17:14 | 20 | JumpDrive?  Was that here in San Diego? |
| 11:17:18 | 21 | A.   That's a compound question. |
| 11:17:21 | 22 | Q.   Let me rephrase it, then. |
| 11:17:24 | 23 | Where did you first see the Lexar JumpDrive? |
| 11:17:26 | 24 | A.   Ipswich, Massachusetts. |
| 11:17:31 | 25 | Q.   And was anybody else there when you first saw |

| | | |
|---|---|---|
| 11:17:34 | 1 | it? |
| 11:17:38 | 2 | A. Best of my knowledge, no. |
| 11:17:41 | 3 | Q. And what did you do to inspect the Lexar |
| 11:17:44 | 4 | JumpDrive? |
| 11:17:55 | 5 | A. I looked at it basically with the unaided eye. |
| 11:17:58 | 6 | Q. Anything else? |
| 11:17:59 | 7 | A. Then I reassembled it and saw how it went |
| 11:18:06 | 8 | together. |
| 11:18:11 | 9 | Q. Did you take it apart again? |
| 11:18:14 | 10 | A. Yes, sir. |
| 11:18:20 | 11 | Q. And when you say you reassembled it, what did |
| 11:18:24 | 12 | you do? |
| 11:18:26 | 13 | A. I oriented it in different positions until it |
| 11:18:30 | 14 | snapped back together. |
| 11:18:32 | 15 | Q. You didn't -- did you put the grips back on? |
| 11:18:36 | 16 | A. After the two halves of the plastic were |
| 11:18:41 | 17 | superimposed on the circuitry. |
| 11:18:46 | 18 | Q. And then did you remove the grips again? |
| 11:18:52 | 19 | A. I just took my finger off and they fell off. |
| 11:18:55 | 20 | Q. Oh, I see. So you didn't glue them back on or |
| 11:18:58 | 21 | anything like that? |
| 11:18:59 | 22 | A. No. |
| 11:19:00 | 23 | Q. Did you do any kind of testing of the Lexar |
| 11:19:05 | 24 | JumpDrive? |
| 11:19:06 | 25 | A. Well, yes. |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | | |
|---|---|---|---|
| 11:19:08 | 1 | Q. | What did you do? |
| 11:19:10 | 2 | A. | I visually inspected it with the aided eye. |
| 11:19:15 | 3 | Q. | Aided or unaided?  I'm sorry. |
| 11:19:18 | 4 | A. | Aided. |
| 11:19:25 | 5 | Q. | Aided with -- by what? |
| 11:19:26 | 6 | A. | Jeweler's loupe that clamps on my spectacles. |
| 11:19:31 | 7 | Q. | Any other kind of testing? |
| 11:19:33 | 8 | A. | Yes. |
| 11:19:33 | 9 | Q. | What?  What else? |
| 11:19:38 | 10 | A. | Mechanical abrasion. |
| 11:19:40 | 11 | Q. | And what did you do? |
| 11:19:42 | 12 | A. | A couple of different things. |
| 11:19:44 | 13 | Q. | Tell me what they were. |

11:19:52   14        A.    If you take a look at the two halves of the

11:19:58   15    plastic covering for the circuitry, we see the presence

11:20:06   16    of a molded-in pin on one side and a locating hole or

11:20:19   17    bush on the other side, and we see these both on the top

11:20:22   18    and the bottom of the jump drive.

11:20:26   19            And if you get this in the right light, you can

11:20:38   20    see some shiny areas around where these pins and holes

11:20:44   21    were, and also down in here.  So the question became,

11:20:51   22    Well, how did they put this together?

11:20:59   23            So I mean I never cut my nails that short, so I

11:21:05   24    was able to dig and just scrape a little bit to see if

11:21:09   25    there was any residue that you could peel off which

| | | |
|---|---|---|
| 11:21:11 | 1 | would indicate the presence of a solvent adhesive. |
| 11:21:18 | 2 | Q.    And did you find any residue that would |
| 11:21:20 | 3 | indicate the presence of a solvent adhesive? |
| 11:21:24 | 4 | A.    Well, it's very difficult to say for a fact |
| 11:21:29 | 5 | because this is all the work that I did, but to me, if I |
| 11:21:37 | 6 | had to guess or opine, I would guess or opine that this |
| 11:21:44 | 7 | thing was staked. |
| 11:21:48 | 8 | Q.    What do you mean by "staked"? |
| 11:21:52 | 9 | A.    Ultrasonically welded. |
| 11:22:06 | 10 | Q.    And why would you opine that? |
| 11:22:08 | 11 | A.    Well, if I wanted to do a more thorough |
| 11:22:11 | 12 | analysis, which I don't think is necessary here, I could |
| 11:22:19 | 13 | take this to a laboratory where they have a lady that |
| 11:22:22 | 14 | works and she is very deft with a scalpel and she could |
| 11:22:27 | 15 | scrape off this layer of material, and we could take a |
| 11:22:33 | 16 | look at it with a microscopic Fourier transform infrared |
| 11:22:39 | 17 | spectrophotometer and determine the chemical composition |
| 11:22:43 | 18 | of the material. |
| 11:22:44 | 19 | Q.    And would that show you whether there was an |
| 11:22:47 | 20 | adhesive used? |
| 11:22:49 | 21 | A.    If it differed from the chemical composition of |
| 11:22:53 | 22 | the underlying gray material, it would strongly indicate |
| 11:22:58 | 23 | that an adhesive was used.  If it was the same as the |
| 11:23:03 | 24 | underlying gray material, then this would lead us to |
| 11:23:08 | 25 | conclude that it was more probable that this was staked |

| | | |
|---|---|---|
| 11:23:11 | 1 | together. |
| 11:23:12 | 2 | Q.    When you say "staked together," are we talking |
| 11:23:17 | 3 | about the top and bottom halves being put together? |
| 11:23:20 | 4 | A.    Yes. |
| 11:23:20 | 5 | Q.    Okay.  So we are talking about the gray |
| 11:23:22 | 6 | material that's along the area where the two -- where |
| 11:23:25 | 7 | the top and bottom half meet? |
| 11:23:27 | 8 | A.    Well, it would be the gray material where we've |
| 11:23:29 | 9 | got the pin and the hole. |
| 11:23:32 | 10 | Q.    I see. |
| 11:23:54 | 11 | Was there any other testing that you did in |
| 11:23:57 | 12 | your analysis? |
| 11:23:57 | 13 | A.    Yes. |
| 11:23:57 | 14 | Q.    What else did you do? |
| 11:24:00 | 15 | A.    Well, I took a look at the surfaces underneath |
| 11:24:10 | 16 | which Mr. Brown had removed the grips; and, again, with |
| 11:24:18 | 17 | my fingernail, I scraped down in an area in which I |
| 11:24:25 | 18 | would have gated the gray part of the product. |
| 11:24:32 | 19 | Q.    When you say "gated," what do you mean? |
| 11:24:35 | 20 | A.    In the injection molding process, we plasticate |
| 11:24:39 | 21 | the material to be able to make it flow, and then we |
| 11:24:44 | 22 | force it with pressure through a gate into the cavity in |
| 11:24:48 | 23 | the mold to form the piece part, and the gate is the |
| 11:24:55 | 24 | point at which it enters the cavity of the mold. |
| 11:25:05 | 25 | Q.    And why did you do that? |

Deposition of Stephen Paul Petrie, Ph.D.                SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 11:25:08 | 1 | A.    To try and ascertain a couple of different |
| 11:25:10 | 2 | things. |
| 11:25:14 | 3 | Q.    What were you trying to ascertain? |
| 11:25:16 | 4 | A.    Well, when I look at a plastic part, the first |
| 11:25:19 | 5 | thing I ask is:  How was it made? |
| 11:25:27 | 6 | Q.    Okay.  Anything else that you were trying to |
| 11:25:30 | 7 | ascertain? |
| 11:25:32 | 8 | A.    The other thing I try and ascertain is what |
| 11:25:38 | 9 | method was used to make it. |
| 11:25:48 | 10 | Q.    Okay.  Anything else? |
| 11:25:52 | 11 | A.    Yeah.  I try and take a look at how the |
| 11:25:55 | 12 | material was gated and how the material flowed in the |
| 11:26:00 | 13 | mold. |
| 11:26:15 | 14 | Q.    And did your inspection of the Lexar JumpDrive |
| 11:26:18 | 15 | allow you to ascertain how the material was gated? |
| 11:26:23 | 16 | A.    Yes, sir. |
| 11:26:24 | 17 | Q.    And did it allow you to ascertain how the |
| 11:26:27 | 18 | material flowed in the mold? |
| 11:26:29 | 19 | A.    To a certain extent, yes, sir. |
| 11:26:31 | 20 | Q.    And to what extent did it allow you to |
| 11:26:34 | 21 | ascertain how the material flowed in the mold? |
| 11:26:36 | 22 | A.    Well, what I did was I took a look at the other |
| 11:26:41 | 23 | side from where I found the evidence of the gate, and I |
| 11:26:45 | 24 | found no gate, so this means that the plastic would have |
| 11:26:53 | 25 | flowed from here downward to fill that half of the mold, |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 11:26:56 | 1 | and then across the mold and outwardly in a radial |
| 11:27:02 | 2 | pattern to fill the rest of the mold. |
| 11:27:13 | 3 | Q.   And by that do you mean there was evidence of a |
| 11:27:15 | 4 | gate on one side of the plastic shell, but no evidence |
| 11:27:18 | 5 | of a gate on the other side of the plastic shell? |
| 11:27:23 | 6 | A.   That's correct, sir. |
| 11:27:25 | 7 | Q.   And when I say "plastic shell," actually I'm |
| 11:27:27 | 8 | only referring to one-half of the plastic shell. |
| 11:27:30 | 9 | Do you understand that? |
| 11:27:37 | 10 | If what you are looking at is two separate |
| 11:27:37 | 11 | halves -- |
| 11:27:37 | 12 | A.   Yes. |
| 11:27:38 | 13 | Q.   -- are they, in your opinion, being molded in |
| 11:27:39 | 14 | separate processes? |
| 11:27:41 | 15 | A.   No. |
| 11:27:43 | 16 | Q.   Are they molded all together as one piece? |
| 11:27:49 | 17 | A.   No. |
| 11:27:53 | 18 | Q.   Are they -- let's talk about the half on the |
| 11:27:57 | 19 | right-hand side. |
| 11:27:58 | 20 | A.   On my right, or -- your left? |
| 11:28:00 | 21 | Q.   Your right, my left. |
| 11:28:01 | 22 | A.   Okay. |
| 11:28:02 | 23 | Q.   Is that molded in a separate process from the |
| 11:28:05 | 24 | other half of the shell? |
| 11:28:07 | 25 | MR. KALER:   And for clarity for the video, I |

| | | |
|---|---|---|
| 11:28:09 | 1 | assume you are referring to the piece that has had the |
| 11:28:12 | 2 | grips removed, correct? |
| 11:28:14 | 3 | MR. KUDLAC:  Yes. |
| 11:28:15 | 4 | MR. KALER:  Okay. |
| 11:28:17 | 5 | THE WITNESS:  Could you reread the question, |
| 11:28:19 | 6 | please. |
| 11:28:20 | 7 | BY MR. KUDLAC: |
| 11:28:20 | 8 | Q.  Let me reask it.  I think that might help. |
| 11:28:24 | 9 | In your opinion, is the half that's on the |
| 11:28:27 | 10 | right, the one that has the -- on your right, the one |
| 11:28:30 | 11 | that has the grips removed, is that molded separate and |
| 11:28:33 | 12 | apart from the molding of the half that's on your left |
| 11:28:36 | 13 | that still has the grips attached? |
| 11:28:39 | 14 | A.  What do you mean by "separate and apart"? |
| 11:28:42 | 15 | Q.  So that it would have -- molded such that it |
| 11:28:47 | 16 | would have to later be connected to the half on the |
| 11:28:50 | 17 | left. |
| 11:28:51 | 18 | A.  Yes. |
| 11:28:51 | 19 | Q.  Okay.  And that was the ultrasonic welding that |
| 11:28:55 | 20 | you were referring to?  Is that how you think they are |
| 11:28:57 | 21 | connected? |
| 11:28:58 | 22 | A.  Most probably. |
| 11:29:01 | 23 | Q.  Okay.  And so when we were talking about the |
| 11:29:09 | 24 | evidence of gating, were you talking about the half |
| 11:29:11 | 25 | that's on your right, the one with the grips removed? |

Deposition of Stephen Paul Petrie, Ph.D.                      SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 11:29:15 | 1 | A.    Yes. |
| 11:29:15 | 2 | Q.    And which side of that half that's on your |
| 11:29:18 | 3 | right did you find the evidence of gating? |
| 11:29:21 | 4 | A.    Right there, where my index finger is. |
| 11:29:24 | 5 | Q.    Okay.  So it's on the -- your left side of |
| 11:29:28 | 6 | the -- of that half of the shell; is that correct? |
| 11:29:31 | 7 | A.    That's correct. |
| 11:29:32 | 8 | Q.    Okay.  And you did not find any evidence of |
| 11:29:34 | 9 | gating on the right-hand side of that half of the shell? |
| 11:29:37 | 10 | A.    Not for the gray plastic part. |
| 11:29:41 | 11 | Q.    Not for the gray plastic part?  Okay. |
| 11:29:44 | 12 | Did you find any evidence of gating for the |
| 11:29:48 | 13 | grips? |
| 11:29:50 | 14 | A.    Yes. |
| 11:29:50 | 15 | Q.    Did you find that on both sides? |
| 11:29:52 | 16 | A.    Yes, sir. |
| 11:29:53 | 17 | Q.    And what does that indicate to you? |
| 11:30:00 | 18 | A.    It further confirmed my suspicion of how this |
| 11:30:05 | 19 | was made. |
| 11:30:09 | 20 | Q.    And what is your suspicion of how it was made? |
| 11:30:12 | 21 | A.    Well, from my experience, I would say, you |
| 11:30:18 | 22 | know, that this was mostly -- most probably made in a |
| 11:30:24 | 23 | two-shot injection molding process. |
| 11:30:31 | 24 | Q.    What do you mean by "a two-shot injection |
| 11:30:34 | 25 | molding process"? |

| | | |
|---|---|---|
| 11:30:36 | 1 | A.    The first shot would be the hard plastic, and |
| 11:30:42 | 2 | the second or subsequent shot would be the softer black |
| 11:30:49 | 3 | grip or grips. |
| 11:30:57 | 4 | Q.    Would that be done with a common mold? |
| 11:31:00 | 5 | Let me rephrase that question. |
| 11:31:02 | 6 | When you referred to a two-shot injection |
| 11:31:04 | 7 | molding process, were you referring to a process that |
| 11:31:07 | 8 | uses a common mold? |
| 11:31:16 | 9 | A.    I wouldn't put it that way.  I would say it |
| 11:31:18 | 10 | uses a first common mold part. |
| 11:31:25 | 11 | Q.    In the way that you're using "two-shot |
| 11:31:32 | 12 | injection molding process," do all two-shot injection |
| 11:31:36 | 13 | molding processes use a first common mold part? |
| 11:31:46 | 14 | A.    I have no way of answering that, because I |
| 11:31:49 | 15 | don't know of all two-shot injection molding processes |
| 11:31:54 | 16 | that exist. |
| 11:31:58 | 17 | You know, maybe somebody has invented something |
| 11:32:01 | 18 | or developed something I haven't seen, or maybe I just |
| 11:32:05 | 19 | haven't seen it. |
| 11:32:13 | 20 | Q.    In the way that you used the term "two-shot |
| 11:32:16 | 21 | injection molding process," are you referring to a |
| 11:32:19 | 22 | process that uses a first common mold part? |
| 11:32:24 | 23 | A.    Yes. |
| 11:32:46 | 24 | Q.    Is it possible that the halves of the Lexar |
| 11:32:50 | 25 | JumpDrive that we have before us were made with a |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 11:32:54 | 1 | process that did not use a two-shot injection molding |
| 11:32:57 | 2 | process? |
| 11:33:01 | 3 | A.    Yes. |
| 11:33:02 | 4 | Q.    And is it possible that the Lexar JumpDrive |
| 11:33:05 | 5 | that we have before us was made with a process that used |
| 11:33:10 | 6 | two separate single-shot injection molding processes? |
| 11:33:15 | 7 | A.    Yes. |
| 11:33:39 | 8 | Q.    When you performed your inspection and testing |
| 11:33:42 | 9 | of the Lexar JumpDrive, did you take any notes? |
| 11:33:53 | 10 | A.    Yes. |
| 11:33:54 | 11 | Q.    Do you still have them? |
| 11:33:55 | 12 | A.    No. |
| 11:33:57 | 13 | Q.    Did you provide them to Mr. Kaler? |
| 11:34:00 | 14 | A.    Yes, sir. |
| 11:34:03 | 15 | Q.    Thank you.  Were you -- when you did your |
| 11:34:08 | 16 | inspection of the Lexar JumpDrive, were you provided any |
| 11:34:13 | 17 | notes or documentation other than what we've seen here |
| 11:34:18 | 18 | today that were part of the package that you opened up |
| 11:34:21 | 19 | for us? |
| 11:34:22 | 20 | A.    No, sir. |
| 11:34:23 | 21 | Q.    Were you given any photographs? |
| 11:34:27 | 22 | A.    No, sir. |
| 11:34:28 | 23 | Q.    Did you take any photographs? |
| 11:34:30 | 24 | A.    No, sir. |
| 11:34:39 | 25 | Q.    From your inspection of the Lexar JumpDrive, |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 11:34:42 | 1 | can you tell what injection molding machine was used to |
| 11:34:48 | 2 | make it? |
| 11:34:55 | 3 | A.   Well, again, with an engineering level of |
| 11:34:58 | 4 | certainty, I'd say that this was probably made on a |
| 11:35:06 | 5 | two-shot injection molding machine with a rotary table |
| 11:35:10 | 6 | or mold. |
| 11:35:28 | 7 | Q.   You used the phrase, "engineering level of |
| 11:35:31 | 8 | certainty." |
| 11:35:32 | 9 | A.   Yes. |
| 11:35:33 | 10 | Q.   What does that mean? |
| 11:35:34 | 11 | A.   Well, it's based on the engineering principles |
| 11:35:38 | 12 | that I understand. |
| 11:36:00 | 13 | Q.   As part of your investigation or analysis of |
| 11:36:03 | 14 | the Lexar JumpDrive, did you do anything to determine |
| 11:36:08 | 15 | what processes, other than a two-shot injection molding |
| 11:36:12 | 16 | process, could have been used to manufacture it? |
| 11:36:17 | 17 | A.   Yes, sir. |
| 11:36:18 | 18 | Q.   What did you do? |
| 11:36:26 | 19 | A.   Well, I took a look at the gating of the hard |
| 11:36:30 | 20 | gray plastic material vis-a-vis the gating of the soft |
| 11:36:37 | 21 | black material, and I referred to my experience, okay, |
| 11:36:48 | 22 | in two-shot injection molding, and I concluded that this |
| 11:36:56 | 23 | part was probably -- or most probably made using a |
| 11:37:03 | 24 | two-shot process with a rotary mold. |
| 11:37:32 | 25 | (Exhibit 5 was marked for identification.) |

Deposition of Stephen Paul Petrie, Ph.D.                SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 11:37:33 | 1 | BY MR. KUDLAC: |
| 11:37:33 | 2 | Q.   Sir, I'm handing you what has been marked as |
| 11:37:36 | 3 | Exhibit 5, which is a document entitled, "Declaration of |
| 11:37:41 | 4 | Stephen Petrie, Ph.D., in Support of Plaintiff's Amended |
| 11:37:45 | 5 | Motion for Application of 35 U.S.C. §295 Presumption of |
| 11:37:50 | 6 | Infringement." |
| 11:37:54 | 7 | Sir, do you recognize Exhibit 5? |
| 11:37:58 | 8 | A.   Yes, I do. |
| 11:38:00 | 9 | Q.   Is that the declaration that you have signed in |
| 11:38:03 | 10 | this case of Sorensen versus Lexar Media? |
| 11:38:08 | 11 | A.   Yes, it is. |
| 11:38:11 | 12 | Q.   Sir, do you provide in that declaration, which |
| 11:38:13 | 13 | is Exhibit 5, any description of the gating analysis |
| 11:38:19 | 14 | that you performed in your inspection of the Lexar Media |
| 11:38:24 | 15 | product? |
| 11:38:28 | 16 | A.   In order to save time, to the best of my |
| 11:38:32 | 17 | recollection, no. |
| 11:38:34 | 18 | Q.   Sir, in Exhibit 5, your declaration, do you |
| 11:38:37 | 19 | provide any description of the abrasion testing that you |
| 11:38:42 | 20 | performed? |
| 11:38:44 | 21 | A.   Again, to the best of my knowledge, no. |
| 11:38:57 | 22 | Q.   Sir, in Exhibit 5, your declaration, do you |
| 11:39:00 | 23 | provide a description of your experience with two-shot |
| 11:39:06 | 24 | injection molding processes? |
| 11:39:11 | 25 | A.   Again, to the best of my recollection, no. |

| | |
|---|---|
| 11:39:18 | 1 |
| 11:39:23 | 2 |
| 11:39:31 | 3 |
| 11:39:31 | 4 |
| 11:39:35 | 5 |
| 11:39:38 | 6 |
| 11:39:47 | 7 |
| 11:39:49 | 8 |
| 11:39:57 | 9 |
| 11:39:59 | 10 |
| 11:40:02 | 11 |
| 11:40:04 | 12 |
| 11:40:07 | 13 |
| 11:40:14 | 14 |
| 11:40:16 | 15 |
| 11:40:23 | 16 |
| 11:40:25 | 17 |
| 11:40:30 | 18 |
| 11:40:35 | 19 |
| 11:40:40 | 20 |
| 11:40:47 | 21 |
| 11:40:50 | 22 |
| 11:40:52 | 23 |
| 11:40:53 | 24 |
| 11:40:56 | 25 |

Q.  Sir, in Exhibit 5, do you provide a description of your knowledge of the commercially available injection molding processes?

A.  Again, to the best of my knowledge, no.

Q.  Sir, in Exhibit 5 do you provide a description of your analysis in determining what is a commercially reasonable injection molding process?

A.  Again, to the best of my knowledge, no.

Q.  I apologize.  I rephrase -- I'm going to have to ask a similar question to the last one, because I think I got the phrasing wrong.

In Exhibit 5, sir, do you provide a description of what you consider to be a commercially practical injection molding process?

A.  Again, to the best of my knowledge, no.

Q.  And, one more question of that nature:  Sir, in Exhibit 5, do you provide a description of your analysis of how you came to the conclusion as to what a commercially practical injection molding process is?

A.  Again, no.

Q.  Sir, did you prepare your declaration, Exhibit 5?

A.  I worked on it.

Q.  Okay.  Who did you work on it with?

A.  Attorney Kaler.

| | | |
|---|---|---|
| 11:40:57 | 1 | Q.   And you reviewed it for accuracy before you |
| 11:41:01 | 2 | signed it? |
| 11:41:02 | 3 | A.   Yes, I did, sir. |
| 11:41:28 | 4 | Q.   As part of your analysis of the Lexar |
| 11:41:30 | 5 | JumpDrive, did you do any comparison of the Lexar |
| 11:41:36 | 6 | 128 meg JumpDrive to any other jump drives? |
| 11:41:44 | 7 | A.   No. |
| 11:41:44 | 8 | Q.   As part of your investigation of the Lexar |
| 11:41:46 | 9 | JumpDrive, did you do anything to determine what |
| 11:41:50 | 10 | injection molding processes were available in China |
| 11:41:53 | 11 | between the years 2002 and 2008? |
| 11:41:59 | 12 | A.   No. |
| 11:42:44 | 13 | Q.   Sir, if I could get you to turn to page 2 of |
| 11:42:47 | 14 | Exhibit 5, which is your declaration -- |
| 11:42:49 | 15 | A.   Yes. |
| 11:42:52 | 16 | Q.   -- in the paragraph numbered 3, towards the end |
| 11:42:58 | 17 | of that paragraph you make reference to discernible |
| 11:43:03 | 18 | elements of Claim 1 of United States patent 4,935,184. |
| 11:43:11 | 19 | Do you see that? |
| 11:43:12 | 20 | A.   Yes. |
| 11:43:25 | 21 | (Exhibit 6 was marked for identification.) |
| 11:43:26 | 22 | BY MR. KUDLAC: |
| 11:43:26 | 23 | Q.   I know you already have a copy of this, but I'm |
| 11:43:29 | 24 | going to mark it for the record. |
| 11:43:31 | 25 | Handing you what has been marked as Exhibit 6, |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 11:43:34 | 1 | which is a copy of U.S. patent 4,935,184, and if it's |
| 11:43:42 | 2 | okay with you, I will refer to that as the '184 patent. |
| 11:43:45 | 3 | A.    That's fine. |
| 11:43:49 | 4 | Q.    Maybe save us a little time. |
| 11:43:51 | 5 | In paragraph 3 of your declaration, which is |
| 11:43:53 | 6 | Exhibit 5, when you refer to discernible elements of |
| 11:43:58 | 7 | Claim 1 of the '184 patent, what were you referring to? |
| 11:44:04 | 8 | A.    Well, if we go back in the patent to the -- |
| 11:44:14 | 9 | Q.    And I just realized that pages 9 and 10 are not |
| 11:44:18 | 10 | in it, in my own copy, at least. |
| 11:44:21 | 11 | MR. KALER:  In that case, I'll object this is |
| 11:44:23 | 12 | not a true copy of the '184 patent. |
| 11:44:25 | 13 | MR. KUDLAC:  It is not. |
| 11:44:26 | 14 | How is it possible that we end up with a copy |
| 11:44:28 | 15 | that doesn't have the columns that we care about? |
| 11:44:32 | 16 | THE WITNESS:  Human error. |
| 11:44:34 | 17 | MR. KUDLAC:  Yes, I guess so. |
| 11:44:35 | 18 | Why don't we -- I know it's early, but why |
| 11:44:37 | 19 | don't we take a few-minute break and see if we can |
| 11:44:41 | 20 | straighten this out. |
| 11:44:42 | 21 | MR. KALER:  Sure. |
| 11:44:42 | 22 | MR. KUDLAC:  I'll see if I can straighten it |
| 11:44:42 | 23 | out. |
| 11:44:43 | 24 | MR. KALER:  If you need use of the copy |
| 11:44:44 | 25 | machine, I can provide that. |

| | | |
|---|---|---|
| 11:44:45 | 1 | MR. KUDLAC:   Thank you. |
| 11:44:46 | 2 | THE VIDEO OPERATOR:   This concludes Tape 1 of |
| 11:44:48 | 3 | the deposition of Stephen Petrie.  Off the record at |
| 11:44:51 | 4 | 11:44. |
| 11:44:53 | 5 | (Discussion off the record) |
| 11:44:53 | 6 | (Luncheon recess taken at 11:55 a.m.) |
| 11:44:53 | 7 | * * * |
| 13:03:43 | 8 | San Diego, California  June 4, 2008  1:04 p.m. |
| 13:04:17 | 9 | THE VIDEO OPERATOR:   This is Tape 2 of the |
| 13:04:19 | 10 | deposition of Stephen Petrie, Ph.D.  Back on the record |
| 13:04:22 | 11 | at 1:04 p.m. |
| 13:04:26 | 12 | |
| 13:04:26 | 13 | CONTINUED EXAMINATION |
| 13:04:26 | 14 | BY MR. KUDLAC: |
| 13:04:26 | 15 | Q.   Dr. Petrie, we've handed you what has been |
| 13:04:29 | 16 | marked as Defendants' Exhibit 6, which is a full copy |
| 13:04:34 | 17 | now of the '184 patent. |
| 13:04:40 | 18 | And before the break I was asking you a |
| 13:04:41 | 19 | question about paragraph 3 of your declaration, so if |
| 13:04:42 | 20 | you have that in front of you also, I'll direct your |
| 13:04:45 | 21 | attention back to that and reask the question if I |
| 13:04:48 | 22 | could, just so we're all on the same page. |
| 13:04:52 | 23 | So paragraph 3 of your declaration, which is |
| 13:04:56 | 24 | Exhibit 5, in the next to the last line of paragraph 3 |
| 13:05:09 | 25 | of your declaration, it makes reference to the |

| | | |
|---|---|---|
| 13:05:12 | 1 | discernible elements of Claim 1 of the '184 patent. |
| 13:05:16 | 2 | Do you see that? |
| 13:05:18 | 3 | A.    Yes. |
| 13:05:18 | 4 | Q.    And what were you referring to as the |
| 13:05:21 | 5 | discernible elements of Claim 1 of the '184 patent? |
| 13:05:27 | 6 | MR. KALER:  Okay.  I'm going to read an |
| 13:05:28 | 7 | objection into the record. |
| 13:05:30 | 8 | The patent local rules for the Northern |
| 13:05:32 | 9 | District of California dated 2001, which are the |
| 13:05:37 | 10 | effective local rules for this particular case, at |
| 13:05:41 | 11 | §2.5(b) notes that a party may object, however, to |
| 13:05:50 | 12 | responding to the following categories of discovery |
| 13:05:53 | 13 | requests or to decline to provide information in its |
| 13:05:57 | 14 | initial disclosures under Federal Rules of Civil |
| 13:06:01 | 15 | Procedure 26(a)(1) on the ground that they are premature |
| 13:06:05 | 16 | in light of the timetable provided in the patent local |
| 13:06:08 | 17 | rules Section (b), requests seeking to elicit from the |
| 13:06:13 | 18 | patent claimant a comparison of the asserted claims and |
| 13:06:17 | 19 | the accused apparatus, product, device, process, method, |
| 13:06:21 | 20 | act, or other instrumentality. |
| 13:06:24 | 21 | And so for this line of questioning, I'm |
| 13:06:27 | 22 | interposing an objection under patent local rules §2-5, |
| 13:06:32 | 23 | subsection (b). |
| 13:06:37 | 24 | BY MR. KUDLAC: |
| 13:06:37 | 25 | Q.    You can answer. |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 13:06:40 | 1 | A.    I can answer? |
| 13:06:41 | 2 | MR. KALER:  You can answer the question.  I'm |
| 13:06:42 | 3 | just preserving the objection. |
| 13:06:44 | 4 | THE WITNESS:  All right.  Could you reread the |
| 13:06:47 | 5 | question, please. |
| 13:06:49 | 6 | BY MR. KUDLAC: |
| 13:06:49 | 7 | Q.    What were you referring to as the discernible |
| 13:06:53 | 8 | elements of Claim 1 of the '184 patent in paragraph 3 of |
| 13:06:58 | 9 | your declaration? |
| 13:06:59 | 10 | A.    Well, if we turn to the '184 patent, in |
| 13:07:07 | 11 | column 9 on line 30, it's stated, "I Claim:  1," so |
| 13:07:22 | 12 | that's Claim 1, and underneath that, it lists the |
| 13:07:28 | 13 | elements of Claim 1. |
| 13:07:34 | 14 | Q.    So were you referring -- so are those the ones |
| 13:07:39 | 15 | that are referred to with the parentheticals around the |
| 13:07:42 | 16 | letters A through I? |
| 13:07:44 | 17 | MR. KALER:  Can we just agree that there's a |
| 13:07:45 | 18 | continuing objection to all questions on this issue |
| 13:07:47 | 19 | under patent local rule 2-5 sub (b)? |
| 13:07:51 | 20 | MR. KUDLAC:  Of course. |
| 13:07:51 | 21 | MR. KALER:  Okay.  So I won't have to interpose |
| 13:07:54 | 22 | that again. |
| 13:07:54 | 23 | MR. KUDLAC:  I appreciate that. |
| 13:07:55 | 24 | MR. KALER:  Okay.  Go ahead. |
| | 25 | |

| | | |
|---|---|---|
| 13:07:59 | 1 | BY MR. KUDLAC: |
| 13:07:59 | 2 | Q.    So when you refer to discernible elements of |
| 13:08:04 | 3 | Claim 1 in the '184 patent in paragraph 3 of your |
| 13:08:08 | 4 | declaration, were you referring to the paragraphs that |
| 13:08:10 | 5 | are labeled A through I of Claim 1 of the '184 patent? |
| 13:08:14 | 6 | A.    Yes, sir. |
| 13:08:15 | 7 | Q.    Were you also referring to the paragraph |
| 13:08:19 | 8 | numbered 1 that leads up to the paragraph with an A, |
| 13:08:22 | 9 | which then that paragraph is approximately on lines 31 |
| 13:08:28 | 10 | through 39 of column 9? |
| 13:08:38 | 11 | A.    Yes. |
| 13:08:39 | 12 | Q.    So by referring to all the discernible elements |
| 13:08:42 | 13 | of Claim 1 of the '184 patent, is it your intent in your |
| 13:08:47 | 14 | declaration to say that all of the elements -- that |
| 13:08:51 | 15 | first introductory paragraph to Claim 1, as well as the |
| 13:08:54 | 16 | paragraphs labeled A through I -- are all discernible |
| 13:08:58 | 17 | from your inspection of the Lexar JumpDrive? |
| 13:09:03 | 18 | MR. KALER:  Objection.  Misstates his |
| 13:09:05 | 19 | declaration. |
| 13:09:09 | 20 | The witness may answer. |
| 13:09:10 | 21 | THE WITNESS:  Well, basically what I was going |
| 13:09:12 | 22 | from was column 9, line 30; the column 10, line 13. |
| 13:09:27 | 23 | BY MR. KUDLAC: |
| 13:09:27 | 24 | Q.    From your inspection of the Lexar JumpDrive, |
| 13:09:31 | 25 | were you able to determine that each of the steps listed |

| | | |
|---|---|---|
| 13:09:37 | 1 | for Claim 1 in the '184 patent were performed in the |
| 13:09:44 | 2 | process of manufacturing the Lexar JumpDrive? |
| 13:09:52 | 3 | A. I was not able to absolutely determine that |
| 13:09:58 | 4 | these steps were followed, but I concluded that these |
| 13:10:06 | 5 | steps were most probably followed. |
| 13:10:17 | 6 | Q. Were there any steps of the -- of Claim 1 of |
| 13:10:21 | 7 | the '184 patent that were harder for you to determine |
| 13:10:26 | 8 | they were most probably followed? |
| 13:10:33 | 9 | A. Reflecting back on my analysis, I would say no. |
| 13:10:40 | 10 | Q. So they were all about the same level of |
| 13:10:42 | 11 | difficulty in order to determine that they were most |
| 13:10:44 | 12 | probably followed? |
| 13:10:52 | 13 | A. In my end analysis, yes. |
| 13:10:58 | 14 | Q. In paragraph 3 of your declaration, the -- on |
| 13:11:02 | 15 | the second and third lines, it refers to the two |
| 13:11:08 | 16 | plastic -- injection molded external plastic shells of |
| 13:11:13 | 17 | the Lexar Media JumpDrive 128 megabyte, and then in |
| 13:11:18 | 18 | parentheses, "(the Accused Products)." |
| 13:11:21 | 19 | Do you see that, sir? |
| 13:11:23 | 20 | A. Yes. |
| 13:11:26 | 21 | Q. When you refer to "the Accused Products," are |
| 13:11:29 | 22 | you referring to the entirety of the Lexar Media |
| 13:11:37 | 23 | JumpDrive as it's finally put together? |
| 13:12:12 | 24 | A. In this case, I was -- restate the question. |
| 13:12:27 | 25 | Q. Yes. When you refer to the "Accused Products" |

| | | |
|---|---|---|
| 13:12:30 | 1 | in paragraph 3 of your declaration, where it defines |
| 13:12:33 | 2 | "Accused Products" -- do you see that in the second and |
| 13:12:37 | 3 | third lines there? |
| 13:12:38 | 4 | A.    Yes. |
| 13:12:38 | 5 | Q.    Okay.  When you are referring to "Accused |
| 13:12:45 | 6 | Products" in your declaration, were you referring to the |
| 13:12:46 | 7 | entirety of the Lexar Media JumpDrive as it's finally |
| 13:12:48 | 8 | assembled? |
| 13:12:50 | 9 | A.    Yes. |
| 13:12:51 | 10 | Q.    And so that refers to the two halves of the |
| 13:12:55 | 11 | plastic shell as they are assembled together enclosing |
| 13:12:59 | 12 | the electronics; is that correct? |
| 13:13:22 | 13 | A.    Well, I looked at it from the perspective of |
| 13:13:27 | 14 | the entire jump drive, but, you know, given the |
| 13:13:33 | 15 | hypothetical that maybe this part could be sold by |
| 13:13:44 | 16 | itself, it could be just one part or the other. |
| 13:13:46 | 17 | Q.    Okay.  I'm not trying to pose a hypothetical; |
| 13:13:50 | 18 | I'm just trying to determine what you were referring to |
| 13:13:53 | 19 | as accused product, and whether you meant the whole |
| 13:13:55 | 20 | thing as assembled together. |
| 13:13:58 | 21 | A.    Well, initially that's what I meant, was the |
| 13:14:02 | 22 | whole thing together. |
| 13:14:04 | 23 | Q.    Okay.  Is there any point in your declaration |
| 13:14:33 | 24 | where you refer to -- where you use the term "Accused |
| 13:14:38 | 25 | Products" in a different way? |

| 13:14:45 | 1 | A. Not to my knowledge. |
| 13:15:00 | 2 | Q. Would you turn to paragraph 39 of your |
| 13:15:03 | 3 | declaration, which is Exhibit 5, and it's on page 8. |
| 13:15:17 | 4 | A. Yes. |
| 13:15:19 | 5 | Q. In paragraph 39 of your declaration, you state, |
| 13:15:23 | 6 | "My examination of the relevant features of the Accused |
| 13:15:28 | 7 | Products, and my knowledge of practices in the plastic |
| 13:15:33 | 8 | injection molding field together form the basis of my |
| 13:15:36 | 9 | determination that the Accused Products with high |
| 13:15:38 | 10 | confidence are manufactured utilizing the '184 process |
| 13:15:43 | 11 | as detailed further below." |
| 13:15:46 | 12 | Do you see that? |
| 13:15:47 | 13 | A. Yes. |
| 13:15:51 | 14 | Q. Does this paragraph state all of the bases for |
| 13:15:55 | 15 | your opinions that you set forth in the declaration |
| 13:15:57 | 16 | concerning whether the Lexar Media JumpDrive is |
| 13:16:02 | 17 | manufactured with a process covered by the '184 patent? |
| 13:16:12 | 18 | A. I missed the first part of the question. I'm |
| 13:16:14 | 19 | sorry. |
| 13:16:15 | 20 | Q. Does this paragraph, paragraph 39 of your |
| 13:16:17 | 21 | declaration, state the full bases for your opinions |
| 13:16:21 | 22 | concerning whether the Lexar Media JumpDrive was |
| 13:16:24 | 23 | manufactured utilizing a process covered by the '184 |
| 13:16:28 | 24 | patent? |
| 13:16:28 | 25 | A. No. |

| 13:16:29 | 1 | Q. Okay. Where else do you state the bases that |
| 13:16:34 | 2 | form your opinion on that matter? |
| 13:16:37 | 3 | A. It's not stated. |
| 13:16:38 | 4 | Q. Okay. Why not? |
| 13:16:51 | 5 | A. I did further examination of the Lexar |
| 13:16:54 | 6 | JumpDrive subsequent to writing this document. |
| 13:17:06 | 7 | Q. For the opinions that you express in this |
| 13:17:10 | 8 | document, your declaration, are the full bases stated in |
| 13:17:14 | 9 | paragraph 39? |
| 13:17:27 | 10 | A. Well, below I go in and -- for the detailed |
| 13:17:36 | 11 | list. |
| 13:17:42 | 12 | Q. So the -- below is the further detail of how |
| 13:17:45 | 13 | you compared the claims to what you believe to be the |
| 13:17:47 | 14 | process used to manufacture; is that correct? |
| 13:17:50 | 15 | A. Yes, sir. |
| 13:17:59 | 16 | Q. Other than the examination of the relevant |
| 13:18:03 | 17 | features of the accused products that you refer to in |
| 13:18:06 | 18 | paragraph 39, and the knowledge of practices in the |
| 13:18:11 | 19 | plastic injection molding field that you also refer to |
| 13:18:15 | 20 | in paragraph 9, are there any other bases for your |
| 13:18:18 | 21 | opinions stated in the declaration? |
| 13:18:27 | 22 | A. At this point when I wrote the document, I'd |
| 13:18:30 | 23 | say no. |
| 13:18:30 | 24 | Q. Okay. In your declaration, is it correct that |
| 13:19:18 | 25 | you did not provide a summary of the available injection |

| 13:19:22 | 1 | molding processes between the 2002 and 2008 time frame? |
| 13:19:28 | 2 | A.    That's correct. |
| 13:19:35 | 3 | Q.    And do you recall -- I'm sorry.  Let me |
| 13:19:38 | 4 | rephrase that. |
| 13:19:39 | 5 | In your declaration, do you recall saying that |
| 13:19:41 | 6 | you relied on the file history of the '184 patent to |
| 13:19:45 | 7 | perform your analysis? |
| 13:19:54 | 8 | A.    I -- yes, this would be included. |
| 13:19:56 | 9 | Q.    Okay.  But does the declaration say that? |
| 13:20:01 | 10 | A.    I don't think so. |
| 13:20:06 | 11 | Q.    Does your declaration set forth your |
| 13:20:09 | 12 | construction of any of the terms in the claims of the |
| 13:20:12 | 13 | '184 patent? |
| 13:20:21 | 14 | A.    I compared, okay, the claims set forth under |
| 13:20:28 | 15 | Claim 1 to the product, but I didn't make a claim |
| 13:20:33 | 16 | construction chart. |
| 13:20:35 | 17 | Q.    Did you set forth in the declaration what you |
| 13:20:37 | 18 | believed to be the -- the proper construction of the |
| 13:20:40 | 19 | claims? |
| 13:20:43 | 20 | A.    Yes. |
| 13:20:45 | 21 | Q.    Could you show that to me. |
| 13:20:52 | 22 | A.    Well, for example, on page 9, line 9 -- this |
| 13:21:05 | 23 | would be 47 -- "The accused products have a closed end |
| 13:21:09 | 24 | and an open end and are produced by cyclic injection |
| 13:21:15 | 25 | molding." |

| | | |
|---|---|---|
| 13:21:19 | 1 | And "I claim: 1, a method of cyclic injection |
| 13:21:24 | 2 | molding, a thin-walled, hollow plastic product having a |
| 13:21:27 | 3 | closed end and an open end," so I went through and I |
| 13:21:31 | 4 | compared the product to the claims to see if it met each |
| 13:21:36 | 5 | and every one of these requirements. |
| 13:21:39 | 6 | Q.    Okay.   That's actually not what I'm asking you, |
| 13:21:42 | 7 | so let me rephrase my question. |
| 13:21:44 | 8 | A.    Okay. |
| 13:21:44 | 9 | Q.    I must have -- |
| 13:21:45 | 10 | A.    Sorry. |
| 13:21:46 | 11 | Q.    That's quite all right.   I understand what you |
| 13:21:48 | 12 | are saying and I must be saying something wrong.   So let |
| 13:21:52 | 13 | me try it again.   I must be asking the question in a bad |
| 13:21:56 | 14 | way that we are talking past each other. |
| 13:21:59 | 15 | In terms of stating what you believe the claims |
| 13:22:01 | 16 | of the patent mean -- regardless of whether they apply |
| 13:22:05 | 17 | to the accused products or not, but what the claim terms |
| 13:22:09 | 18 | mean -- in any place in your declaration did you go |
| 13:22:11 | 19 | through the claim and say, This claim term means this, |
| 13:22:19 | 20 | and, That claim term means that?   Did you do anything -- |
| 13:22:22 | 21 | any of that kind of analysis in your declaration? |
| 13:22:24 | 22 | A.    No. |
| 13:22:52 | 23 | Q.    Is it correct that you did not have the |
| 13:22:55 | 24 | opportunity to inspect the molds that were used to form |
| 13:22:59 | 25 | the products that are accused of infringement, the Lexar |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 13:23:04 | 1 | 128 meg JumpDrive? |
| 13:23:07 | 2 | A.    That's correct. |
| 13:23:09 | 3 | Q.    Would -- is -- I'm sorry.  Let me rephrase |
| 13:23:12 | 4 | that. |
| 13:23:12 | 5 | Is inspecting the molds the only way to |
| 13:23:15 | 6 | determine with, as I believe you said earlier, absolute |
| 13:23:19 | 7 | certainty what process was used to manufacture the |
| 13:23:23 | 8 | accused products? |
| 13:23:29 | 9 | A.    To be absolutely sure, I'd have to say yes. |
| 13:23:37 | 10 | Q.    Would inspecting mold drawings allow you to be |
| 13:23:41 | 11 | absolutely sure? |
| 13:23:46 | 12 | A.    Well, I would say no. |
| 13:23:49 | 13 | Q.    Why not? |
| 13:23:51 | 14 | A.    Because I can conceive a way to make mold |
| 13:23:56 | 15 | drawings that would produce the same product using a |
| 13:24:02 | 16 | different process. |
| 13:24:03 | 17 | Q.    For example, a single-shot process that was |
| 13:24:06 | 18 | repeated that you used -- I'm sorry. |
| 13:24:08 | 19 | For example, a multiple single-shot process? |
| 13:24:14 | 20 | A.    Yes, sir. |
| 13:24:14 | 21 | Q.    And by "multiple single-shot process," you |
| 13:24:18 | 22 | understand me to mean doing a single-shot injection |
| 13:24:21 | 23 | mold, taking the plastic piece out, and putting it into |
| 13:24:25 | 24 | a different mold? |
| 13:24:26 | 25 | A.    That's correct. |

KRAMM & ASSOCIATES, INC.                                                                        Page: 78

| | | |
|---|---|---|
| 13:24:26 | 1 | Q.   Okay.  And is it your understanding that using |
| 13:24:29 | 2 | a multiple single-shot process would not use the claims |
| 13:24:32 | 3 | of the '184 patent? |
| 13:24:37 | 4 | A.   Yes. |
| 13:24:54 | 5 | Q.   If you knew what brand and version of an |
| 13:24:59 | 6 | injection molding machine was used in the manufacturing |
| 13:25:02 | 7 | process, would that allow you to tell whether a multiple |
| 13:25:07 | 8 | single-shot process was used, as compared to a two-shot |
| 13:25:14 | 9 | injection molding process? |
| 13:25:16 | 10 | A.   It's -- |
| 13:25:17 | 11 | MR. KALER:  Can you clarify that question?  Are |
| 13:25:18 | 12 | you -- are you saying if he knew the molding machine |
| 13:25:23 | 13 | that was used? |
| 13:25:25 | 14 | MR. KUDLAC:  Yes. |
| 13:25:25 | 15 | MR. KALER:  Is that the question? |
| 13:25:31 | 16 | THE WITNESS:  It might be possible if, for |
| 13:25:32 | 17 | instance, a company like Husky made a certain model |
| 13:25:38 | 18 | injection molding machine that was only capable of |
| 13:25:41 | 19 | making single shots, but if they made the same company |
| 13:25:47 | 20 | and same model number that was available in a single |
| 13:25:51 | 21 | shot and multi-shot configuration, then no. |
| 13:25:56 | 22 | BY MR. KUDLAC: |
| 13:25:56 | 23 | Q.   Because you could use it in either way, either |
| 13:25:59 | 24 | method, a single shot or a multi-shot? |
| 13:26:03 | 25 | A.   Yes. |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| 13:26:03 | 1 | Q.   Fair enough. |
| 13:26:53 | 2 | Would you turn to page 4 of your declaration, |
| 13:26:55 | 3 | and, in particular, paragraph 17. |
| 13:27:06 | 4 | In paragraph 17 of your declaration, you state |
| 13:27:10 | 5 | that "The '184 patent provides a long-sought elegant |
| 13:27:14 | 6 | solution to a pervasive problem in the injection molding |
| 13:27:19 | 7 | of hollow plastic products." |
| 13:27:21 | 8 | Do you see that? |
| 13:27:23 | 9 | A.   Yes. |
| 13:27:23 | 10 | Q.   Do you provide a basis in your declaration for |
| 13:27:25 | 11 | saying the '184 patent provides a long-sought elegant |
| 13:27:29 | 12 | solution? |
| 13:27:33 | 13 | A.   No. |
| 13:27:34 | 14 | Q.   Did you ever write about in any of your papers |
| 13:27:37 | 15 | that there was a need for -- that there was a pervasive |
| 13:27:43 | 16 | problem in injection molding of hollow plastic products, |
| 13:27:46 | 17 | i.e., how to stabilize the mold parts against relative |
| 13:27:50 | 18 | movement against the highly pressurized injection of |
| 13:27:53 | 19 | molten plastic? |
| 13:27:56 | 20 | A.   What do you mean by "papers"? |
| 13:27:58 | 21 | Q.   Any of the papers that are listed in your CV. |
| 13:28:05 | 22 | A.   Would these include lecture notes? |
| 13:28:07 | 23 | Q.   Well, let's just talk about the papers that are |
| 13:28:10 | 24 | in your CV. |
| 13:28:11 | 25 | A.   So we're limiting this to technical |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 13:28:13 | 1 | publications? |
| 13:28:14 | 2 | Q.  Yes, sir. |
| 13:28:15 | 3 | A.  No, I haven't. |
| 13:28:16 | 4 | Q.  Have you talked about that subject in lecture |
| 13:28:18 | 5 | notes? |
| 13:28:19 | 6 | A.  Yes, sir. |
| 13:28:19 | 7 | Q.  And when did you do that? |
| 13:28:22 | 8 | A.  When I teach courses in injection molding. |
| 13:28:24 | 9 | Q.  And when did you start talking about that being |
| 13:28:27 | 10 | a pervasive problem? |
| 13:28:32 | 11 | A.  I don't know.  As long as I've been teaching |
| 13:28:35 | 12 | injection molding. |
| 13:28:36 | 13 | Q.  Is that since 1979? |
| 13:28:40 | 14 | A.  Yeah, covered core shift. |
| 13:28:45 | 15 | Q.  I'm sorry? |
| 13:28:45 | 16 | A.  I've covered core shift. |
| 13:28:47 | 17 | Q.  And core shift is what you're referring to as |
| 13:28:50 | 18 | mold parts -- stabilize the mold parts against relative |
| 13:28:54 | 19 | movement during the highly pressurized injection of |
| 13:28:57 | 20 | molten plastic? |
| 13:28:59 | 21 | A.  Right. |
| 13:28:59 | 22 | Q.  Okay.  Do you still have the lecture notes? |
| 13:29:05 | 23 | A.  I use books and courses on mold design and |
| 13:29:09 | 24 | injection molding that -- this is published in |
| 13:29:11 | 25 | textbooks, so whether or not I still have the slide that |

| | | |
|---|---|---|
| 13:29:17 | 1 | I excerpted, I don't know. |
| 13:29:20 | 2 | Q.   Okay.   That's fine.   I'm just asking if you |
| 13:29:22 | 3 | have them. |
| 13:29:23 | 4 | What textbooks do you use? |
| 13:29:26 | 5 | A.   I use a book by Mangus about how to make |
| 13:29:31 | 6 | injection molds.   I use a couple of books by Potsche -- |
| 13:29:43 | 7 | Q.   By whom? |
| 13:29:44 | 8 | A.   I'm trying to think of how to spell his name. |
| 13:29:47 | 9 | P-o-t-s-c-h-e. |
| 13:29:50 | 10 | -- on injection molding.   It's covered in mold |
| 13:30:02 | 11 | design books and molding books. |
| 13:30:03 | 12 | Q.   Okay.   Would you turn over to paragraph 19 of |
| 13:30:16 | 13 | your declaration, which is on page 5; in particular the |
| 13:30:21 | 14 | third sentence which reads -- on line 10 -- "With regard |
| 13:30:27 | 15 | to those few elements for which absolute determination |
| 13:30:31 | 16 | is not possible without inspection of the mold tooling, |
| 13:30:34 | 17 | the best evidence that can be gathered from the |
| 13:30:36 | 18 | examination of the accused products and a consideration |
| 13:30:39 | 19 | of the commercially reasonable techniques that may be |
| 13:30:43 | 20 | employed shows that those elements were most reasonably |
| 13:30:46 | 21 | present in the accused processes." |
| 13:30:53 | 22 | Do you see that? |
| 13:30:54 | 23 | A.   Yes. |
| 13:30:54 | 24 | Q.   Which elements were you referring to for which |
| 13:30:55 | 25 | absolute determination is not possible without |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| 13:30:56 | 1 | inspection of the mold tooling? |

13:30:56   1   inspection of the mold tooling?

13:31:00   2       A.   Wow.  If we start off under the "I claim," if

13:31:20   3   we take a look at the utilizing a first mold cavity and

13:31:23   4   a second mold cavity, the first mold cavity being

13:31:29   5   defined by a common mold part, this may or may not be

13:31:34   6   discerned.  And, for instance, I give injection mold,

13:31:43   7   the gray part, in a single-shot machine, and then

13:31:48   8   transfer it to a mold on the second machine, and then

13:31:57   9   subsequently injection-mold the grips, or I could do it

13:32:04  10   as stated in the '184 patent:  Using a cyclic injection

13:32:10  11   molding machine with a rotating mold.  I might even gate

13:32:18  12   them the same way.

13:32:21  13       Q.   When you say "gate them the same way," do you

13:32:24  14   mean gate them the same way using the two-shot process

13:32:28  15   versus the two, single-shot processes?

13:32:31  16       A.   Right.

13:32:32  17       Q.   Okay.  In line 13 of that paragraph 19, you

13:32:42  18   refer to consideration of the commercially reasonable

13:32:44  19   techniques that may be employed.

13:32:46  20       A.   Yes.

13:32:48  21       Q.   In your declaration, do you identify any

13:32:55  22   commercially reasonable techniques other than the

13:32:59  23   multi-shot process that you say is covered by the '184

13:33:02  24   patent?

13:33:03  25       A.   No.

| | | |
|---|---|---|
| 13:33:07 | 1 | Q.   And do you provide any detail of the |
| 13:33:08 | 2 | consideration of the commercially reasonable techniques |
| 13:33:10 | 3 | that you went through in your analysis?  Do you provide |
| 13:33:13 | 4 | that in the declaration? |
| 13:33:15 | 5 | A.   No. |
| 13:33:47 | 6 | Q.   Were there any other elements that you were |
| 13:33:52 | 7 | referring to as the few elements for which absolute |
| 13:33:56 | 8 | determination is not possible without inspection of the |
| 13:33:59 | 9 | mold tooling, other than the one that you just referred |
| 13:34:01 | 10 | to? |
| 13:34:18 | 11 | A.   Some of these things go hand in hand, like, for |
| 13:34:21 | 12 | instance, under 1(c), you solidify the injection; inject |
| 13:34:41 | 13 | the first plastic material to form a first plastic |
| 13:34:45 | 14 | material component, combining the first common mold part |
| 13:34:49 | 15 | with the second complementary mold part to assemble the |
| 13:34:54 | 16 | second mold cavity with the first plastic material |
| 13:34:58 | 17 | component attached to the first common mold part, so |
| 13:35:01 | 18 | when the second mold cavity is assembled, the first |
| 13:35:04 | 19 | plastic material component is contained within the |
| 13:35:07 | 20 | second mold cavity; this goes hand in hand with the |
| 13:35:11 | 21 | previous one, because if you're going to do these in two |
| 13:35:15 | 22 | separate machines, you are not going to meet this |
| 13:35:17 | 23 | element either. |
| 13:35:19 | 24 | Q.   So if you are doing them in two separate |
| 13:35:21 | 25 | machines, you won't have a first common mold part, and |

| | | |
|---|---|---|
| 13:35:24 | 1 | so then any of these elements that talk about a first |
| 13:35:28 | 2 | common mold part, they wouldn't be there? |
| 13:35:32 | 3 | A.   Right. |
| 13:35:32 | 4 | Q.   Okay.  Would you look at paragraph 20 of your |
| 13:35:46 | 5 | declaration, and in particular the second sentence that |
| 13:35:49 | 6 | reads, "Most high quality products, as the Accused |
| 13:35:53 | 7 | Products, are made in molds comprising a common mold |
| 13:35:57 | 8 | part." |
| 13:35:57 | 9 | Do you see that? |
| 13:35:58 | 10 | A.   Yes. |
| 13:35:59 | 11 | Q.   Do you provide any basis for your statement -- |
| 13:36:03 | 12 | I'm sorry.  Let me rephrase that. |
| 13:36:05 | 13 | Do you provide any basis in your declaration |
| 13:36:07 | 14 | for the statement that "most high quality products, as |
| 13:36:11 | 15 | the Accused Products, are made in molds comprising a |
| 13:36:14 | 16 | common mold part"? |
| 13:36:15 | 17 | A.   No, I don't. |
| 13:37:09 | 18 | Q.   Would you turn to paragraph 48 of your |
| 13:37:12 | 19 | declaration, which is on page 9. |
| 13:37:31 | 20 | And you'll see if you read paragraph 48, that |
| 13:37:33 | 21 | there's also a reference to the first common mold part |
| 13:37:36 | 22 | in there. |
| 13:37:38 | 23 | If a first common mold part is not used in a |
| 13:37:41 | 24 | process to manufacture the Lexar JumpDrive, then this |
| 13:37:48 | 25 | paragraph 48 would not be true; is that correct? |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 13:38:15 | 1 | A.   What was the question again, please? |
| 13:38:17 | 2 | Q.   If a first common mold part is not used in the |
| 13:38:20 | 3 | manufacturing process for the Lexar JumpDrive that you |
| 13:38:23 | 4 | examined, then paragraph 48 would not be true; is that |
| 13:38:26 | 5 | correct? |
| 13:38:27 | 6 | MR. KALER:   I'm going to object to the |
| 13:38:28 | 7 | characterization of what is opinion testimony |
| 13:38:35 | 8 | specifically with high confidence. |
| 13:39:07 | 9 | THE WITNESS:   Can I have the question again, |
| 13:39:08 | 10 | please. |
| 13:39:10 | 11 | BY MR. KUDLAC: |
| 13:39:11 | 12 | Q.   Sure. |
| 13:39:12 | 13 | Do you want the question again?   I'm sorry. |
| 13:39:15 | 14 | A.   Yes, please. |
| 13:39:16 | 15 | Q.   I thought you said you had a question. |
| 13:39:17 | 16 | The question again -- I probably won't get it |
| 13:39:22 | 17 | exactly the same -- if a first common mold part is not |
| 13:39:25 | 18 | used in the manufacturing process for the Lexar |
| 13:39:28 | 19 | JumpDrive that you examined, then paragraph 48 would not |
| 13:39:34 | 20 | be true; is that correct? |
| 13:39:50 | 21 | A.   I'm really not -- I'm really not sure because, |
| 13:39:53 | 22 | see, these things, again, go hand in hand. |
| 13:39:55 | 23 | But the '184 patent, okay, to be used, you need |
| 13:40:03 | 24 | the first common mold cavity, you need the first common |
| 13:40:10 | 25 | mold part, and then you need the second mold cavity |

| | | |
|---|---|---|
| 13:40:14 | 1 | that's being used in conjunction with the first common |
| 13:40:18 | 2 | mold cavity and the first mold part. |
| 13:40:23 | 3 | So I mean if I took the first mold part and |
| 13:40:28 | 4 | took it out and put it into a different machine -- the |
| 13:40:34 | 5 | way you asked the question, it's sort of ambiguous. |
| 13:40:45 | 6 | Maybe I can explain it a different way. |
| 13:40:47 | 7 | Q.   Why is it ambiguous? |
| 13:40:50 | 8 | A.   Well, for the '184 patent to work, you have to |
| 13:41:00 | 9 | have this first common mold cavity forming this first |
| 13:41:02 | 10 | common mold part, and then you have to have a second |
| 13:41:06 | 11 | complementary cavity in the same machine. |
| 13:41:15 | 12 | Q.   I want to make sure we are getting our |
| 13:41:18 | 13 | terminology right. |
| 13:41:19 | 14 | You have used the term a couple of times, |
| 13:41:21 | 15 | "first common mold part" and now you are talking about a |
| 13:41:25 | 16 | cavity. |
| 13:41:26 | 17 | A.   Right. |
| 13:41:26 | 18 | Q.   Is the first common mold part a -- for lack of |
| 13:41:29 | 19 | a better word, a piece of metal that when mated with |
| 13:41:33 | 20 | another piece of metal or some other hard substance, |
| 13:41:37 | 21 | those two things together form a cavity between them? |
| 13:41:41 | 22 | A.   That's correct. |
| 13:41:41 | 23 | Q.   And then you would take away that second part |
| 13:41:46 | 24 | and bring in another complementary part and put it |
| 13:41:51 | 25 | together with the first piece to form a different |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 13:41:53 | 1 | cavity; is that right? |
| 13:41:55 | 2 | A.   No.   You would take a second mold half and |
| 13:41:58 | 3 | combine it with the first mold half, inclusive of the |
| 13:42:03 | 4 | plastic part -- |
| 13:42:05 | 5 | Q.   Okay. |
| 13:42:06 | 6 | A.   -- to form a second mold cavity. |
| 13:42:09 | 7 | Q.   Okay.  So when we talk about a first common |
| 13:42:11 | 8 | mold part, we are talking about the mold half -- |
| 13:42:14 | 9 | A.   No. |
| 13:42:15 | 10 | Q.   -- half of the first common -- I'm sorry -- |
| 13:42:17 | 11 | first of the half -- first -- when we are talking about |
| 13:42:20 | 12 | the first common mold part, are you talking about half |
| 13:42:26 | 13 | of the first mold cavity? |
| 13:42:30 | 14 | A.   No.  I'm talking about the plastic that's part |
| 13:42:33 | 15 | of the part. |
| 13:42:42 | 16 | Q.   So in paragraph 48 where you say, "The first |
| 13:42:46 | 17 | mold cavity utilized to mold the Accused Product is |
| 13:42:50 | 18 | formed of a first common mold part," are you saying that |
| 13:42:55 | 19 | the first common mold part is referring to a plastic |
| 13:42:59 | 20 | piece that is formed in the cavity? |
| 13:43:09 | 21 | A.   No.  It would be the metal parts. |
| 13:43:14 | 22 | Q.   Okay.  So then the first common mold part would |
| 13:43:17 | 23 | be the half of the mold that is used in the first shot |
| 13:43:21 | 24 | and the second shot? |
| 13:43:23 | 25 | A.   Right. |

| | | |
|---|---|---|
| 13:43:27 | 1 | Q.    Excellent.  I actually thought we were on the |
| 13:43:30 | 2 | same page.  I just wanted to make sure that we were |
| 13:43:33 | 3 | talking about the same thing. |
| 13:43:43 | 4 | Okay.  Let's talk about paragraph 49 for a |
| 13:43:45 | 5 | moment, in your declaration. |
| 13:44:00 | 6 | With respect to the process that was used to |
| 13:44:02 | 7 | manufacture the Lexar JumpDrive, if a first common mold |
| 13:44:08 | 8 | part was not used, then what is said in paragraph 49 |
| 13:44:17 | 9 | would not be true; is that correct? |
| 13:44:25 | 10 | MR. KALER:  Again, I'm going to object to the |
| 13:44:26 | 11 | characterization of true or false on an opinion |
| 13:44:30 | 12 | statement. |
| 13:44:46 | 13 | THE WITNESS:  If the first complementary mold |
| 13:44:51 | 14 | part isn't used, then the '184 process wouldn't be used. |
| 13:44:57 | 15 | Is that the question? |
| 13:44:57 | 16 | BY MR. KUDLAC: |
| 13:44:58 | 17 | Q.    My question was -- and I may have said |
| 13:45:01 | 18 | "complementary" and I didn't mean to, so let me rephrase |
| 13:45:04 | 19 | the question, or restate it, depending on whether I got |
| 13:45:08 | 20 | it right the first time. |
| 13:45:10 | 21 | If a first common mold part was not used in the |
| 13:45:13 | 22 | manufacturing of the Lexar Media JumpDrive that you |
| 13:45:17 | 23 | inspected, then paragraph 49 would not be true; is that |
| 13:45:22 | 24 | correct? |
| 13:45:24 | 25 | A.    Yes. |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| 13:45:28 | 1 | Q.    In the process, as you are setting it forth in |
| 13:45:31 | 2 | the declaration here, it goes through a series of steps. |
| 13:45:37 | 3 | The step that you describe in 48 and then the step that |
| 13:45:41 | 4 | you describe in 49, in that way, the way you've |
| 13:45:46 | 5 | described it in paragraphs 48 and 49, at the end of the |
| 13:45:51 | 6 | step described in 49, at that point, is the first |
| 13:45:55 | 7 | plastic material that you refer to in that paragraph, is |
| 13:45:58 | 8 | that a hollow product at that point? |
| 13:46:04 | 9 | MR. KALER:  Objection.  Relevance. |
| 13:46:09 | 10 | THE WITNESS:  In this case, is the first -- the |
| 13:46:18 | 11 | injected first plastic material, is that a hollow |
| 13:46:21 | 12 | product?  Is that your question? |
| 13:46:24 | 13 | BY MR. KUDLAC: |
| 13:46:24 | 14 | Q.    Yes. |
| 13:46:25 | 15 | A.    The answer would be yes. |
| 13:46:32 | 16 | MR. KALER:  Are you asking with regard to the |
| 13:46:35 | 17 | specific accused product, or are you asking with regard |
| 13:46:37 | 18 | to the '184 patent generally? |
| 13:46:39 | 19 | MR. KUDLAC:  I was asking with respect to the |
| 13:46:42 | 20 | accused product. |
| 13:46:43 | 21 | MR. KALER:  Okay. |
| 13:46:44 | 22 | BY MR. KUDLAC: |
| 13:46:47 | 23 | Q.    Did you understand my question that way, that I |
| 13:46:49 | 24 | was referring to the accused product? |
| 13:46:53 | 25 | A.    Yes. |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 13:46:53 | 1 | Q.   Okay.  Excellent. |
| 13:47:03 | 2 | Would you read paragraph 50 to yourself again |
| 13:47:12 | 3 | and let me know when you're finished. |
| 13:47:44 | 4 | A.   I'm finished. |
| 13:47:45 | 5 | Q.   Okay.  If in the process used to manufacture |
| 13:47:48 | 6 | the Lexar Media JumpDrive that you inspected, a first |
| 13:47:53 | 7 | common mold part is not used, then paragraph 50 would |
| 13:47:57 | 8 | not be true; is that correct? |
| 13:48:00 | 9 | MR. KALER:  Same objection. |
| 13:48:13 | 10 | THE WITNESS:  It may or may not be true. |
| 13:48:27 | 11 | BY MR. KUDLAC: |
| 13:48:30 | 12 | Q.   If a -- if in the process of manufacturing the |
| 13:48:34 | 13 | Lexar Media JumpDrive that you inspected, a first common |
| 13:48:36 | 14 | mold part is not used, then there would not be a step of |
| 13:48:43 | 15 | combining a first common mold part with a second |
| 13:48:48 | 16 | complementary mold part, correct? |
| 13:48:54 | 17 | A.   Correct. |
| 13:49:21 | 18 | Q.   Would you please turn to paragraph 51. |
| 13:49:24 | 19 | In paragraph 51, in the second sentence -- and |
| 13:49:28 | 20 | you can read the whole thing, obviously -- but in the |
| 13:49:30 | 21 | second sentence, you say, "The second plastic material |
| 13:49:35 | 22 | then solidifies to form a second plastic material |
| 13:49:38 | 23 | component that combines with the first plastic material |
| 13:49:41 | 24 | component to produce the Accused Products." |
| 13:49:45 | 25 | Do you see that? |

| | | |
|---|---|---|
| 13:49:47 | 1 | A.    Yes. |
| 13:49:49 | 2 | Q.    Can you explain how -- well, let me ask a |
| 13:49:53 | 3 | couple backup questions. |
| 13:50:01 | 4 | In your declaration, you don't say whether the |
| 13:50:02 | 5 | first plastic material -- sorry. |
| 13:50:03 | 6 | In your declaration, you don't say what the |
| 13:50:04 | 7 | first plastic material is with respect to the Lexar |
| 13:50:06 | 8 | Media JumpDrive, correct? |
| 13:50:08 | 9 | A.    Correct. |
| 13:50:09 | 10 | Q.    And with respect to the second plastic |
| 13:50:11 | 11 | material, in your declaration you don't say what that is |
| 13:50:14 | 12 | with respect to the Lexar Media JumpDrive, correct? |
| 13:50:18 | 13 | A.    That's correct. |
| 13:50:27 | 14 | Q.    And did you attach any drawings of the Lexar |
| 13:50:30 | 15 | Media JumpDrive to your declaration? |
| 13:50:32 | 16 | A.    No. |
| 13:50:34 | 17 | Q.    Did you attach any photographs of the Lexar |
| 13:50:36 | 18 | Media JumpDrive to your declaration? |
| 13:50:38 | 19 | A.    No. |
| 13:50:38 | 20 | MR. KALER:  Is Lexar contending it has not |
| 13:50:51 | 21 | received a copy of drawing D5493? |
| 13:51:03 | 22 | MR. KUDLAC:  I'm sorry.  I don't know what |
| 13:51:04 | 23 | D549 -- I'm not trying to play a game with you, but -- |
| 13:51:09 | 24 | MR. KALER:  I don't think it was attached to |
| 13:51:10 | 25 | the declaration, but I believe that drawing has been |

| | | |
|---|---|---|
| 13:51:13 | 1 | provided to Lexar, yes. |
| 13:51:15 | 2 | BY MR. KUDLAC: |
| 13:51:15 | 3 |    Q.   As you step through the process, going from |
| 13:51:19 | 4 | paragraph 48 to 49 to 50 and then down to 51, at the end |
| 13:51:25 | 5 | of that process as you've described it, at that point do |
| 13:51:32 | 6 | you have both halves of the Lexar Media JumpDrive |
| 13:51:40 | 7 | plastic shell casing? |
| 13:51:45 | 8 |    A.   In which context do you mean?  In the process |
| 13:51:48 | 9 | that I allege this was made with, or in another process? |
| 13:51:52 | 10 |    Q.   In the process that you describe in those |
| 13:51:54 | 11 | paragraphs. |
| 13:51:55 | 12 |    A.   I would have both halves of the product. |
| 13:52:00 | 13 |    Q.   Would they be in the same mold cavity at that |
| 13:52:06 | 14 | point? |
| 13:52:07 | 15 |    A.   No. |
| 13:52:07 | 16 |    Q.   So would they be combined to produce the |
| 13:52:10 | 17 | accused product at that point? |
| 13:52:12 | 18 |    A.   Yes. |
| 13:52:14 | 19 |    Q.   Well, when you say "combined," what do you |
| 13:52:18 | 20 | mean, then? |
| 13:52:19 | 21 |        Let me ask it a different way. |
| 13:52:21 | 22 |        If by the "Accused Product" there you mean the |
| 13:52:23 | 23 | whole thing, at that point after you've gone through |
| 13:52:26 | 24 | step 51, do you have the accused product? |
| 13:52:29 | 25 |        MR. KALER:  So are you asking with regard to |

Deposition of Stephen Paul Petrie, Ph.D.                SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 13:52:31 | 1 | the electronics and everything at this point, or are you |
| 13:52:35 | 2 | just asking about the external casing? |
| 13:52:38 | 3 | MR. KUDLAC: Well, the -- |
| 13:52:40 | 4 | Q. I think it's clear how we defined accused |
| 13:52:42 | 5 | products, so -- |
| 13:52:44 | 6 | A. Well, we defined the accused product as the |
| 13:52:48 | 7 | whole device, so I don't have the electronics, I don't |
| 13:52:53 | 8 | have the cover, and I certainly don't have a cotter |
| 13:52:57 | 9 | ring. |
| 13:52:58 | 10 | Q. And you also don't have the two halves of the |
| 13:53:01 | 11 | shell put together? |
| 13:53:03 | 12 | A. That's correct. |
| 13:53:05 | 13 | Q. So at that point, after step 51 -- I'm sorry. |
| 13:53:12 | 14 | After the step that you describe in |
| 13:53:13 | 15 | paragraph 51, you have not done the ultrasonic welding; |
| 13:53:20 | 16 | is that correct? |
| 13:53:21 | 17 | A. Or attachment of the two halves to each other. |
| 13:53:36 | 18 | Q. So then at the end of the step described in 51, |
| 13:53:38 | 19 | with the way that you've defined "Accused Product," you |
| 13:53:41 | 20 | don't actually have that accused product yet; is that |
| 13:53:44 | 21 | correct? |
| 13:53:45 | 22 | A. No. It's not assembled. |
| 13:54:03 | 23 | Q. In paragraph 52, starting in line 8, there's a |
| 13:54:07 | 24 | sentence that reads, "The stabilization allows the |
| 13:54:11 | 25 | Accused Products to be produced with improved control of |

KRAMM & ASSOCIATES, INC.                                                    Page: 94

| | | |
|---|---|---|
| 13:54:13 | 1 | its dimensions." |
| 13:54:15 | 2 | Do you see that? |
| 13:54:16 | 3 | A.   Yes. |
| 13:54:17 | 4 | Q.   In your declaration, did you provide any |
| 13:54:19 | 5 | description of the improved control of the dimensions of |
| 13:54:24 | 6 | the accused products? |
| 13:54:26 | 7 | A.   No. |
| 13:54:26 | 8 | Q.   Did you provide any description in your |
| 13:54:29 | 9 | declaration of the dimensions -- the measurement of the |
| 13:54:33 | 10 | dimensions that you're referring to in paragraph 52? |
| 13:54:37 | 11 | A.   No. |
| 13:54:38 | 12 | Q.   Did you provide any variance or tolerance |
| 13:54:41 | 13 | measurements for those dimensions? |
| 13:54:43 | 14 | A.   No. |
| 13:55:17 | 15 | Q.   If you'd look at paragraph 55 of your |
| 13:55:20 | 16 | declaration, which is Exhibit 5, in the sentence |
| 13:55:28 | 17 | beginning at line 27, you state that you have "concluded |
| 13:55:33 | 18 | that the only commercially practical processes in which |
| 13:55:37 | 19 | to make the accused products are processes that infringe |
| 13:55:39 | 20 | Claim 1 of the '184 patent." |
| 13:55:41 | 21 | Do you see that? |
| 13:55:42 | 22 | A.   Yes. |
| 13:55:43 | 23 | Q.   And do you provide the basis for your statement |
| 13:55:45 | 24 | that "the only commercially practical processes in which |
| 13:55:48 | 25 | to make the Accused Products are processes that infringe |

| | | |
|---|---|---|
| 13:55:52 | 1 | Claim 1 of the '184 patent"?  Do you provide that basis |
| 13:55:55 | 2 | in your declaration? |
| 13:55:56 | 3 | A.   No. |
| 13:56:05 | 4 | Q.   If you would turn to the final page of the |
| 13:56:09 | 5 | declaration, which is page 11, the paragraph at the top |
| 13:56:16 | 6 | starting in line 1 says, "I have further concluded that |
| 13:56:20 | 7 | the physical evidence indicates the use in the Accused |
| 13:56:25 | 8 | Products of processes that infringe Claim 1 of the '184 |
| 13:56:27 | 9 | patent, thus satisfying the substantially likely |
| 13:56:32 | 10 | requirement of 35 U.S.C. §295," do you see that? |
| 13:56:39 | 11 | A.   Yes. |
| 13:56:39 | 12 | Q.   What did you do to determine what the |
| 13:56:42 | 13 | substantially likely requirement of 35 U.S.C. §295 |
| 13:56:46 | 14 | means? |
| 13:56:49 | 15 | A.   Well, I compared the two parts of the accused |
| 13:56:52 | 16 | product, which I honestly believe infringe Claim 1 of |
| 13:56:57 | 17 | the '184 patent, and given my knowledge of two-shot |
| 13:57:02 | 18 | injection molding and the production of assembled |
| 13:57:09 | 19 | plastic parts, I'd say there's a fairly high degree of |
| 13:57:16 | 20 | certainty that it meets this requirement. |
| 13:57:22 | 21 | Q.   And when you say "a fairly high degree of |
| 13:57:26 | 22 | certainty," what do you mean? |
| 13:57:28 | 23 | A.   Well, as I explained before, you can't be |
| 13:57:31 | 24 | totally sure of something, but to me it's most likely |
| 13:57:39 | 25 | this was made using the '184 patent. |

Deposition of Stephen Paul Petrie, Ph.D.                SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| 13:57:43 | 1 | Q. Have you done a study of injection molding |
| 13:57:46 | 2 | processes used to form jump drives? |
| 13:57:48 | 3 | A. No, I haven't done a study of it. |
| 13:57:51 | 4 | Q. Have you examined other jump drives to see if |
| 13:57:53 | 5 | they were made by the same process as the '184 patent? |
| 13:57:56 | 6 | A. No. |
| 13:57:58 | 7 | Q. Have you done a study of processes that have |
| 13:58:07 | 8 | been used to make plastic parts that have two different |
| 13:58:12 | 9 | materials on them to see if they all use the '184 |
| 13:58:15 | 10 | patent? |
| 13:58:21 | 11 | A. I have investigated other products that were |
| 13:58:25 | 12 | believed to use the '184 product. |
| 13:58:28 | 13 | Q. Have you published any papers on the likelihood |
| 13:58:33 | 14 | that plastic products that have two different materials |
| 13:58:36 | 15 | have been made using the '184 patent? |
| 13:58:38 | 16 | A. No, I haven't published any papers on it. |
| 13:58:41 | 17 | Q. Have you submitted any papers for publication |
| 13:58:44 | 18 | to a peer-reviewed journal for that purpose? |
| 13:58:49 | 19 | A. No. |
| 13:58:50 | 20 | Q. So have you done anything that would determine |
| 13:58:53 | 21 | the likelihood that you've made an error in determining |
| 13:58:57 | 22 | your opinion that it was substantially likely made using |
| 13:59:02 | 23 | the '184 patent? |
| 13:59:05 | 24 | A. Yeah. I've analyzed my own thought process and |
| 13:59:09 | 25 | gone through it and said, you know, like, Am I likely to |

| | | |
|---|---|---|
| 13:59:13 | 1 | be wrong? |
| 13:59:15 | 2 | And in a couple of cases, there were other ways |
| 13:59:19 | 3 | that you could have done it; like when I talked about |
| 13:59:22 | 4 | assembling the part, it could have been glued or it |
| 13:59:25 | 5 | could have been ultrasonically welded.  But having seen |
| 13:59:30 | 6 | the assembly of small parts like this that are made in |
| 13:59:36 | 7 | injection molding machines using robots to line and |
| 13:59:40 | 8 | stack the parts for subsequent staking, it would be my |
| 13:59:43 | 9 | opinion that the most likely, you know, commercially |
| 13:59:49 | 10 | available process that would produce, like, the most |
| 13:59:53 | 11 | money would be to use one of these automated processes. |
| 13:59:58 | 12 | Q.  So something using robots? |
| 14:00:00 | 13 | A.  Yeah. |
| 14:00:01 | 14 | Q.  So do you know whether robots were used in the |
| 14:00:03 | 15 | manufacture of this product or not? |
| 14:00:05 | 16 | A.  No, I didn't find any evidence of it. |
| 14:00:09 | 17 | Q.  Where did you look? |
| 14:00:11 | 18 | A.  I looked at the surfaces. |
| 14:00:15 | 19 | Q.  And what would have been a telltale sign of |
| 14:00:19 | 20 | robots being used? |
| 14:00:21 | 21 | A.  Well, it might have been some type of mark. |
| 14:00:23 | 22 | Q.  So if you were using a two, single-shot process |
| 14:00:29 | 23 | to manufacture this product, would you have found this |
| 14:00:31 | 24 | evidence of robot markings? |
| 14:00:34 | 25 | A.  You may or may not. |

| | | |
|---|---|---|
| 14:00:35 | 1 | Q. So it could have been done by hand: Taken out |
| 14:00:38 | 2 | of the mold and moved to another one, right? |
| 14:00:41 | 3 | A. In the single-shot process, yes. |
| 14:00:43 | 4 | Q. Yes. And that wouldn't leave any robot |
| 14:00:45 | 5 | markings, right? |
| 14:00:46 | 6 | A. No. |
| 14:00:46 | 7 | Q. And that would be a decision that each |
| 14:00:48 | 8 | individual manufacturer would make as to whether they |
| 14:00:50 | 9 | wanted to do it that way, or some other way that would |
| 14:00:53 | 10 | possibly infringe the '184 patent? |
| 14:00:56 | 11 | A. Right. It would be the manufacturer's |
| 14:00:58 | 12 | decision, not mine. |
| 14:01:05 | 13 | Q. How many products have you analyzed that you've |
| 14:01:08 | 14 | determined were formed using a multiple single-shot |
| 14:01:15 | 15 | process? |
| 14:01:16 | 16 | A. How many products? |
| 14:01:17 | 17 | Q. Yes, sir. |
| 14:01:18 | 18 | A. I really don't have a number. |
| 14:01:21 | 19 | Q. Did you describe any of that analysis in your |
| 14:01:23 | 20 | declaration? |
| 14:01:24 | 21 | A. No. |
| 14:01:25 | 22 | Q. So we don't really have anything to compare |
| 14:01:27 | 23 | your analysis of the accused product in terms of your |
| 14:01:30 | 24 | conclusion that it's a multi-shot process, as compared |
| 14:01:36 | 25 | to your analysis of other products where you determined |

| | | |
|---|---|---|
| 14:01:39 | 1 | it was multiple single-shot processes, correct? |
| 14:01:43 | 2 | A.    That's correct. |
| 14:01:44 | 3 | MR. KUDLAC:   Okay.  Why don't we take a |
| 14:01:45 | 4 | 10-minute break, and I will see if I can wrap things up. |
| 14:01:49 | 5 | MR. KALER:   Do you think there will be a few |
| 14:01:50 | 6 | more questions? |
| 14:01:51 | 7 | MR. KUDLAC:   If there's more, it's less than 20 |
| 14:01:54 | 8 | minutes. |
| 14:01:54 | 9 | MR. KALER:   Okay. |
| 14:01:55 | 10 | THE VIDEO OPERATOR:   Off the record at 2:01. |
| 14:02:03 | 11 | (Recess from 2:01 p.m. to 2:24 p.m.) |
| 14:24:08 | 12 | THE VIDEO OPERATOR:   Back on the record at |
| 14:24:09 | 13 | 2:24. |
| 14:24:12 | 14 | BY MR. KUDLAC: |
| 14:24:13 | 15 | Q.    In your declaration, you did not provide a cost |
| 14:24:16 | 16 | analysis of any multiple single-shot processes that were |
| 14:24:22 | 17 | available from the 2002 to 2008 time frame; is that |
| 14:24:25 | 18 | right? |
| 14:24:26 | 19 | A.    That's correct. |
| 14:24:27 | 20 | Q.    In terms of determining whether a process is |
| 14:24:31 | 21 | commercially practical, that determination depends, at |
| 14:24:34 | 22 | least in part, on cost analysis; is that right? |
| 14:24:40 | 23 | A.    It would be a substantial part of it. |
| 14:24:43 | 24 | Q.    And the cost of the process depends, at least |
| 14:24:45 | 25 | in part, on the labor associated with the process; is |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 14:24:49 | 1 | that right? |
| 14:24:50 | 2 | A.    That's correct. |
| 14:24:51 | 3 | Q.    If you were asked in this case to agree to use |
| 14:24:54 | 4 | the information about the manufacturing process used to |
| 14:24:57 | 5 | make the Lexar 128 meg JumpDrive only for this case -- |
| 14:25:04 | 6 | in other words, to use it nowhere outside of this |
| 14:25:07 | 7 | case -- could you agree to that? |
| 14:25:10 | 8 | MR. KALER:   Objection.   You are talking about |
| 14:25:11 | 9 | what the terms of a particular order are likely to be, |
| 14:25:13 | 10 | and I'm not sure having him speculate on that is |
| 14:25:16 | 11 | appropriate. |
| 14:25:17 | 12 | BY MR. KUDLAC: |
| 14:25:17 | 13 | Q.    You can answer. |
| 14:25:19 | 14 | A.    Could you repeat the question, please. |
| 14:25:21 | 15 | Q.    Sure.   If you were asked to agree to use the |
| 14:25:24 | 16 | information concerning the process used to manufacture |
| 14:25:28 | 17 | the 128 meg jump drive only in this case, could you |
| 14:25:37 | 18 | agree to that? |
| 14:25:37 | 19 | A.    Yes. |
| 14:25:37 | 20 | Q.    And have you ever signed a protective order in |
| 14:25:40 | 21 | other litigation that you have worked on that restricted |
| 14:25:44 | 22 | you from using information you learned in that case, |
| 14:25:47 | 23 | confidential information -- |
| 14:25:48 | 24 | A.    Yes. |
| 14:25:50 | 25 | Q.    -- in that case to just that case? |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

| | | |
|---|---|---|
| 14:25:52 | 1 | A.    Yes. |
| 14:25:53 | 2 | MR. KUDLAC:  Those are all the questions I have |
| 14:25:54 | 3 | for the witness today. |
| 14:25:56 | 4 | Thank you. |
| 14:25:56 | 5 | MR. KALER:  I'm good. |
| 14:25:57 | 6 | MR. KUDLAC:  All right.  We're done. |
| 14:26:00 | 7 | THE WITNESS:  That's it?  We're done. |
| 14:26:03 | 8 | Thank you. |
| 14:26:04 | 9 | MR. KUDLAC:  Thank you very much.  Off the |
| 14:26:05 | 10 | record? |
| 14:26:06 | 11 | MR. KALER:  Well, do we need to discuss on the |
| 14:26:08 | 12 | record any issues about document handling or anything? |
| 14:26:12 | 13 | MR. KUDLAC:  We were -- actually, there was one |
| 14:26:13 | 14 | thing -- |
| 14:26:14 | 15 | MR. KALER:  You can use these copies.  I can |
| 14:26:16 | 16 | make new copies for myself.  You can use the two copies |
| 14:26:20 | 17 | we talked about here. |
| 14:26:21 | 18 | MR. KUDLAC:  Okay.  Can we just mark them and |
| 14:26:22 | 19 | then have them part of the record? |
| 14:26:25 | 20 | MR. KALER:  Sure.  Why don't you mark those on |
| 14:26:26 | 21 | the record. |
| 14:26:27 | 22 | MR. KUDLAC:  Okay.  Just for completion, we'll |
| 14:26:29 | 23 | mark as Exhibit 7 an 8½-by-11 copy of a drawing produced |
| 14:26:38 | 24 | by plaintiff. |
| 14:26:43 | 25 | (Exhibit 7 was marked for identification.) |

| | | |
|---|---|---|
| 14:26:45 | 1 | MR. KUDLAC:  And Exhibit 8, a -- |
| 14:26:50 | 2 | MR. KALER:  We're on the record. |
| 14:26:52 | 3 | MR. KUDLAC:  Just a second.  Is this a D-sized |
| 14:26:54 | 4 | drawing? |
| 14:26:55 | 5 | MR. KALER:  That is a D-sized drawing, yes. |
| 14:26:57 | 6 | MR. KUDLAC:  We will mark as Exhibit 8 a |
| 14:26:58 | 7 | D-sized drawing produced by plaintiff in this case at |
| 14:27:01 | 8 | the deposition. |
| 14:27:02 | 9 | (Exhibit 8 was marked for identification.) |
| 14:27:03 | 10 | MR. KALER:  And the other one is an A-sized |
| 14:27:06 | 11 | drawing. |
| 14:27:07 | 12 | MR. KUDLAC:  Thank you. |
| 14:27:08 | 13 | THE VIDEO OPERATOR:  This concludes the |
| 14:27:09 | 14 | deposition of Stephen Petrie, Ph.D. |
| 14:27:13 | 15 | Off the record at 2:27. |
| | 16 | (The Video Deposition concluded at 2:27 p.m.) |
| | 17 | * * * |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

Deposition of Stephen Paul Petrie, Ph.D.                    SORENSEN, et al. vs. LEXAR MEDIA, INC., et al.

1          I declare under penalty of perjury under the laws

2     of the State of California and the United States of

3     America that the foregoing is true and correct.

4          Subscribed at _____,
                                      (City)

5     _____, this _____ day of _____, 2008.
         (State)              (Day)            (Month)

6

7

8

9                         _____

10                        STEPHEN PAUL PETRIE, Ph.D.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    COUNTY OF SAN DIEGO,)

2    STATE OF CALIFORNIA.)

3        I, Lynn Penfield, a Certified Shorthand Reporter

4    No. 8589, State of California, RPR, do hereby

5    certify:

6        That the witness in the foregoing deposition,

7                STEPHEN PAUL PETRIE, Ph.D.,

8    was by me sworn to testify the truth in the within

9    entitled cause; that said deposition was taken at the

10   time and place therein named and was reported by me in

11   shorthand and transcribed by means of computer-aided

12   transcription, and that the foregoing 104 pages is a

13   full, complete and true record of said proceeding.

14       And I further certify that I am a disinterested

15   person and am in no way interested in the outcome of

16   said action, or connected with or related to any of the

17   parties in said action, or to their respective counsel.

18       The dismantling, unsealing, or unbinding of the

19   original transcript will render the reporter's

20   certificate null and void.

21       IN WITNESS WHEREOF, I have hereunto set my hand

22   this 5th day of June, 2008.

23

24   _____

25           Lynn Penfield, CSR No. 8589, RPR