JARED BOBROW (Bar No. 133712)
jared.bobrow@weil.com
JOSEPH H. LEE (Bar No. 248046)
joseph.lee@weil.com
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100

KEVIN KUDLAC (*pro hac vice*)
kevin.kudlac@weil.com
WEIL, GOTSHAL & MANGES LLP
8911 Capital of Texas Highway
Building One, Suite 1350
Austin, TX 78759
Telephone: (512) 349-1930
Facsimile: (512) 527-0798

Attorneys for Defendant
LEXAR MEDIA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JENS ERIK SORENSEN, as Trustee of SORENSEN RESEARCH AND DEVELOPMENT TRUST, <br><br> Plaintiff, <br><br> v. <br><br> LEXAR MEDIA, INC., a Delaware corporation; and DOES 1 - 100, <br><br> Defendants. | Case No. C08-00095 JW RS <br><br> RESPONSE TO PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR APPLICATION OF 35 U.S.C. § 295 PRESUMPTION OF INFRINGEMENT <br><br> Date:        September 12, 2008 <br> Time:        10:00 a.m. <br> Courtroom:   8, 4th Floor <br> Judge:       Hon. James Ware |

1

# TABLE OF CONTENTS

2

Page

3    I.    LEXAR HAS BEEN DILIGENT IN DISCOVERY ............................................................. 1

4          A.    Lexar Has Diligently Pursued Information Describing The Processes Used
                 By The Manufacturers ........................................................................................ 2

5                1.    Lexar's Initial Response To Sorensen's Discovery Requests
                       Accurately Reflected The Information Available At The Time Of
6                      The Response ....................................................................................... 2

7                2.    Lexar Diligently Pursued All Potential Sources Of Additional
                       Information ......................................................................................... 4

8                3.    Lexar Timely Provided Sorensen With Any Additional Information
                       It Had Discovered During Its Investigations ...................................... 5

9                4.    Sorensen's Argument That Lexar's Diligent Investigation And
10                     Subsequent Supplementation Of Discovery Responses Constitutes
                       Delay Is Baseless ................................................................................ 7

11         B.    Lexar Has Been Diligent In Identifying The Manufacturers .............................. 8

12               1.    Lexar Diligently Pursued And Timely Disclosed Information
                       Identifying The Manufacturers ........................................................... 8

13               2.    Sorensen's Arguments Concerning The Timeliness Of The
                       Disclosure Of Fourté Are Irrelevant To This Motion ......................... 9

14   II.   SORENSEN HAS FAILED TO MAKE A REASONABLE EFFORT TO
15         DISCOVER THE PROCESS USED TO MAKE THE HOUSING .................................. 10

           A.    Sorensen Has Not Diligently Pursued Discovery In This Case ......................... 10

16   III.  SORENSEN CANNOT ESTABLISH A SUBSTANTIAL LIKELIHOOD OF
17         INFRINGEMENT ......................................................................................................... 13

           A.    Courts Have Consistently Required Claim Construction To Occur Prior To
18               A Determination Under 35 U.S.C. § 295 .......................................................... 14

19         B.    Whether A Substantial Likelihood Of Infringement Exists Cannot Be
                 Determined Without Construing The Claims ..................................................... 14

20   IV.   CONCLUSION ............................................................................................................... 15

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

## CASES

4

*Kemin Foods, L.C. v. Pigmentos Vegetales del Centro S.A. de C.V.*
   No. 4:02-cv-40327 (Dkt # 201) (S.D. Iowa Aug. 27, 2004)................................ 11, 12, 14

5

## STATUTES

6

35 U.S.C. § 295...................................................................................................... passim

7

Fed. R. Civ. P. 26(e)(1).................................................................................................. 2

8

9

## OTHER AUTHORITIES

10

S. Rep. No. 100-83, at 33 (1987) ............................................................................. 9-10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1          Sorensen, in his Supplemental Brief in Support of Plaintiff's Motion for

2    Application of 35 U.S.C. § 295 Presumption of Infringement ("Supplemental Brief"), attacks

3    Lexar Media, Inc. ("Lexar") for doing the very thing that parties are supposed to do in

4    litigation—investigate the factual issues in the case, provide the results of that investigation in

5    response to discovery requests, and supplement or correct the discovery responses when

6    additional material information comes to light. Because Sorensen cannot make a case on the

7    merits that § 295 applies, he resorts to accusing Lexar of numerous discovery abuses and

8    improper conduct. But a closer look at the facts shows that, far from delaying discovery,

9    engaging in improper activities, or playing games, Lexar has faithfully fulfilled its obligations in

10    this case.

11          In contrast, Sorensen has done little to pursue discovery in this case, and has

12    rejected opportunities for additional discovery that he has admitted would be useful. Because

13    Lexar's responses to discovery demonstrate that further discovery and investigation by Sorensen

14    regarding the accused process would be meaningful and fruitful, and because Sorensen cannot

15    show, at this stage of the litigation, that a substantial likelihood of infringement exists, Plaintiff's

16    Motion for Application of 35 U.S.C. § 295 Presumption of Infringement ("Motion for

17    Presumption") should be denied.

18    **I.    LEXAR HAS BEEN DILIGENT IN DISCOVERY**

19          Lexar has, during the course of this nascent litigation, diligently responded to

20    Sorensen's discovery requests. As Lexar does not itself make the accused flash drive housing and

21    does not specify the process used by its suppliers, Lexar has had to seek such information from

22    others. Even after its initial response's to Sorensen's discovery requests, Lexar continued to

23    pursue possible additional sources of information regarding the processes used to manufacture the

24    flash drive housing at issue in this case. When additional information was found, Lexar timely

25    provided the additional information to Sorensen. To have Sorensen turn around and, based on

26    Lexar's cooperation, accuse Lexar of misrepresentations and "discovery games" is absurd.

27

28

1

2

    A.    **Lexar Has Diligently Pursued Information Describing The Processes Used By The Manufacturers**

3             Lexar has been diligent in providing Sorensen with information concerning the

4 processes used by the manufacturers to make the housing. It timely responded to Sorensen's

5 requests for such information with its understanding of the process at the time and conducted

6 further investigations to confirm its understanding. To the extent it gained additional knowledge

7 during its investigation, it supplemented the information it had previously provided to Sorensen,

8 as outlined in Fed. R. Civ. P. 26(e)(1). As a complete history of Lexar's actions will show, Lexar

9 has gone above and beyond what is required by the Federal Rules in cooperating with Sorensen.

10 Sorensen's suggestion that Lexar has done otherwise is demonstrably false.

11

12

        1.    **Lexar's Initial Response To Sorensen's Discovery Requests Accurately Reflected The Information Available At The Time Of The Response**

13             On July 7, 2008, after being instructed to do so by the Court during the June 30,

14 2008 hearing, Sorensen served, for the first time, discovery requests on Lexar that seek

15 information on the process used to manufacture the housing. (Resp. Lee Decl.[1], Exhs. A and B.)

16 The discovery requests took the form of requests for documents and interrogatories. On July 21,

17 2008, Sorensen served a request for a deposition of Lexar's Fed. R. Civ. P. 30(b)(6) witness on

18 the process used to manufacture the housing. (Resp. Lee Decl., Exh. C.) On July 22, 2008,

19 before a response was due, Lexar produced all the documents it had then identified as containing

20 information concerning the process used to manufacture the housing. (Resp. Lee Decl. ¶ 2, Exh.

21 D.) Then, on August 6, 2008, Lexar responded to all three discovery requests. (Suppl. Lee

22 Decl.[2], Exh. A; Resp. Lee Decl., Exhs. E and F.) Lexar agreed to have the deposition Sorensen

23 requested take place on August 22, 2008. (Resp. Lee Decl., Exh. G.)

24

25 [1] All references to the Resp. Lee Decl. are to the Declaration of Joseph H. Lee in Support of Defendant Lexar Media's Response to Plaintiff's Supplemental Brief in Support of Plaintiff's

26 Motion for Application of 35 U.S.C. § 296 Presumption of Infringement, filed concurrently with this brief.

27 [2] All references to the Suppl. Lee Decl. are to the Declaration of Joseph H. Lee in Support of Defendant Lexar Media's Supplemental Statement in Opposition to Plaintiff's Motion for

28 Application of 35 U.S.C. § 295 Presumption of Infringement, filed on August 29, 2008.

1          Lexar's August 6, 2008 response to Sorensen's interrogatories and its production

2   of documents on July 22, 2008 were based on its knowledge at the time. (*See* Suppl. Lee Decl.,

3   Exh. A at 6-7.) The basis for its knowledge came mostly from correspondence between Lexar

4   and Sorensen and also between Lexar and ATG and AMCO prior to the filing of the current suit.

5   (*Id.*) At the time of the pre-suit discussions with Sorensen, Lexar was represented by both in-

6   house counsel and Latham & Watkins. (*See* Suppl. Kramer Decl.[3], Exh. H.) Those attorneys,

7   along with other Lexar employees, also were involved in the communications with AMCO and

8   ATG. (*Id.*) On March 8, 2006, Lexar was acquired by Micron Technology, Inc. ("Micron").

9   After that acquisition, over the course of time, all the in-house attorneys involved with the pre-

10  suit discussions with both Sorensen and ATG and AMCO left Lexar, and Micron's legal

11  department took over responsibility for managing Lexar's dealings with Sorensen. Most of the

12  Lexar employees involved in the discussions also left Lexar. And Weil, Gotshal & Manges,

13  Lexar's current counsel for this case, first became involved in representing Lexar shortly after

14  Sorensen filed suit. (Resp. Lee Decl. ¶ 3.)

15          Because of the departure of most of the individuals who had been involved in the

16  pre-suit discussions, Lexar and its current counsel relied heavily on the documents that were

17  previously identified as relevant to this case. Lexar also reviewed the contents of the files kept by

18  Lexar's prior counsel regarding the Sorensen matter. (Resp. Lee Decl. ¶ 4.) In addition, on June

19  10th and 11th, Lexar's outside counsel and Micron's in-house counsel visited Lexar to interview

20  individuals who may have had knowledge relevant to the issues in this case. (Resp. Lee Decl.

21  ¶ 5.) Based on the information in the previously described documents and the information

22  provided by Lexar's employees, Lexar understood that the two identified manufacturers—AMCO

23  and ATG—used the same process. Accordingly, Lexar responded to Sorensen's interrogatory

24  asking Lexar to "[d]escribe, step-by-step, the manufacturing process used for the [housing]" with

25  a description of the process supplied by ATG. (Suppl. Lee Decl., Exh. A at 5-6.) Lexar

26  additionally replied that its investigation was on-going and that it would supplement its answer as

27  _____

[3] All references to the Suppl. Kramer Decl. are to the Declaration of Melody Kramer in Support
28  of Supplemental Brief to Plaintiff's Motion For Application of 35 U.S.C. § 295 Presumption of
    Infringement, filed under seal.

1    appropriate. (*Id.*) On July 22, 2008, Lexar also produced the documents it had then identified

2    that described the process, and identified those documents to Sorensen in its response to

3    Sorensen's interrogatory requesting the basis for its description of the process. (*Id.* at 6-7.) In

4    short, Lexar's initial response to Sorensen's interrogatory and document requests was made in

5    good faith and reflected the knowledge it had at the time.

6                    **2.    Lexar Diligently Pursued All Potential Sources Of Additional**
                            **Information**

7

8                    Despite answering Sorensen's interrogatory with the knowledge it had at the time,

9    Lexar pursued additional information.    This included searching for additional responsive

10    documents, interviewing individuals that may have had knowledge of the process, and visiting

11    and inspecting the tools and facilities involved in manufacturing the housing.

12                    On August 8, 2008, Lexar's outside counsel visited ATG in Taiwan. (Resp. Lee

13    Decl. ¶ 6.)  During that visit, Lexar's counsel interviewed individuals with knowledge of the

14    process used to make the housing and inspected the molds and injection molding machines used

15    to make the housing. (*Id.*) As part of the inspection, Lexar's counsel took numerous pictures of

16    the molds and injection molding machines used to make the housing and recorded video of the

17    injection molding machine in operation.[4] (*Id.*)  During the interviews, Lexar sought additional

18    information regarding the process, as well as other information responsive to Sorensen's

19    document requests, such as information regarding ownership of the tooling, the identification of

20    additional entities involved in the manufacture of the housing, and the location where the housing

21    was manufactured. (*Id.*)    Lexar also asked ATG to suggest potential dates for Sorensen to

22    inspect the tooling. (*Id.*)

23                    On August 10th and 11th, Lexar visited with AMCO in China. (Resp. Lee Decl.

24    ¶ 7.)  During that visit, Lexar interviewed individuals with knowledge of the process used to

25    make the housing and inspected the molds and injection molding machines used to make the

26    _____

27    [4] As the flash drive housing at issue in this case is no longer being manufactured, the video
      recorded the injection molding machine manufacturing a product unrelated to this case.  To
28    Lexar's understanding, however, there was no relevant difference in the operation of the machine
      during manufacture of the housing at issue in this case.

1    housing.  As part of the inspection, Lexar's counsel took numerous pictures of the molds and

2    injection molding machines used to make the housing.  (*Id.*)  During the interviews, Lexar sought

3    additional information regarding the process, as well as other information responsive to

4    Sorensen's document requests, such as information regarding ownership of the tooling, the

5    identification of additional entities involved in the manufacture of the housing, and the location

6    where the housing was manufactured.  (*Id.*)  Lexar also asked AMCO to suggest potential dates

7    for Sorensen to inspect the tooling.  (*Id.*)  It is during this visit that Lexar learned that its prior

8    understanding regarding AMCO's process was incorrect, and that AMCO's process for making

9    the housing was different from ATG's process.  (Resp. Lee Decl. ¶ 8.)

10            After returning from the trip to Asia to visit the suppliers, Lexar's counsel

11    reviewed documents collected from ATG and AMCO, as well as additional documents collected

12    from Lexar which were uncovered after additional searching.  (Resp. Lee Decl. ¶ 9.)  Ultimately,

13    Lexar collected and reviewed thousands of pages of documents.  (*Id.*)

14            Far from delaying discovery, Lexar, in the two months since the June 30, 2008

15    hearing, reviewed thousands of pages of documents, interviewed numerous individuals with

16    possible knowledge of the process, and flew to China and Taiwan to obtain additional information

17    and inspect the manufacturing tools and facilities.

18            **3.    Lexar Timely Provided Sorensen With Additional Information It Had**
              **Discovered During Its Investigations**

19

20            On August 14, 2008, during a meet and confer regarding discovery issues, Lexar

21    informed Sorensen that additional documents would shortly be forthcoming.  (Resp. Lee Decl.

22    ¶ 10.)  On August 19, 2008, Lexar completed its review of the additional documents collected

23    from Lexar, AMCO, and ATG and produced them to Sorensen.  (Resp. Lee Decl., Exh. H.)

24    During the course of that review, Lexar discovered that additional emails existed between Lexar

25    and AMCO.  (Resp. Lee Decl. ¶ 11.)  These emails were produced along with all the other

26    documents (with two exceptions) on August 19th.  (*Id.*)  On August 20, 2008, one of the

27    exceptions—the video of the injection molding machine used by ATG—was produced.  (Resp.

28    Lee Decl., Exh. I.)  On August 27, 2008, the other exception—a spreadsheet showing the number

1    of housing sets supplied by each manufacturer—was produced. (Resp. Lee Decl., Exh. J.)

2    After reviewing the documents for production and after the trip to Taiwan and

3    China, Lexar prepared Ton Nguyen, its 30(b)(6) witness on the manufacturing processes, for the

4    deposition to take place on August 22, 2008. In preparation for that deposition, Mr. Nguyen

5    reviewed the pictures and video taken of the tooling and the documents provided by the housing

6    suppliers, and also discussed the processes with individuals at AMCO and ATG, as well as with

7    Ezequiel Ramirez, a former Lexar employee. (Resp. Lee Decl. ¶ 12.) During the deposition, Mr.

8    Nguyen testified as to the process used by the suppliers and specifically mentioned the

9    differences between ATG's and AMCO's process. (*See, e.g.*, Suppl. Lee Decl., Exh. C, at 13:7-

10   11, 34:11-35:24, 54:22-55:3, 56:15-25, 58:3-60:6, and 68:14-16 (excerpts of the August 22, 2008

11   deposition of Lexar's 30(b)(6) representative) (filed under seal).)

12   During the discussions between Mr. Nguyen and ATG regarding the process used

13   by ATG to manufacture the housing, ATG offered September 1st or 2nd as possible dates for

14   Sorensen to inspect the tooling. (Resp. Lee Decl. ¶ 13.) Immediately after the conclusion of the

15   deposition, Mr. Kudlac offered Michael Kaler, the Sorensen attorney taking the deposition, the

16   dates that ATG had suggested for a visit. (Suppl. Kramer Decl., Exh. P.) Lexar followed up Mr.

17   Kudlac's verbal offer with a letter. (*Id.*) Sorensen rejected the offer because of the timing of the

18   inspection. (Suppl. Kramer Decl., Exh. Q.) In reply, Lexar offered to work with Sorensen to

19   select a mutually agreeable date for inspection. (Suppl. Kramer Decl., Exh. N.) Sorensen has not

20   yet suggested alternative dates for an inspection. (Resp. Lee Decl. ¶ 16.)

21   Once the review of documents and the preparation of Lexar's 30(b)(6) witness was

22   completed, Lexar turned to supplementing its interrogatory responses. On August 28, 2008,

23   Lexar provided supplemental interrogatory responses reflecting the knowledge it had gained since

24   it had served its original responses three weeks previously, on August 6, 2008. (Suppl. Lee Decl.,

25   Exh. B.) This knowledge included detailed descriptions of the manufacturing process of all the

26   suppliers and identification of additional individuals that may have knowledge of the accused

27   process, much of which had been previously provided to Sorensen via document production and

28   the deposition of Mr. Nguyen. (*Id.* at 3-12.)

1    From Lexar's initial response to its supplemental response, only twenty-two days

2    had passed, with much of the information being supplied earlier in the timeframe.  During those

3    twenty-two days, Lexar collected, reviewed, and produced additional documents; interviewed

4    individuals with knowledge of the process and incorporated any additional information into its

5    supplemental responses; visited its suppliers in Asia; and provided a witness for a deposition on

6    the processes used to manufacture the housing.  To characterize this as delay is simply wrong.

7
8

       **4.**     **Sorensen's Argument That Lexar's Diligent Investigation And Subsequent Supplementation Of Discovery Responses Constitutes Delay Is Baseless**

9    As has been described in ample detail above, Lexar has, from the start, diligently

10   pursued any leads that would help it respond to Sorensen's discovery requests.[5]    Sorensen

11   essentially argues that because Lexar has continued its investigation after providing an initial

12   response to Sorensen's discovery requests and thereafter provided Sorensen with the additional

13   information, it has played "discovery games" and has "delayed every aspect of [Sorensen's]

14   discovery."  It cannot be the case that Lexar's continued efforts to investigate and supplement

15   discovery responses makes its earlier responses deceptive or indicates that Lexar is playing

16   "discovery games."

17   Furthermore, not only does Sorensen's argument unjustifiably assail the integrity

18   of Lexar and its counsel, it fails to address how Sorensen is harmed by Lexar's actions during

19   discovery.  Sorensen now has the additional documents (including pictures and video) produced

20   by Lexar, the supplemental interrogatory responses, and the testimony of Lexar's 30(b)(6)

21   witness.  Lexar has offered to work with Sorensen to arrange for inspections.  Sorensen has not

22   been prejudiced in the least.

23   This case is in its infancy.  Sorensen received the information in plenty of time for

24   his expert to incorporate it into his analysis regarding whether there is a substantial likelihood of

25   infringement.[6]  Furthermore, Sorensen has yet to serve his preliminary infringement contentions

---

[5] Lexar confirmed that Fourté was a supplier of the housing in early August.  As with AMCO and ATG, Lexar intends to further investigate Fourté's involvement in manufacturing the housing.

[6] Of note, Sorensen flatly misstates the terms of the Protective Order when he says that the confidentiality designation of documents Lexar produced delayed the ability of his expert to review it.  *See* Protective Order 7.3(c) (listing experts as one category of persons that can review

1   under the Patent Local Rules, so this new information can be fully incorporated into any

2   arguments regarding infringement he chooses to make. Discovery has just begun, so Sorensen

3   similarly has plenty of opportunity to follow-up on any additional discovery prompted by the

4   additional disclosures. Sorensen cannot show any prejudice from Lexar's actions during

5   discovery because no prejudice exists.

6          **B.     Lexar Has Been Diligent In Identifying The Manufacturers**

7          Sorensen's argument concerning the timing of disclosures related to the identity of

8   the manufacturers is similarly flawed. Lexar responded with the knowledge available to it at the

9   time, diligently pursued additional sources of information, and timely supplemented its responses

10  as additional information was uncovered. Furthermore, much of what Sorensen complains about

11  is completely irrelevant to his Motion for Presumption, because 35 U.S.C. § 295 cannot be

12  applied to Fourté, a U.S.-based company with manufacturing facilities in the United States.

13          **1.     Lexar Diligently Pursued And Timely Disclosed Information
                      Identifying The Manufacturers**

14

15          Similar to the timeline of events surrounding Lexar's investigation and disclosure

16  of information regarding the process used to make the housing, a description of the steps Lexar

17  took to identify suppliers reveals just how diligent Lexar was.

18          On May 22, 2008, Sorensen served his first set of interrogatories. (Resp. Lee

19  Decl., Exh. K.) One of the interrogatories asked for the identities of the manufacturers of the

20  housing; another asked for the identities of Lexar employees with knowledge of the manufacture,

21  import, sale and/or offer for sale of the housing.[7] (*Id.* at 5-6.) On June 23, 2008, the parties

22  agreed to extend the time for a response to both Sorensen's first set of interrogatories as well as

23  Lexar's First Set of Requests for Production and First Set of Interrogatories by two weeks, in part

24  because a protective order had not yet been entered in this case. (Resp. Lee Decl., Exh. L.) On

25  July 7, 2008, per agreement, Lexar responded to Sorensen's first set of interrogatories. (Suppl.

26  Kramer Decl., Exh. C.) In that response, Lexar identified two suppliers: ATG and AMCO. (*Id.*)

27  material designated "Highly Confidential – Attorneys' Eyes Only").

28  [7] The remaining four interrogatories in the first set asked for revenues and number of units
    manufactured, imported, or sold. (Resp. Lee Decl., Exh. K at 5.)

1    Just like with the response to Sorensen's requests concerning the process used to

2  make the housing, Lexar's response was based on its knowledge at the time it served the

3  response, including documents that identified ATG and AMCO as suppliers. (Resp. Lee Decl.

4  ¶ 17.) None of the documents it was aware of at the time of the response identified Fourté as a

5  third supplier. (*Id.*) Similarly, at the time of the June 30, 2008 hearing, since Lexar was only

6  aware of ATG and AMCO as suppliers, Lexar's counsel so informed the Court.

7    Lexar continued its investigations regarding the manufacture of the housing and

8  obtained new information indicating that Fourté was an additional supplier of the housing. (Resp.

9  Lee Decl. ¶ 18.) Lexar followed up on that information and was able to confirm Fourté as a

10  supplier through additional documents it obtained after further searching. (*Id.*)

11    Those documents were produced to Sorensen on August 19, 2008 and August 27,

12  2008. (Resp. Lee Decl., Exhs. H and J.) Lexar's 30(b)(6) witness was also prepared to testify as

13  to the existence of Fourté and did so in response to questioning on August 22, 2008. (*See, e.g.*,

14  Suppl. Lee Decl., Exh. C, at 13:7-11 (excerpts of the August 22, 2008 deposition of Lexar's

15  30(b)(6) representative) (filed under seal).) Finally, Lexar timely amended its response to

16  Sorensen's interrogatory concerning the identity of the manufacturers on August 28, 2008 to

17  include not only Fourté, but the subcontractors for ATG and AMCO as well as the entity used by

18  ATG for purposes of receiving the housing purchase orders.[8] (Suppl. Kramer Decl., Exh. G.)

19              **2.    Sorensen's Arguments Concerning The Timeliness Of The Disclosure**
                        **Of Fourté Are Irrelevant To This Motion**
20

21    Fourté is a U.S.-based company. Lexar understands that Fourté manufactured the

22  housing in the United States. As Sorensen admits, he can subpoena Fourté directly if he wishes to

23  obtain discovery from it. As explained in Lexar's Supplemental Statement in Opposition to

24  Plaintiff's Motion for Presumption ("Supplemental Statement"), 35 U.S.C. § 295 is not intended

25  to apply when the manufacturer has operations in the United States. S. Rep. No. 100-83, at 33

26  ────────────────────
    [8] Sorensen's complaint about the timing of the disclosure of "additional manufacturers" is without
27  merit. Uni Power is a subsidiary or sister company of ATG and Summlux produced the housing
    on behalf of ATG. Nishoku produced the housing on behalf of AMCO. For purposes of
28  determining the manufacturing process, ATG, Uni Power and Summlux can be treated as a single
    manufacturer, as can AMCO and Nishoku.

1    (1987) (Declaration of Joseph H. Lee in Support of Defendant Lexar Media's Opposition to

2    Plaintiff's Motion for Application of 35 U.S.C. § 295 Presumption of Infringement, Exh. D, at

3    33) (filed on 6/9/08) (the "rebuttable presumption would be inapplicable if the defendant has used

4    the process in the United States, or has derived the products directly or indirectly from a

5    manufacturer who used the process in the United States."). Sorensen contention that Lexar's

6    disclosure of Fourté comes too late is baseless, given that Lexar timely amended its interrogatory

7    response and given that discovery is in its infancy.

8    **II.    SORENSEN HAS FAILED TO MAKE A REASONABLE EFFORT TO**
     **DISCOVER THE PROCESS USED TO MAKE THE HOUSING**
9

10        It is clear why Sorensen is making such baseless arguments. He is hoping to avoid

11    the real work that is a part of every litigation: obtaining discovery. Sorensen cannot continue to

12    avoid the burdens involved in conducting discovery by invoking 35 U.S.C. § 295. His attempt to

13    avoid the costs associated with litigation cannot constitute reasonable efforts.

14        **A.    Sorensen Has Not Diligently Pursued Discovery In This Case**

15        Sorensen attempts to cover its failure to pursue more than cursory discovery by

16    manufacturing an issue regarding the timeliness of Lexar's responses should be seen for the sham

17    it is. Far from being diligent and making a reasonable effort to determine the process used to

18    make the housing, Sorensen returns to the demonstrably baseless arguments of its Motion for

19    Presumption regarding the alleged futility of discovery. But Sorensen's arguments are even more

20    flawed now than when he first made them.

21        Until directed by the Court at the June 30, 2008 hearing, Sorensen had not even

22    served a single discovery request which inquired about the details of the process used to

23    manufacture the housing. Sorensen has yet to formally request an inspection of the tooling, and

24    despite mentioning the desire to conduct such an inspection at the hearing, turned down Lexar's

25    initial offer of an inspection, and has yet to respond to Lexar's subsequent offer. Despite being

26    provided with the names of several individuals with knowledge of the housing, including how it

27    was made, Sorensen has yet to request depositions of those individuals. Despite being provided

28    with the names of the manufacturers, including manufacturers with offices in the United States, to

1    the best of Lexar's knowledge Sorensen has yet to serve discovery on those manufacturers. Of

2    course, Sorensen has discretion as to whether he wishes to do any of the things he has not yet

3    done, and it may turn out during the course of discovery that he will do some or all of these

4    things. But if he chooses to rest on what he has done to date, he cannot then argue that he has

5    made a reasonable effort to determine the process used to make the housing.

6              Sorensen, instead of doing the work that is necessary to constitute a reasonable

7    effort, hides behind the Order on Plaintiff's Motion to Apply 35 U.S.C. § 295 from *Kemin Foods,*

8    *L.C. v. Pigmentos Vegetales del Centro S.A. de C.V.* ("*Kemin* Order") in support of his Motion for

9    Presumption. No. 4:02-cv-40327 (Dkt # 201) (S.D. Iowa Aug. 27, 2004) (filed as Exhibit A to

10   the Declaration of Melody Kramer in Support of Supplemental Brief). In *Kemin*, the patentee

11   Kemin, in seeking to determine the process used by PIVEG, the defendant, requested documents,

12   inspected the manufacturing plant, and took depositions. *Kemin* Order at 23. Sorensen argues

13   that he has essentially followed the example of Kemin and should therefore similarly gain the

14   advantage of § 295. But the issue in *Kemin*, which was decided less than three weeks before trial

15   and well after the close of discovery, was not whether the discovery Kemin did was fruitful.

16   Rather, it was whether the discovery done was sufficient to constitute a reasonable effort. And on

17   that point, a closer look reveals that a vast gulf exists between what Kemin did and what Sorensen

18   has done. Put simply, Kemin had "followed all of the avenues of discovery likely to uncover the

19   PIVEG process." *Id.* at 32. Sorensen has not.

20             It is true that, like Kemin, Sorensen has requested documents. But Kemin's

21   document request produced a single two-page document. *Id.* at 23. PIVEG asserted that those

22   two pages constituted the entirety of its documents regarding the process. *Id.* In contrast, Lexar

23   has already provided over a thousand pages and will continue to produce any additional

24   responsive documents it may find. Lexar has also provided over 300 photographs of the molds

25   used by ATG and AMCO, as well as video of the machine used by ATG in operation.

26   Furthermore, in weighing Kemin's efforts regarding document production, the *Kemin* Court

27   discounted PIVEG's argument that it had produced everything it had on the basis that, if

28   manufacture had occurred in the United States, additional documentation would be required by

1  U.S. law. *Id.* at 24. The court argued that PIVEG should not gain the benefit of the more relaxed

2  documentation requirements that exist outside the United States. *Id.* at 24-25. Again, unlike in

3  *Kemin*, Sorensen has failed to point to any laws, U.S. or otherwise, that would have mandated

4  documents in addition to those produced by Lexar. The product in *Kemin* was a human food

5  product, and was therefore governed by Title 21 of the C.F.R., which governs food and drugs.

6  Title 21 of the C.F.R. is inapplicable to the manufacture of a flash drive housing.

7  Unlike Kemin, Sorensen has yet to inspect the tooling, despite being offered an

8  opportunity to do so. Kemin undertook not just one, but two separate inspections of the PIVEG's

9  facilities. *Id.* at 25. As already noted, Lexar has offered to provide Sorensen with an opportunity

10  to inspect the tooling used by ATG, which is in Taiwan, where ATG manufactured the housing.[9]

11  Sorensen rejected Lexar's original offer to inspect the tooling prior to the (originally scheduled)

12  September 8, 2008 hearing. Lexar then offered to work with Sorensen to determine an alternate

13  date for inspection. Sorensen has not yet responded to that offer.[10] Until and unless Sorensen

14  responds to the offer and agrees to inspect the tooling, he cannot be said to have "followed all the

15  avenues of discovery."

16  Finally, a substantial difference exists between the depositions Kemin took and the

17  deposition Sorensen took. Kemin took the deposition of everyone at PIVEG that might have

18  knowledge of the actual process. *Id.* at 29. In contrast, Sorensen has taken just one deposition,

19  that of Lexar's 30(b)(6) witness. Lexar has identified at least five additional U.S. residents, in

20  addition to its 30(b)(6) witness, that may have knowledge of the manufacturing process. Lexar

21  has also identified nine individuals outside the United States that may have knowledge of the

22  manufacturing process.[11] Not only has Sorensen yet to depose those individuals identified, it has

23

24  [9] Sorensen's reference to the address on a business card as "proof" that ATG manufactured the housing in China is nonsensical, especially since the very business card Sorensen cites includes addresses for both China **and** Taiwan. (Suppl. Kramer Decl., Exh. R.)

25  [10] Sorensen, in his rejection of the initial offer, inquired about having the molds shipped to the United States. Lexar is willing to look into whether that is possible, but given that each mold set weighs over one ton, expects the cost for such an arrangement will be substantial. As the potentially cheaper alternative of visiting the tooling *in situ* is already available and the expense of shipping the tooling is likely to constitute an unreasonable cost, Lexar believes it is appropriate for Sorensen to bear the cost of shipping.

26

27

28  [11] On this point, Lexar respectfully directs the Court's attention to its initial Opposition to

RESPONSE TO SUPPLEMENTAL BRIEF IN SUPPORT OF
PLAINTIFF'S MOT. FOR APPLICATION OF 35 U.S.C. § 295     12     Case No. C08-00095 JW RS

1    yet to even inquire as to depositions. Furthermore, any argument Sorensen might make that the

2    deposition of Lexar's 30(b)(6) witness negates the need to depose anyone else overlooks the

3    nature of a 30(b)(6) deposition. While it is true that Lexar's 30(b)(6) witness is testifying as to

4    the knowledge of the company, it is not true that such testimony is the limit of the knowledge of

5    the identified individuals. For example, Ezequiel Ramirez, one of the individuals identified, is no

6    longer at Lexar. To the extent that Lexar's witness was able to discern Mr. Ramirez's knowledge

7    regarding the accused process, he did so, but it is quite possible that a deposition of Mr. Ramirez

8    may yield additional information concerning the process. The same situation applies to the other

9    witnesses. As a result, Sorensen's failure to depose even a single witness other than Lexar's

10   30(b)(6) witness cannot constitute a reasonable effort.

11          In the original Motion for Presumption, Sorensen argued that discovery would be

12   useless. Nevertheless, within the short span of time between the June 30, 2008 hearing and now,

13   Sorensen was provided with a great deal of information which helped Sorensen determine the

14   process used to make the housing. Undoubtedly, were Sorensen to pursue the additional avenues

15   of discovery listed above, it is likely that even more information regarding the process would be

16   uncovered. Accordingly, Sorensen's repeated argument that there is no point in further discovery

17   should be rejected.

18   **III.    SORENSEN CANNOT ESTABLISH A SUBSTANTIAL LIKELIHOOD OF**
             **INFRINGEMENT**
19

20          In his Supplemental Brief in Support of Plaintiff's Motion for Presumption

21   ("Supplemental Brief"), Sorensen repeats his argument that he has been able to show that a

22   substantial likelihood of infringement exists with respect to the process used by Lexar's suppliers

23   to manufacture the housing. But his argument regarding this issue is just as flawed now as it was

24   when he first made it in his opening brief.

25

26

---

27   Plaintiff's Motion for Presumption to point out that mechanisms exist to depose Chinese-
     nationals despite Chinese law. Furthermore, since many of the identified individuals live or work
28   in Taiwan, it is quite possible to depose them without running afoul of any Chinese laws.

1

2

**A.    Courts Have Consistently Required Claim Construction To Occur Prior To A Determination Under 35 U.S.C. § 295**

3    As previously explained in Lexar's Opposition, without a claim construction order,

4    it is not possible to determine whether a substantial likelihood exists that an accused process

5    infringes.  Sorensen does not dispute Lexar's argument in its Opposition that Sorensen's analysis

6    of whether the process used to make the housing infringes U.S. Patent No. 4,935,184 ("the '184

7    patent"), despite an opportunity to do so in his Reply to Lexar's Opposition.  Nor does Sorensen

8    point to a single instance where 35 U.S.C. § 295 was applied without the claims being construed.

9    In fact, *Kemin*, the very case Sorensen relies on for its belief that § 295 should be applied, heavily

10   relies on earlier claim construction rulings in determining whether a substantial likelihood of

11   infringement has occurred.  *Id.* at 10 n.13, 12 n.15.

12

13

**B.    Whether A Substantial Likelihood Of Infringement Exists Cannot Be Determined Without Construing The Claims**

14   The need for claim construction is made evident by Sorensen's arguments in his

15   Supplemental Brief.  Sorensen points to the additional discovery relied upon by the defendant and

16   claims that it shows that a "common mold part" was used.  But because the claims have yet to be

17   construed, his reliance on the unconstrued claim term "common mold part" is flawed.  As the

18   term has not been defined, the Plaintiff's expert, Dr. Petrie, relies on his own construction of that

19   term when analyzing infringement.  Since it is unclear at this stage whether his definition is

20   correct, any analysis based on that definition is unreliable.  Furthermore, Plaintiff's use of quotes

21   and emphasis whenever the term "common mold part" is used implies that it has a specific

22   meaning to one of skill in the art, thus making it likely that the term will need to be construed.[12]

23   Even if the specific term "common mold part" does not require construction, claim

24   construction would still be necessary to determine whether a substantial likelihood of

25   infringement exists.  Sorensen claims that "Lexar's only articulated defense to Plaintiff's

26

27   [12] Lexar does not argue at this point that "common mold part" requires construction.  Rather, it points out that because claim construction has not yet begun and Sorensen has yet to serve his preliminary infringement contentions, Lexar is unable to determine whether "common mold part"

28   should be construed.

1   allegation of patent infringement" is dependent on an argument that the process used to make the

2   housing does not use a 'common mold part.'" Supplemental Brief at 13. Despite Sorensen's

3   statement, Lexar has pointed out additional possible reasons why the process used to make the

4   housing does not infringe. *See, e.g.*, Opposition at 5 n.6 (pointing out that Plaintiff has failed to

5   identify structures in the housing that correspond to a "stabilizing region" or to a "first plastic

6   material"). But the larger point, which Plaintiff ignores in falsely asserting that Lexar's only

7   articulated defense is that a "common mold part" does not exist, is that because claim

8   construction has yet to take place, it is impossible to determine that a substantial likelihood of

9   infringement exists. At the appropriate point in this litigation, Lexar will present its arguments

10  that it does not infringe. But Plaintiff has not yet served his preliminary infringement

11  contentions. Nor have the claim terms been construed. Without such information, Lexar's

12  noninfringement analysis is incomplete, and it would be premature of Lexar to bring forth such

13  arguments. It is similarly premature to decide the Motion for Presumption.

14  **IV.    CONCLUSION**

15          Sorensen's papers mischaracterize Lexar's actions during discovery. Sorensen

16  cannot avoid its obligations to expend reasonable effort by pointing to imaginary slights by Lexar.

17  As Sorensen has failed to expend reasonable effort to discover the processes used to make the

18  housing and as he has failed to show that there is a substantial likelihood that the housing is made

19  using an infringing process, Lexar respectfully requests that Sorensen's motion be denied.

20  Dated:  September 8, 2008                    WEIL, GOTSHAL & MANGES LLP

21

22                                              BY: _____ */s/ Jared Bobrow*_____
                                                        JARED BOBROW
23                                                      jared.bobrow@weil.com

24                                                      Attorneys for Defendant,
                                                        LEXAR MEDIA, INC.
25

26

27

28